IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,      )
                                   )
                        Plaintiff, )
                                   )
v.                                 )          No.  08-1405-WEB
                                   )
L.D. DRILLING, INC.,               )
VAL ENERGY, INC., and              )
NASH OIL & GAS, INC.,              )
                                   )
                       Defendants. )
_____)

**Memorandum and Order**

This matter came before the court on May 1, 2009 for a hearing on Northern Natural Gas

Company's motion for preliminary injunction.  The motion seeks an order allowing Northern to

test four gas wells operated by defendant Nash Oil & Gas, Inc., to determine if Nash's wells are

producing Northern storage gas.  Northern's claim is based on K.S.A. § 55-1210, which grants

an injector of natural gas in Kansas the right to test wells that are on "adjoining property."  At

the hearing on May 1st, the court orally indicated it would grant the motion for preliminary

injunction.  This written memorandum will supplement the court's oral ruling.

As the court noted at the hearing, Northern's motion depends in part on a legal question:

whether Nash's wells can be considered on "adjoining property" where the certified boundary of

Northern's storage field does not touch or adjoin the sections containing Nash's wells, but where

Northern has obtained storage lease rights that extend from the certified boundary to the section

containing Nash's wells or an adjoining section.  The court informed the parties that in its view,

Nash's wells would qualify as "adjoining property" due to the storage leases.  In view of that

finding, and the court's conclusion that Northern's claim is not barred by res judicata, the parties agreed that the matter could be submitted to the court upon the filing of a short stipulation regarding the location of the respective wells and leases. Nash indicated it would then seek an appeal from the court's ruling, and it requested a stay of the preliminary injunction to permit an interlocutory appeal.

The parties' stipulation has now been filed, and the court is prepared to rule. For the reasons previously stated, and for the following reasons, Northern's motion for preliminary injunction is granted. Further, the court denies Nash's motion to stay the order of preliminary injunction pending appeal.

I. *Background*.

To say this case is not written on a clean slate is an understatement. Over the last decade or more, there have been numerous lawsuits and administrative proceedings involving the Cunningham storage field and the surrounding area. The following is a partial summary of this background.

Northern is a natural gas company engaged in the interstate transportation of natural gas within the meaning of the Natural Gas Act, 15 U.S.C. § 717a. As such, it is subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC). *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 295 (1988). With respect to its operations within Kansas, Northern is a natural gas public utility subject to regulations promulgated by the Kansas Corporation Commission (KCC). K.S.A. § 55-1201, et seq.

Northern owns and operates an underground natural gas storage facility in Pratt and Kingman counties, Kansas, known as the Cunningham Storage Field. The Cunningham field is

operated pursuant to a Certificate of Public Convenience and Necessity from the FERC and/or

the KCC.  A natural gas company generally must obtain such certificates before it can engage in

the construction, operation or extension of any facility for the transportation, storage or sale of

natural gas in commerce.  *See* 15 U.S.C. § 717f(c)(1)(A); *Schneidewind*, 485 U.S. at 302.  *See*

*also* Kan. Admin. Reg. 82-3-1002, et seq.

      The purpose of the federal Natural Gas Act is to protect the interests of the public by

fostering an adequate supply of natural gas at reasonable rates.  *See Schneidewind, supra*.

Similarly, Kansas law recognizes that the underground storage of natural gas permits the

building of reserves for orderly withdrawal in periods of peak demand, which promotes the

public interest and the welfare of the state.  K.S.A. § 55-1202.  State law provides a mechanism

by which the Kansas Corporation Commission may determine when the underground storage of

natural gas is in the public interest.  *Id*.  If the KCC certifies that the storage is in the public

interest, and the injector qualifies as a natural gas public utility, the injector may seek KCC

permission to exercise the power of eminent domain to acquire property to use for underground

storage.  *Id*.

      In 1977 and 1978, Northern obtained certificates from the KCC and from FERC's

predecessor to construct and operate the Cunningham field.  Initially, Northern was authorized to

store gas in the Viola formation underlying more than 20,000 acres of property.  *See Beck v.*

*Northern Natural Gas Co.*, 170 F.3d 1018, 1021 (10th Cir. 1999).  Several years after Northern

began storage operations, some of the storage gas migrated vertically to the Simpson formation,

located directly below the Viola formation.  In 1996, Northern's application was granted to

expand the certified boundaries of the Cunningham field to include the Simpson formation.  *See*

*id.*

Northern contends it initially believed the Cunningham Storage Field did not allow for significant migration of gas beyond the 1978-certificated boundaries because data suggested the Viola and Simpson formations were structurally raised and bounded by two faults running southwest to northeast.  Northern subsequently obtained additional data, however, which allegedly led it to believe gas was migrating beyond the field's northern boundary.  In November of 2002, Northern filed suit against Trans Pacific Oil Corporation in the U.S. District Court for the District of Kansas, claiming Trans Pacific was producing Northern storage gas from two wells (the "Park wells") located just outside the northern boundary of Northern's storage field. *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, No. 02-1418-JTM (U.S. Dist. Ct., D. Kan.).  In September 2004, Northern filed suit against defendant Nash Oil & Gas, Inc., also in this court, alleging that Nash was producing Northern storage gas from four wells: the Vernon #1, Holland #1-26, Young # 1-26, and J.C. #1.  These wells were located about four miles north of the 1978-certificated boundary.  *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, No. 04-1295-JTM (U.S. Dist. Ct., D. Kan.).  In January of 2005, Northern filed an application with the FERC/KCC for a certificate allowing it to control and recapture storage gas migrating from the Cunningham field by installing additional monitoring and withdrawal wells.

In May 2005, a jury in the Trans Pacific case (No. 02-1418-JTM) found that Northern storage gas had not migrated to the area of the two Park wells after July 1, 1993.[1]  The verdict

---

[1] This date reflects the effective date of K.S.A. § 55-1210, which abolished the "rule of capture" and created a new rule providing that gas injected into an underground natural gas field remains the property of the injector, even if it migrates out of the storage area into another area where the owner has a right to produce native gas.

4

led to a counterclaim judgment against Northern in excess of $4 million for damages to the defendants from having to shut-in the Park wells during the litigation.

Also in May of 2005, Judge Marten denied Northern's motion to test the four Nash wells at issue in Case No. 04-1295.  Judge Marten found Nash's wells were not on "adjoining property" within the meaning of K.S.A. § 55-1210, because the wells "do not touch a section containing the storage field nor are they adjacent or contiguous to the storage field."

In September 2005, FERC granted Northern's application to install two withdrawal wells near the northern boundary of the Cunningham field.  In doing so, FERC found that storage gas was migrating to the north of the field: "We find that Northern's geological, engineering and storage operational field data clearly show evidence of gas migration from the Cunningham Field and support the need for additional wells within the present certificated boundary to recapture this gas.  The construction and operation of the proposed facilities should enable Northern to control and recover storage gas, and assure the integrity of the storage field...."  *Northern Natural Gas Co.*, 112 FERC P 61291, 2005 WL 2242984, ¶ 22 (Sept. 15, 2005).

In March 2007, Judge Marten granted Nash's motion for summary judgment against Northern in Case No. 04-1295.  He found the Kansas statute of limitations barred Northern's claims for conversion and unjust enrichment because it was reasonably ascertainable to Northern at least by the year 2000 that Nash's wells were producing Northern storage gas, as shown by letters from Northern's counsel in that period.  *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, 506 F.Supp.2d 520, 526 (D. Kan. 2007).  He rejected Northern's reliance on a "continuing tort" theory because "plaintiff's injury was discoverable and nothing prevented the plaintiff from seeking redress as early as 1999 or 2000."  *Id*. at 527.  Alternatively, Judge Marten found

Northern's claims were barred by the doctrine of collateral estoppel.  He said Northern's claim that storage gas was migrating north to the Nash wells was merely "an extension of the theory presented in the TransPac case," and was thus the same issue that had already been determined adversely to Northern by the jury in the *Trans Pacific* case.

On March 16, 2007, Northern filed an application with FERC for a certificate of public convenience and necessity allowing it to expand the certificated boundary of the Cunningham Storage Field.  Northern proposed an extension area of approximately 4,800 acres to the north of the existing boundary, arguing that recent studies and data showed the northern fault had never been sealing, and that large volumes of storage gas were migrating to the north across a broad area.  Northern pointed out that it had obtained limited storage lease rights in the extension area, and that it would need to rely on eminent domain to obtain property rights to the entire extension area.  In July 2007, Judge Marten denied a motion by Trans Pacific to enjoin Northern from proceeding with the FERC application.

In September 2007, the Tenth Circuit affirmed the judgment in the *Trans Pacific* case. *See Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 248 Fed.Appx. 882, 2007 WL 2753079 (10th Cir. 2007).  Among other things, Northern argued on appeal that the district court judgment was based upon a flawed interpretation of K.S.A. § 55-1210, because the verdict form had required Northern to prove its gas had *migrated after* July 1, 1993, the effective date of K.S.A. § 55-1210.  Northern argued the date the gas had migrated was immaterial under the statute.  The circuit, without addressing the merits of that argument, found Northern had waived the issue by failing to object to the verdict form at the time of trial.  *Id*.

On May 19, 2008, the Tenth Circuit affirmed Judge Marten's ruling dismissing

Northern's claims against Nash.  *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626 (10th Cir. 2008).  The Tenth Circuit agreed that Northern's injury from Nash's alleged production was reasonably ascertainable by the year 2000, such that Northern's claims for conversion and unjust enrichment were barred by the statutes of limitation.  The court rejected Northern's argument for a "continuing tort" exception, finding that although Kansas had recognized a continuing tort theory on claims of nuisance, it had not done so on claims of conversion and unjust enrichment.  *Id.* at 631.  As for Northern's claim for declaratory or injunctive relief under K.S.A. § 55-1210, the circuit said the statute had merely abolished the "rule of capture" and did not create an independent cause of action.  Judge Henry dissented from the ruling, arguing that the continuing tort issue was not settled under Kansas law and should be certified to the Kansas Supreme Court.

On June 17, 2008, the Tenth Circuit affirmed Judge Marten's ruling that he had no jurisdiction to prevent Northern from seeking a FERC certificate to expand the boundary of the Cunningham field.  *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 529 F.3d 1248 (10th Cir. 2008).  In doing so, the Circuit stated that "the jury in this lawsuit did not decide that natural gas had *never* migrated north from Cunningham Field; its decision at most was only that natural gas had not migrated to the Park Leases *on or after* July 1, 1993, up to the date of trial."  *Id.* at 1251.  The court noted that the FERC proceeding allegedly involved a new 2007 migration study based in part on evidence collected after the jury's verdict.  The court further noted that the determination of whether a certificate of public convenience was warranted was different from the issue decided by the jury.  The court said any issue as to whether the FERC application should be precluded by the doctrine of collateral estoppel was for FERC to determine, not for the

7

district court.

On March 14, 2008, Northern filed suit against L.D Drilling, Inc., and subsequently added Val Energy, Inc. as a defendant, alleging that the defendants' wells north of the Cunningham field were producing storage gas and creating "pressure sinks" which caused storage gas to migrate toward their wells. *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, No. 08-1077 (U.S. Dist. Ct., D. Kan.). This action was voluntarily dismissed by Northern before either defendant answered.

On October 30, 2008, FERC issued a ruling on Northern's application to expand the certified boundary of the Cunningham field. *Northern Natural Gas Co.*, 125 FERC P 61127, 2008 WL 4760679 (Oct. 30, 2008). Northern had asserted that a new study in 2006-07, including data from its new recovery and monitoring wells north of the northern fault, showed that storage gas was migrating across a wide area to the north. It alleged that Trans Pacific's Park wells were producing storage gas. At the outset, FERC rejected an argument by Trans Pac that the application was barred by the prior *Trans Pac* litigation. "To the extent we can determine that storage gas has migrated beyond the borders of the reservoir," FERC stated, "it is irrelevant when such migration began or whether Northern is entitled under state law to damages for storage gas produced by Trans Pac." FERC proceeded to analyze several factors, including the available evidence concerning geology, gas migration systems, and gas composition from the Park wells (1 and 1A). FERC concluded that gas from these two wells was composed primarily (though not entirely) of storage gas. FERC also found that storage gas had migrated north to

Northern's observation wells (13-31 and 18-21) near the northern certified boundary.[2]  FERC

concluded Northern had shown that storage gas had migrated "into at least the southernmost part

of the proposed 4,800-acre extension area," but Northern had not presented geologic or

engineering data for the remainder of the area.  "Without additional engineering and geologic

information," FERC stated, "the Commission cannot appropriately define what may be the

expanded boundaries of the storage formation beyond the southernmost portion of the proposed

extension area."  ¶ 50.  FERC also noted that Northern had presented prior gas compositional

data from Nash Area wells which indicated these wells "could be producing storage gas," but

Northern had not definitively identified the reservoir from which those wells were producing.

FERC granted the application to extend the certified boundaries by approximately 1,760 acres,

but denied it with respect to the remainder of the proposed extension area.  The Commission

noted that Northern had not proposed to use any of the expansion area for the injection of storage

gas, and that FERC's order did not authorize any such activities.

On November 18, 2008, Northern filed suit against Trans Pacific and others, alleging that

Trans Pac's wells produced Northern storage gas after the date of the jury's verdict in the prior

litigation.  *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, No. 08-1365-WEB (U.S. Dist.

Ct., D. Kan.).  This action was subsequently settled, and was dismissed by stipulation of the

parties on February 19, 2009.

On December 19, 2008, Northern filed an action against L.D. Drilling and Val Energy.

---

[2] Well 13-31 is located at the northern 1978-certificated boundary in Section 13, Township 27 South, Range 11 West in Pratt County, Kansas.  Well 18-21 is located at the northern 1978-certificated boundary in Section 18, Township 27 South, Range 10 West in Kingman County, Kansas.  *Northern Natural Gas Co.*, 125 FERC P 61127, ¶47, 2008 WL 4760679 (Oct. 30, 2008).

*Northern Natural Gas Co. v. L.D. Drilling*, No. 08-1400-MLB (U.S. Dist. Ct., D. Kan.).  Four

days later, on December 23, 2008, Northern filed a separate action – the instant case – against

these same two defendants and adding defendant Nash Oil & Gas.  The complaint in the instant

case includes claims for Declaratory and Injunctive Relief, Conversion, Unjust Enrichment,

Nuisance, Tortious Interference with Business Relationship, and Civil Conspiracy.  The

complaint alleges the defendants have produced and are producing Northern storage gas, and that

they are creating "pressure sinks" that cause Northern's storage gas to migrate to their wells and

which interferes with Northern's storage operations.

The complaint alleges that defendant Nash owns or operates the following wells in Pratt

or Kingman Counties which have been permitted in or completed in the Viola and/or Simpson

formation:

        - Holland 2-26, permitted March 18, 2008;
        - CRC No. 2, permitted September 26, 2008;
        - Staab 1, completed May 22, 2007;
        - Trinkle 1, completed October 30, 2006;
        - CRC No. 1, permitted March 18, 2008; and
        - J.C. No. 1, completed April 18, 2003.

On April 14, 2009, FERC denied Northern's motion for rehearing of its order limiting the

proposed extension area.  *Northern Natural Gas Co.*, 127 FERC P 61038, 2009 WL 998921

(Apr. 14, 2009).  Essentially, Northern argued that the certified area would not be sufficient to

prevent migration of storage gas, in part because the limited area would prevent Northern from

fully implementing its containment plan.  In rejecting the motion, FERC noted that due to

Northern's recent settlement with Trans Pac, Northern had now acquired leases and could

conduct seismic testing on over 3,900 acres of the proposed extension area.  ¶20.  It further noted

that no third-party production would occur in the extension area.  ¶21.  It said that although

10

Northern's extended containment plan could be viable, Northern "has not conclusively

demonstrated that gas is migrating into that area."  ¶22.  Moreover:

> With the settlement, Northern does not need Commission
> authorization to complete step two of the containment plan, i.e.,
> the preparation of construction design documents for recycling and
> monitoring wells, flow lines, compression and related equipment.
> Northern may submit to the Commission, without prejudice, any
> additional applications once these construction plans are
> completed.  The Commission observes that this approach has the
> benefit of allowing Northern to move forward with its containment
> plan without the condemnation of surrounding landowner property
> interests, which has not been shown to be necessary at this time.

¶22.  Northern presented evidence concerning production rates from Nash area wells from 1985,

which it argued were indicative of storage gas.  FERC noted, however, that the Cunningham

storage field was apparently stable from 1984 to 1996, which it said was inconsistent with

Northern's argument.  It also noted that two other wells located in the presumed gas migration

pathway to the Nash wells had been shut-in in the 1980's, indicating no economically

recoverable volumes of gas were present at that time.  FERC found Northern "has not provided

sufficient record evidence to rebut this evidence, the most recent we have, that storage gas is not

migrating north of the expanded certificated boundary authorized in the October 30 order."  ¶29.

FERC rejected Northern's argument that the Commission had provided no rational basis

for the "arbitrary line" it drew in setting the boundary.  It said Northern had presented no

evidence that gas was migrating north of the boundary, and again noted that Northern could do

seismic testing on more than 80% of the proposed extension area, "which may provide it with

more convincing evidence..., in which case Northern may file another application to further

expand the certificated boundaries of its storage facility." ¶ 30.  FERC also noted that although

Northern had now acquired contract rights to much of the extended area, its proposal still relied

11

to some extent on eminent domain, and it said Northern had not shown a compelling need for eminent domain in the absence of evidence of migration into that area.  "If Northern collects additional data showing more conclusively the migration of storage gas outside the expansion area granted by the October 30 Order, the Commission will reevaluate the boundary expansion request."  On the present record, however, FERC said Northern's data did not justify the expansion.

FERC discussed at some length evidence of gas samples previously taken from Nash area wells.  Northern argued that the relatively low helium content and the "C1/C2 ratio" (the ratio of methane to heavier hydrocarbons) in those samples made them "virtually indistinguishable" from Northern's storage gas.  In response, FERC noted several factors that it found to be inconsistent with Northern's assertion, including a relatively stable helium concentration in the Nash area wells (as opposed to a declining ratio over time as would be expected if storage gas were replacing native gas), the absence of an increase in the C1/C2 ratio over time (as opposed to an increasing ratio as would be expected if storage gas were replacing native gas), the absence of evidence of storage gas in the expected migration pathway to the Nash wells in 1984 – at around the same time two Nash wells were producing 1.1MMcf per day of natural gas, and the fact that the Cunningham field was stable from 1984-1996.  Based on the evidence before it, FERC found that "gas from the Nash area in the mid-1980's, while similar in composition to storage gas, does not definitively contain storage gas and may contain only native gas."  Similarly, FERC found Northern's evidence concerning the geology in the extension area to be incomplete, and again pointed out that Northern now had the means to perform seismic tests on the area and could submit an additional application if it obtained such evidence.  In sum, Northern's request for

certification of the additional 3,040 acres was "premature" and was denied.

There is no factual dispute between the parties as to the location and boundaries of the pre-2008 certificated storage field, the 2008 extended certificated storage boundaries, the Northern storage rights area, and the four Nash wells that are the subject of the motion for preliminary injunction. *See* Doc. 59.

II. *Motion for Preliminary Injunction*.

a. *Authority*. Section 55-1210 provides in pertinent part:

> 55-1210. Property rights to injected natural gas established
>
> (a) All natural gas which has previously been reduced to possession, and which is subsequently injected into underground storage fields, sands, reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise, shall at all times be the property of the injector, such injector's heirs, successors or assigns, whether owned by the injector or stored under contract.
>
> (b) In no event shall such gas be subject to the right of the owner of the surface of such lands or of any mineral interest therein, under which such gas storage fields, sands, reservoirs and facilities lie, or of any person, other than the injector, such injector's heirs, successors and assigns, to produce, take, reduce to possession, either by means of the law of capture or otherwise, waste, or otherwise interfere with or exercise any control over such gas. Nothing in this subsection shall be deemed to affect the right of the owner of the surface of such lands or of any mineral interest therein to drill or bore through the underground storage fields, sands, reservoirs and facilities in such a manner as will protect such fields, sand, reservoirs and facilities against pollution and the escape of the natural gas being stored.
>
> *(c) With regard to natural gas that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased:*
>
> (1) The injector, such injector's heirs, successors and assigns shall not lose title to or possession of such gas if such injector, such

injector's heirs, successors or assigns can prove by a
preponderance of the evidence that such gas was originally
injected into the underground storage.

*(2) The injector, such injector's heirs, successors and assigns,
shall have the right to conduct such tests on any existing wells on
adjoining property, at such injector's sole risk and expense
including, but not limited to, the value of any lost production of
other than the injector's gas, as may be reasonable to determine
ownership of such gas.*

(3) The owner of the stratum and the owner of the surface shall be
entitled to such compensation, including compensation for use of
or damage to the surface or substratum, as is provided by law, and
shall be entitled to recovery of all costs and expenses, including
reasonable attorney fees, if litigation is necessary to enforce any
rights under this subsection (c) and the injector does not prevail.

(d) The injector, such injector's heirs, successors and assigns shall
have the right to compel compliance with this section by injunction
or other appropriate relief by application to a court of competent
jurisdiction.

(Emphasis added). The Kansas Supreme Court affirmed the constitutionality of subsection (c)(2)

in *Williams Natural Gas Co. v. Supra Energy*, 261 Kan. 624, 931 P.2d 7 (1997). In so doing, the

court rejected an argument that the term "adjoining" was impermissibly vague. The court said

"adjoining land" for purposes of the statute "has it usual and ordinary meaning, that of being

contiguous or touching, such that adjoining means any section adjacent to the boundaries of an

underground storage field." *Williams*, 261 Kan. at 624 (Syl. ¶4). Thus, "any section of land

which touched a section containing a storage field was adjoining." *Id*. at 630.

b. *Summary of Arguments*. Northern argues that K.S.A. § 55-1210(c)(2) grants a right

"to test wells on lands adjoining areas where the injector has acquired storage rights, by eminent

domain or otherwise, to determine ownership of the gas being produced on the adjoining

14

properties."  Doc. 26 at 2.  Northern argues that its "Storage Rights Area" –  by which it means

the area in which it has acquired storage rights leases but which has not been certified by FERC

or KCC for use as part of the Cunningham field – adjoins the sections containing Nash's wells.

It argues that the purpose of the Kansas Storage Act is to protect all storage rights, regardless of

how the rights were acquired, and that nothing in the testing provision limits its application only

to certificated storage fields.  Northern argues that the *Williams* case did not state otherwise, and

that the language in that opinion referring to the boundary of a storage "field" should not be

taken as an exclusion of non-certificated storage areas, because the *Williams* court was simply

addressing the issue before it, which happened to involve a certificated storage field.  On the

contrary, it argues, *Williams'* implication that an "injector" may include someone who injects

gas into a non-approved storage site indicates that whether or not the storage area is certified is

immaterial.

   Northern argues it will suffer irreparable injury if an injunction is not granted because it

needs the test results to determine whose gas is being produced, whether condemnation would be

appropriate, and whether the integrity of the storage area is being maintained.  Doc. 26 at 7-9.  It

also alleges that defendant Nash may be financially unable to compensate Northern if Northern

were to prevail.  It argues that Nash will not be injured by an injunction and that the public

interest favors an injunction.

   In response, Nash's argues that the four wells in question are not on "adjoining property"

within the meaning of the statute because they are not in a section adjacent to or touching a

section containing a "storage field."  Doc. 32 at 5.  It argues that Northern is attempting to

obscure the meaning of "adjoining property" by referring to its "Storage Rights Area" rather than

to the boundaries of the storage field.  Nash notes that the *Williams* court used the latter term, and that *Williams* relied upon the certified storage field boundary in that case as the decisive reference point.  It argues that Northern is only entitled to conduct tests (if at all) on wells located on property adjacent to the certificated storage field.  Since none of the four wells at issue qualifies under that test, Nash argues the motion for an injunction should be denied.

Even if the statute could apply, Nash argues the "clean hands" doctrine should preclude an injunction because Northern has engaged in inequitable conduct and undue delay.  It points out that in the 2004 litigation, Northern's claims against Nash were barred by the statute of limitations because Northern's injury was "reasonably ascertainable" by the year 2000.  Nash argues that the previous finding that Northern waited too long to assert its claims should likewise bar its current claim for injunctive relief.  Additionally, Nash argues that Northern has not reported any suspected leak to the KCC, although it is required to do so, and says Northern has made "duplicitous" statements in administrative and court proceedings concerning the extent of any gas migration.  Nash also argues it will suffer harm in the form of ongoing litigations costs, including having to respond to extensive discovery requests from Northern.  It argues that Northern is attempting to avoid the effects of the previous judgment in Nash's favor, and that Northern is repeating its erroneous attempt to use the statute to acquire "sensitive information" regarding Nash's wells "in an attempt to place Nash's business in danger again."  Doc. 32 at 13. It argues that Northern cannot meet the requirements for an injunction and that the motion should be denied.

III. *Findings of Fact and Conclusions of Law*.

The material facts relating to the request for injunction appear to be undisputed.  The

16

sections of land containing the certified boundaries of Northern's Cunningham storage field do

not currently touch or adjoin the sections of land containing the four Nash wells that Northern

seeks to test.  *See* Doc. 59, Exh. 1.  Northern has obtained extensive storage lease rights in the

"in-between" sections, however, such that Northern now has a contractual right – but not legal

approval – to store gas in an area which extends from the certified boundary to sections

containing Nash's wells or to sections adjoining those sections.

As shown by the map, Northern has not obtained storage lease rights to all of the "in-

between" area.  It has obtained a substantial portion, however, including all of Sections 11 and

12, the Southern Half of Section 2, and approximately half of the Southern Half of Section 1, all

in Township 27 South, Range 11 West, Pratt County, Kansas; as well as the Southwest Quarter

of Section 6 and the Northwest Quarter of Section 7, Township 27 South, Range 10 West,

Kingman County, Kansas.

Two of the Nash wells at issue – the CRC #1 and CRC #2 - are located within a half a

mile of the closest area of where Northern has storage lease rights.  The other two wells appear

to be within a mile of where Northern has storage leases.  All four of the wells are over a mile

away from the nearest spot of the certificated boundary of the Cunningham field.  Two of the

wells are approximately two miles away (or slightly more) from the nearest portion of the

certificated boundary.

Section 55-1210 limits the testing of wells to those that are on "adjoining property."  But

it does not expressly define what the well property must adjoin.  The obvious purpose of Section

55-1210 was to change the "rule of capture" and to protect an injector's title to any natural gas

that was reduced to possession and was "injected into underground storage fields, sands,

reservoirs and facilities, whether such storage rights were acquired by eminent domain or otherwise...." K.S.A. § 55-1210(a). Nothing in this subsection expressly limits its application only to areas that are approved or certified as storage fields. And the protection of all gas injected into underground storage "fields, sands, reservoirs and facilities," regardless of how those storage rights were acquired, was clearly designed to protect title to all injected gas. Subsection (c) deals with injected gas "that has migrated to adjoining property or to a stratum, or portion thereof, which has not been condemned as allowed by law or otherwise purchased." Like subsection (a), nothing in this provision limits its application to an injector's *certified* or approved storage field. Moreover, the latter provision suggests that a well would be considered on adjoining property if it were next to "gas storage fields, sands, reservoirs or facilities" that an injector of natural gas *has* "otherwise purchased" – i.e., which the injector has leased.

The absence of any language requiring that the injector's storage area be certified is significant in view of Kansas Supreme Court cases decided just a few years before the adoption of the statute. In *Anderson v. Beech Aircraft Corp.*, 237 Kan. 336, 699 P.2d 1023 (1985), Beech Aircraft injected natural gas into an underground storage reservoir for future use in Beech's plant. The underground reservoir was common to both Beech's property and the adjoining property. Beech had no contractual right to use the adjoining property. After a leaseholder on the adjoining property began to produce storage gas from the reservoir, a dispute developed over title to the gas. In addressing this claim, the Supreme Court observed that Beech was not a "natural gas public utility" within the meaning of K.S.A. § 55-1201; such a designation applied only to entities in the business of transporting or distributing natural gas. Kansas law provided that only a natural gas public utility could exercise the right to eminent domain to obtain

18

property for underground gas storage, and could do so only after obtaining a certificate from the

Kansas Corporation Commission that the property was appropriate for storage and the storage

was in the public interest.  K.S.A. § 55-1204.  The Supreme Court held that under these

circumstances, the "rule of capture" applied, meaning Beech lost title to the gas after injecting it

into the reservoir: "[W]here a natural gas public utility was not involved, where no certificate

authorizing an underground storage facility had been issued by the Kansas Corporation

Commission, and where the defendant had used the property of an adjoining landowner for gas

storage without authorization or consent, the defendant, as the owner of non-native natural gas,

lost title thereto when it injected non-native gas into the underground area and the gas was then

produced from the common reservoir located under the adjacent property."  *Anderson*, 237 Kan.

at 348.  Notably, the Supreme Court invited the legislature to change this rule if it thought the

outcome was improper: "In the event the legislature should determine that it would be in the best

interests of the people of Kansas to adopt different legal principles to regulate the storage of

natural gas, that is a matter for future legislative action."  *Id*.

In *Union Gas System, Inc. v. Carnahan*, 245 Kan. 80, 774 P.2d 962 (1989), the Court

again addressed title to injected storage gas.  In that case, the plaintiff Union Gas had acquired

storage gas leases and began injecting gas into the "Squirrel" sandstone formation in

Montgomery County in 1952.  In 1985, not long after the *Anderson* decision, a well was drilled

by the defendant on a lease near Union's storage field.  After Union was denied a temporary

injunction to halt the defendant's production, it decided to exercise its right as a natural gas

public utility to condemn the property.  It sought a certificate from the KCC pursuant to K.S.A. §

55-1204, which was granted on January 13, 1986.  The Supreme Court subsequently determined

that Union was not entitled to recover for any storage gas that was produced by the defendant before the KCC certified the field.  The Court said Union could have obtained the certificate back in 1952 when it began injection, and by its failure to do so it had "placed itself under the rule of *Anderson*."  As a result, any gas produced by the defendant before the KCC certificate was issued was subject to the rule of capture.  But after the KCC authorized Union to store gas, Union "acquired a changed status.  Its operation was given official sanction and its gas was identified.  Thereafter it became an exception to the rule of capture expressed in *Anderson*."  *Id.*, 245 Kan. at 88.  Once the storage operation became certified, "the gas was no longer *ferae naturae* and subject to the rule of capture.  The title to Union's gas remained in Union."  *Id.*  In sum, then, under *Union Gas* and *Anderson,* certification of the storage field by the KCC was critical to determining whether an injector retained title to injected storage gas.

In 1993, the Kansas legislature took the Supreme Court up on its invitation to change the rules through its adoption of K.S.A. § 55-1210.  Viewed against this background, it is highly significant that the statute contains no language limiting its application to natural gas public utilities or to KCC-certified storage areas.  To infer such requirements in the absence of express language would be to re-write the statute.  *Anderson* and *Union Gas* previously held that only a natural gas public utility with an approved site could retain title to storage gas.  Section 55-1210, by contrast, says simply that all injected gas shall at all times be the property of the injector.  By its terms, the statute applies to any injector of natural gas, not merely to public utilities whose storage area has been certified by the KCC.  Moreover, the statute applies to "storage rights obtained by eminent domain *or otherwise*," which would include storage leases such as those held by Northern.  These points are buttressed by *Williams,* where the appellant complained that

the term "injector" in the statute could be construed to mean "anyone who injects gas, regardless of whether they are a natural gas storage company or have an approved storage site." *Williams*, 261 Kan. at 630. Notably, the Supreme Court did not respond by saying that the statute applied only to approved or certified storage fields. Rather, it said there was nothing unconstitutional about permitting anyone to be considered an injector because the statute does not give injectors a right to condemn property and because the testing provisions do not constitute a taking of property. *Id.* This reinforces the view that the testing provision is not limited to wells that adjoin *approved or certified* underground storage areas.[3] It also leads to the conclusion that the Supreme Court did not intend to limit the statute's application only to certified storage areas when it defined "adjoining land" as a section adjacent to "the boundaries of a storage field." *Williams*, 261 Kan. at 624 (Syl. ¶4).

In sum, the court finds that Northern's storage lease area, despite the absence of KCC approval, can qualify as part of its "underground storage fields, sands, reservoirs and facilities" that gives rise to a right to test adjoining wells. The court is not persuaded by Nash's suggestion that this interpretation could allow an injector to acquire a storage lease next to a remote well, "call this storage lease part of the Cunningham facility," and require that testing be performed on the well. Doc. 32 at 6. A court retains discretion to consider equitable factors when an injunction is sought, and a prerequisite to any injunction is a finding that the injunction is not adverse to the public interest. This is sufficient to preclude spurious attempts by an injector to

_____

[3] The court notes that by Kansas administrative regulation, no "underground porosity gas storage facility" in operation before July 1, 2002, could continue in operation thereafter without a permit from the KCC. *See* Kan. Admin. Reg. § 82-3-1002. In the court's view, regulations such as this adopted after the enactment of K.S.A. § 55-1210, do not affect the scope of the statute and do warrant a denial of the testing rights provided by the legislature.

21

claim unconnected areas as part of its underground storage facility.  Those considerations are
clearly not in play here.  Northern has obtained a substantial storage lease acreage that is
contiguous with a storage field it has operated for thirty years.  The leases include the same
underground formations that are used in the certified area of the Cunningham field.  FERC has
already determined that storage gas has migrated to the north of the previously (1978)
established boundary, beyond an underground structure that was originally expected to serve as a
barrier to gas migration.  The migration is in the general direction of Nash's wells.  Obviously,
the question of whether Nash's wells are producing storage gas is disputed, and the court
expresses no opinion on that issue.  There could be any number of reasons – including those
identified by FERC – that weigh against such a conclusion.  But the point is that the potential
migration of gas from Northern's leased storage area to Nash's wells is not a spurious claim
involving some remote, unrelated storage lease.  The court concludes that Northern's storage
rights area is properly considered a part of its underground storage "fields, sands, reservoirs and
facilities," despite the fact it has not been approved for use by FERC or the KCC.  This is true,
moreover, despite the fact Northern has not – and indeed is prohibited – from injecting gas into
the leased area.  Nothing in K.S.A. § 55-1210 limits its application to only to those specific
sections of land into which gas is actually injected.  It is obvious that underground storage may
include areas that are designed to contain the injected gas.  Excluding such areas from the
protection of the statute would contravene the letter and the spirit of the law.  The record amply
shows that the leased area may properly be considered as part of a containment area associated
with Northern's storage field.

　　　　To prevail on a motion for a preliminary injunction, the movant must establish that four

equitable factors weigh in its favor: (1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC,* 562 F.3d 1067, 1070 (10th Cir. 2009). "Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Id.* (*quoting Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)). The injunction sought by Northern would alter the status quo between the parties, and is thus considered a disfavored injunction, requiring the movant to make a heightened showing with respect to the foregoing factors.

There is no question that Northern is an injector within the meaning of K.S.A. § 55-1210, and the court finds that the testing right in subsection (c) applies to storage areas acquired by contract, and to KCC-certified storage areas alike. Under the undisputed facts before the court, Northern's "storage rights area" is acreage associated with Northern's "underground storage fields, sands, reservoirs and facilities," and it qualifies as a storage field adjacent to or touching the sections containing the four Nash wells at issue. The Kansas statute gives an injector a right to test such wells at the injector's sole risk and expense. The fact that Northern may have no specific evidence of migration to Nash's wells does not defeat its claim, since the testing provision is obviously designed to determine if storage gas has in fact migrated to wells located next to storage areas. The court concludes that Northern has met its burden of showing that it is substantially likely to prevail on the merits of this claim.

In so finding, the court has considered but rejected Nash's arguments concerning *res judicata* and/or collateral estoppel. In the 2004 litigation, Judge Marten held that Northern could

not test other Nash wells because its storage field did not adjoin those wells.  Nash does not

contend that Northern held the storage lease area at that time or that Northern did (or could have)

litigated the issue of whether the storage rights area constituted adjoining property.  Because the

issue presented here is materially different and Northern did not have a full and fair opportunity

to litigate the issue in the prior proceeding, the judgment in that case has no preclusive effect on

Northern's current claim for testing.[4]  (In view of this finding, the court need not determine

whether a claim for testing is a "one-time" claim, or whether the statute would permit repeated

tests by an injector.).

　　　　For similar reasons, Nash's arguments concerning unclean hands or undue delay are

unpersuasive.  Nash has not alleged or shown any undue delay that would preclude Northern's

statutory right to test adjacent wells.  Northern made an attempt to test different Nash wells in

the 2004 litigation, but that attempt was appropriately rebuffed on the grounds that the wells

were not adjacent to Northern's storage area.  Northern has now acquired the adjacent property,

and the court finds no undue delay in its presentation of the current claim for testing.  Nor does

the court see any allegation in Nash's "unclean hands" arguments that would justify a denial of

the right to test the wells.  Nash says that despite Northern's claim of migration, it has not

reported any possible leak to the KCC, as it is required to do.  Even assuming there was a

reporting failure, it would not justify a denial of testing.  The KCC undoubtedly has access to

FERC's rulings concerning the Cunningham field and is on notice of Northern's current claims

of gas migration.

---

[4] The court expresses no opinion on the applicability of *res judicata* or collateral estoppel
to any of the other claims in this action.  The above discussion pertains only to Northern's claim
to test wells pursuant to K.S.A. § 55-1210(c)(2).

The court finds that Northern would suffer irreparable injury if the injunction were denied, because Northern would be deprived of evidence critical to determining if gas migration is occurring.  *Cf. Williams*, 261 Kan. at 632.   Northern may also suffer the loss of an opportunity to take appropriate remedial action without the benefit of an injunction.  As the *Williams* court noted, "[i]njectors need the information provided by testing in order to prevent further gas migration or to determine if it is necessary to condemn surrounding property."  *Williams*, 261 Kan. at 630.  The court further finds that the threatened injury to Northern outweighs any harm to defendant Nash from issuing the injunction.  As noted above, the statute requires the injector to pay all costs associated with the tests, including the value of any lost native gas production.  Nash will thus be protected against any financial loss resulting from the tests.  Nash implies that it will incur harm in the form of having to respond to oppressive discovery requests.  Doc. 32 at 12-13.  In that regard, the court will grant defendant Nash's motion to stay discovery in this proceeding, at least until the tests are completed and the parties have had an opportunity to assess the results.  Northern has provided the court and Nash with a summary of the proposed tests and the manner in which they would be conducted.  The court finds the proposed tests are reasonable for determining the ownership of the gas.  The court gathers from Nash's response at the preliminary injunction hearing, including its proffer that some of the tests could be conducted using Nash's equipment, that it has no objection to the specific *manner* of the proposed tests (although it objects to allowing the tests at all).  The court thus does not anticipate any disagreements concerning the manner of performing the tests, but if a dispute should arise, the parties may present the issue to the court for prompt resolution.  Lastly, the court concludes that the injunction will not be adverse to the public interest.  On the contrary, the injunction is

consistent with the public interest in maintaining the integrity of underground gas storage fields.

Defendant Nash has asked the court to stay the entry of the preliminary injunction to allow it to pursue an appeal.  Rule 62 of the Federal Rules of Civil Procedure provides in part that while an appeal is pending from an order of injunction, the court may suspend or modify the injunction upon terms that secure the opposing party's rights.  To obtain a stay, the movant is generally required to show the following:  "(1) its strong position on the merits of the appeal; (2) irreparable injury if the stay was denied; (3) that a stay would not substantially harm other parties to the litigation; and (4) that the public interests favor a stay."  *Securities Investor Protection Corp. v. Blinder, Robinson & Co., Inc.*, 962 F.2d 960, 968 (10th Cir.1992).  The court has considered these factors, but concludes that the interests do not weigh in favor of a stay.  Nash has not identified any irreparable injury likely to result from denial of a stay.  And for reasons previously stated, the court finds Northern is likely to prevail on the merits and that the public interest favors the prompt performance of the tests.

IV.  *Conclusion*.

Plaintiff Northern Natural Gas Company's Motion for Preliminary Injunction (Doc. 25) is GRANTED.  The court determines that Northern has a right pursuant to K.S.A. § 55-1210(c)(2) to conduct well tests upon the following wells operated by defendant Nash Oil & Gas Company: CRC #1, CRC #2, Trinkle #1, and Staab #1, to determine ownership of the gas produced by these wells.  The tests shall be limited to those identified by Randal M. Brush, P.E., in his outline dated April 23, 2009, which was provided to defendant Nash, or such other tests as may be agreed upon by the parties.  The tests may include the installation of any necessary equipment to determine gas production volumes, producing pressures, water production

volumes, and wellbore liquid levels.  Defendant Nash Oil & Gas, Inc., and its officers and agents are ordered to allow Northern and its agents such access as is reasonably necessary to perform such tests, and are directed not to interfere or obstruct Northern and its agents in conducting such well tests.  The court directs both parties to confer with each other in good faith concerning the manner of conducting such tests.

Defendant Nash's Motion to Stay Discovery (Doc. 20) is GRANTED.  Nash's oral motion to stay the injunction is DENIED.

IT IS SO ORDERED this __12th__ Day of May, 2009, at Wichita, Ks.

s/Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge