IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,      )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )        No.  08-1405-WEB
                                   )
L.D. DRILLING, INC.,               )
VAL ENERGY, INC., and              )
NASH OIL & GAS, INC.,              )
                                   )
                    Defendants.    )
_____)

**<u>Memorandum and Order</u>**

This matter is before the court on the following motions: Defendant Nash Oil & Gas,

Inc.'s Motions to Dismiss (Docs. 15, 33); Defendant L.D. Drilling, Inc.'s Motion to Dismiss

(Doc. 21); Val Energy, Inc.'s Motion to Dismiss (Doc. 34), Plaintiff Northern Natural Gas

Company's Motion to Dismiss Counterclaims (Doc. 108) ; and Plaintiff Northern's Motion to

Consolidate (Doc. 30).

Northern claims in this action that the defendants are producing storage gas that has

migrated from the Cunningham Storage Field operated by Northern.  The defendants deny the

allegations, and seek dismissal, arguing among other things that Northern's claims are barred by

res judicata.

I. *<u>Background & Summary of Complaint</u>*.

Plaintiff Northern Natural Gas Company ("Northern") owns and operates an underground

gas storage facility in Pratt and Kingman Counties, Kansas, known as the Cunningham Storage

Field.  Doc. 1, ¶1.  The facility is operated pursuant to Certificates of Public Convenience and

Necessity issued by the Federal Energy Regulatory Commission (FERC) and/or the Kansas Corporation Commission (KCC). ¶2. The above-named defendants are owners and/or operators of wells producing natural gas in the general vicinity of the Cunningham Storage Field.

After depletion of native natural gas in the Cunningham Field, Northern obtained storage leases and certification for gas storage operations in the Viola formation of the Cunningham Storage Field in 1977-78. ¶14. Following certification, Northern injected storage gas and re-pressurized the Cunningham Storage Field to facilitate the storage of natural gas. Northern has operated the field for approximately 30 years.

In 1996, the KCC and FERC expanded the certificated boundaries of the Cunningham Storage Field to include the Simpson formation, based upon evidence of pressure communication between the Viola and Simpson formations. ¶15.

According to Northern, early data led it to believe the field did not allow for significant migration of gas beyond the 1978-certificated boundaries because the Viola and Simpson formations were structurally raised and bounded by two faults running southwest to northeast. ¶16. In 2002, however, data led Northern to believe that its storage gas was migrating beyond the northern boundary of the field and traveling northwesterly through a narrow geological channel, to wells owned by Trans Pacific Oil Corporation. Northern concluded Trans Pacific was producing migrated storage gas from two wells (the "Park Wells") located just outside the 1978-boundary. ¶17. On November 19, 2002, Northern sued Trans Pacific in U.S. District Court for the District of Kansas, claiming Trans Pacific was producing Northern storage gas from the Park Wells. *See Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, No. 02-1418-

JTM (U.S. Dist. Ct., D. Kan).[1]  A reservoir model completed in 2003 led Northern to believe that storage gas was possibly migrating further northward beyond the Park Wells to wells owned and operated by defendant Nash.  ¶18.

On September 3, 2004, Northern filed suit against Nash in U.S. District Court for the District of Kansas, claiming Nash was producing Northern storage gas from four wells: Vernon #1, Holland #1-26, Young #1-26, and J.C. #1.  ¶20.  *See Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*, No. 04-1295-JTM (U.S. Dist. Ct., D. Kan.).  In May of 2005, in *Northern v. Nash*, No. 04-1295, Judge Marten denied Northern's motion pursuant to K.S.A. § 55-1210 to test the Nash area wells at issue in that case, finding the wells were not on "adjoining property" within the meaning of the statute.

On May 31, 2005, a jury in *Northern v. Trans Pacific*, No. 02-1418, found in a special verdict that Northern's storage gas did not migrate to the area of the Park Wells on or after July 1, 1993.[2]  The jury further awarded Trans Pacific and three other defendants damages totaling approximately $4 million for lost production from having shut-in their wells during the litigation.

---

[1] Northern asserted claims for relief under various theories, including K.S.A. § 55-1210, conversion, and unjust enrichment.  A claim for trespass was abandoned. *See* Pretrial Order in No. 02-1418-JTM, Doc. 57 at 3.

[2] This date reflects the effective date of K.S.A. § 55-1210, which declared that gas injected into an underground storage natural gas field remains the property of the injector even if it migrates out of the storage area.

In ruling on a certified question related to the *Trans Pacific* litigation, the Kansas Supreme Court recently indicated that K.S.A. § 55-1210 only operated prospectively, and that the verdict form used by Judge Marten thus reflected a correct view of Kansas law.  In *Northern Natural Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer, LLP*, 2009 WL 3234155 (Oct. 9, 2009), the Supreme Court stated that an injector of natural gas lost title to storage gas that migrated from its storage area to an adjoining property prior to July 1, 1993, the effective date of the statute.

Judge Marten entered judgment accordingly on June 1, 2005.

On September 15, 2005, FERC found that Northern had shown that gas was migrating beyond the boundaries of the Cunningham Storage Field. ¶23. Based on authorization from FERC, Northern installed two additional withdrawal wells near the northern border of the field in 2005 and 2006. ¶24. Northern also installed two monitoring wells. The withdrawal wells captured large amounts of Northern storage gas, but other data indicated the wells were unable to control all of the migration and that storage gas was located along a wide area of the northern certificated boundary. ¶25.

Northern alleges that the 2005 withdrawal and monitoring wells presented the first actual evidence that Northern storage gas was not migrating north through a narrow channel, as Northern's experts originally believed during the *Trans Pacific* litigation. The new evidence allegedly showed that storage gas was breaching a broad, two-mile wide "structural low" and migrating across the northern boundary of the Cunningham Storage Field. ¶26. Northern began an extensive study that included the new data, which was completed in 2007. This study and accompany reservoir simulation model allegedly showed:

> (1) the northern fault of the Cunningham Storage Field is non-sealing; (2) by removing water and fluids, wells drilled north of the storage area including, *inter alia*, Defendants' wells, have caused and will continue to cause, the pressure in the area of the wells to drop and, thus, create a pressure sink drawing Northern's storage gas to the area of those wells; (3) Northern's storage gas has migrated, and continues to migrate, across a 2-mile wide area through the "structural low" to the north, and the volume of storage gas migration is increased by the substantial pressure sinks created by Defendants' actions north of the Cunningham Storage Field; (4) the original belief that gas was only migrating through a narrow channel to the Trans Pacific wells and then beyond to the north toward the Nash area wells was incorrect; (5) the Trans Pacific geologic structure was shown to be located on the western

4

> edge of the storage gas migration pathway; and (6) recent well
> production from the Nash area wells demonstrates that
> approximately 75% of the migrating storage gas from the
> Cunningham Field is reaching the Nash area wells by flowing past
> the Trans Pacific wells area along a 2-mile wide geologic corridor,
> rather than through what was believed at the time of the Trans
> Pacific litigation to be a narrow channel through the Trans Pacific
> wells.

¶28.

On March 27, 2007, in *Northern v. Nash*, No. 04-1295, Judge Marten granted summary

judgment in favor of Nash on Northern's common law claims of conversion and unjust

enrichment, based on the statute of limitations or, in the alternative, the collateral estoppel effect

of the jury's answers to special interrogatories in the *Trans Pacific* litigation.

In September of 2007, the Tenth Circuit affirmed the district court judgment in the *Trans

Pacific* case. *See Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 248 Fed.Appx. 882, 2007

WL 2753079 (10th Cir. 2007).

On March 14, 2008, Northern filed suit against L.D. Drilling, Inc., and subsequently

added Val Energy, Inc., alleging that these defendants' wells north of the Cunningham Storage

Field were producing storage gas and creating pressure sinks which caused storage gas to

migrate toward their wells. *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, No. 08-1077-MLB

(U.S. Dist. Ct., D. Kan.). The action was voluntarily dismissed by Northern before either

defendant answered.

On May 19, 2008, the Tenth Circuit affirmed Judge Marten's entry of summary judgment

dismissing Northern's claim against Nash. *Northern Natural Gas Co. v. Nash Oil & Gas, Inc.*,

526 F.3d 626 (10th Cir. 2008). The circuit agreed with Judge Marten's ruling that Northern's

claims for conversion and unjust enrichment were barred by the two and three-year Kansas

statutes of limitations, because it was reasonably ascertainable to Northern by the year 2000 that Nash's wells were producing Northern storage gas. The court rejected Northern's argument that it had stated a "continuing tort" that would allow it to recover damages for the two or three year period preceding the filing of the complaint. Two members of the panel predicted the Kansas Supreme Court would not recognize a continuing tort on claims of conversion and unjust enrichment, while a dissenting panel member would have certified that issue to the Kansas Supreme Court. The panel also found that K.S.A. § 55-1210 did not entitle Northern to injunctive relief because that section did not create an independent statutory cause of action. In view of these findings, the circuit found it unnecessary to address Judge Marten's alternative holding that the claims were barred by collateral estoppel.

On June 17, 2008, the Tenth Circuit affirmed Judge Marten's ruling in *Northern v. Trans Pacific* that the district court had no jurisdiction to prevent Northern from asking FERC to expand the boundary of the Cunningham Storage Field. In so ruling, the circuit stated that "the jury in this lawsuit did not decide that natural gas had *never* migrated north from Cunningham Field; its decision at most was only that natural gas had not migrated to the Park Leases *on or after* July 1, 1993, up to the date of trial." *Northern Natural Gas Co. v. Trans Pacific Oil Corp.*, 529 F.3d 1248, 1251 (10th Cir. 2008).

Northern alleges that defendants L.D. Drilling, Val Energy, and Nash have exercised control over, produced, sold, and benefitted from the sale of migrated storage gas to which Northern holds lawful title. ¶32.

Based on the results of Northern's 2006-07 study, Northern applied to FERC for a 4,800 acre expansion of the certificated boundaries of the Cunningham Storage Field. On October 30,

2008, FERC partially granted the application, authorizing Northern to expand the boundary by approximately 1,760 acres. ¶30. The Commission's order found, among other things, that storage gas had migrated at least to the Park Wells immediately north of the certificated boundary and that the gas production from the Park Wells consists primarily of Northern's storage gas. ¶36. The Commission found Northern had shown that storage gas was migrating into the southernmost part of the proposed extension area, and that Northern had some evidence which indicated the Nash area wells could be producing storage gas, but that Northern's evidence, especially its engineering and geological information, was incomplete and inadequate and did not overcome other evidence suggesting that the Nash area production was not storage gas. Northern filed a request for rehearing. *Northern Natural Gas Company*, 125 FERC ¶ 61127 (2008).

On November 18, 2008, Northern filed suit against Trans Pacific and others, alleging that Trans Pacific's wells had produced Northern storage gas after the date of the jury's verdict in the prior *Trans Pacific* litigation. The suit was subsequently settled and was dismissed by stipulation of the parties on February 19, 2009. *See Northern Natural Gas Company v. Trans Pacific Oil Corp.*, No. 08-1365-WEB (U.S. Dist. Ct., D. Kan).

Northern alleges that defendant L.D. Drilling owns or operates the following wells completed in the Viola and/or Simpson formation, and which are producing Northern storage gas:

        a. Mezger 1, completed on April 10, 2003;
        b. Mezger 2, completed January 8, 2008;
        c. Geesling 1, completed June 14, 2004;
        d. Young 1, completed January 19, 2004;
        e. Meireis 1-23, completed March 14, 2005;
        f. Moore 1-27, completed May 4, 2005;

      g.  Stanton 1, completed May 18, 2005;
      h.  Zink A, completed May 3, 2006;
      i.  Zink B, completed April 14, 2006;
      j.  Martin 1, completed on May 12, 2006;
      k.  Young 1-26, completed June 5, 1985;
      l.  Trinkle 1-33, completed April 24, 2007.

¶41.  On September 18, 2008, L.D. Drilling filed notice of intent to drill an additional well, the Trinkle 1-28.  ¶42.

On April 15, 2008, defendant Val Energy completed the Riffey VI-25 well in the Viola stratum in Pratt and/or Kingman Counties.  ¶44.

Defendant Nash owns and/or operates the following wells which have been permitted or completed or are producing storage gas in the Viola and/or Simpson strata in Pratt and/or Kingman Counties:

      a.  Holland 2-26, permitted March 18, 2008;
      b.  CRC No. 2, permitted September 26, 2008;
      c.  Staab 1, completed May 22, 2007;
      d.  Trinkle 1, completed October 30, 2006;
      e.  CRC No. 1, permitted March 18, 2008; and
      f.  J.C. No. 1, completed April 18, 2003.

¶45.  The J.C. No. 1 well was included in the 2004 *Northern v. Nash* litigation.  Northern concedes this well is "subject to prior judicial findings and Orders such as the applicable statute of limitations for claims of conversion and unjust enrichment."  ¶47.

On December 19, 2008, Northern filed an action against L.D. Drilling and Val Energy. *Northern Natural Gas Co. v. L.D. Drilling, Inc.*, No. 08-1400-MLB (U.S. Dist. Ct., D. Kan.).  A few days later, Northern filed the instant case (08-1405), naming these same two parties as defendants and adding Nash Oil & Gas Co.

On April 14, 2009, FERC denied Northern's motion for rehearing of its order granting a

limited extension of the certificated storage area. FERC said Northern had not produced sufficient evidence to show that Nash area wells were producing storage gas. FERC said Northern's evidence concerning the geology of the area was incomplete, although it noted that Northern had recently acquired storage lease rights on a large portion of the proposed extension area, and as such Northern could conduct seismic testing, "which may provide it with more convincing evidence ... in which case Northern may file another application...." *Northern Natural Gas Company*, 127 FERC ¶ 61038, at P 30 (2009).

Northern's complaint in the instant action contains the following claims: Count 1 - Declaratory Relief - seeking a declaration that Northern has not lost title to migrated storage gas and an injunction preventing the defendants from further production and sale of Northern's storage gas; Count 2 - Conversion; Count 3 - Unjust Enrichment; Count 4 - Nuisance - based on the defendants' alleged "pressure sinks" that are drawing storage gas from the Cunningham Storage Field and interfering with Northern's ability to operate the field; Count 5 - Tortious Interference with Business Relationship ; and Count 6 - Civil Conspiracy - alleging an agreement among the defendants to engage in coordinated activities for the purpose of collecting and selling Northern storage gas.

II. *Nash's Motion to Dismiss (Doc. 15)*.

Defendant Nash contends that Northern's claims are barred by the doctrine of res judicata/claim preclusion. Doc. 16 at 3. Nash points out that claim preclusion prevents a party from re-litigating issues that were or could have been raised in an earlier action that proceeded to final judgment. Nash contends the 2004 litigation (*Northern v. Nash*, No. 04-1295) precludes Northern from now attempting to re-litigate its claim that storage gas is migrating to the Nash

area wells, as well as from asserting any other claims that arise out of the same series of transactions underlying the 2004 litigation. Doc. 16 at 6. Nash contends that all of Northern's claims meet that test, and that Northern cannot avoid the bar of the judgment by alleging that its current claims relate only to production activity occurring after the 2004 case or "by attempting to disguise its prior claims" under new theories of recovery. Nash also points out that the Tenth Circuit affirmed Judge Marten's holding in the 2004 case that Northern failed to state a claim under a continuing tort theory. Nash argues Northern is now attempting to contravene the Tenth Circuit's holding by asserting that production after the 2004 litigation supports a new cause of action. Doc. 24 at 1.

Nash points out that under the "transactional approach" for determining whether two lawsuits are based on the same cause of action, "a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred from subsequent litigation." *Citing Nwosun v. General Mills Restaurants, Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997). Furthermore, a transaction connotes a natural grouping or common nucleus of operative facts, and all rights of the plaintiff to remedies against the defendant with respect to any part of the transaction out of which the action arose are extinguished by a previous adjudication on the merits. Doc. 16 at 8 (*citing Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1335 (10th Cir. 1988)). Nash contends that "[j]ust as it did in the 2004 case, Northern has asserted that storage gas from the Cunningham storage facility has migrated more than 4 miles north to the area of the Nash leases," and Northern is again claiming that Nash is producing storage gas from the same reservoir as the 2004 case. Northern has again asserted

10

claims for conversion, unjust enrichment, and relief under K.S.A. § 55-1210, as it did in 2004, and has added claims for nuisance, tortious interference, and civil conspiracy. Nash argues that Northern "cannot avoid claim preclusion by simply attempting to state new legal theories,..." Doc. 16 at 13. "For more than a decade now," Nash contends, "Northern has repeatedly attempted to pull Nash into the same dispute regarding gas Northern alleges has previously escaped its Cunningham storage facility. Without regard for the law and with no respect for prior judgments, Northern has pursued claims against Nash which all arise out of the same alleged cause of action and the same set of allegations." *Id.* Nash thus contends Northern's claims are barred by claim preclusion and must be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

Northern says it is not re-litigating claims that were or could have been raised in the 2004 litigation. It says it is asserting new claims "based on new injuries caused by Nash, and Nash's production of Northern's migrated storage gas from five (5) wells which did not even exist at the time Northern filed the 2004 Nash litigation, as well as new and continuing injuries from a single well which was part of the prior litigation." Doc. 19 at 2. Northern contends that the statute of limitations on its current claims could not have begun to run until, at the earliest, Nash began producing Northern's migrated storage gas from the new wells identified in this lawsuit." *Id.* at 9.[3]

Northern contends that under the transactional approach to res judicata, a new action is

---

[3] As to the one well that was at issue in the 2004 Nash litigation - the J.C. No. 1 - Northern contends some of its claims are not barred because "they are encompassed by, or derivative to, Northern's nuisance claim (i.e., a continuing tort), and/or because they are based on acts or omissions occurring, and evidence discovered, after Northern filed the 2004 Nash litigation." Doc. 19 at 9, n.3.

permitted when it raises new and independent claims that are based on new facts.  Thus, new

claims arising after the first complaint may be litigated in a subsequent action where the new

facts are enough on their own to sustain a second action.  *Citing, inter alia, Hatch v. Boulder*

*Town Council,* 471 F.3d 1142 (10th Cir. 2006).  Northern argues this is true even if it could have

amended the complaint in the first action to include actionable conduct arising after that suit was

commenced.  Northern contends Nash "has engaged in a systematic pattern of acquiring new

lease interests, and new gas well drilling activities, ever closer to Northern's Cunningham

Storage Field."   Northern contends the 2004 litigation, "far from leaving Nash battle-weary

from litigation ... has emboldened Nash to more aggressively poach Northern's storage gas...."

Doc. 19 at 15.  Northern says its current claims are based on new facts and are not part of the

transaction previously litigated, such that res judicata does not bar the claims.  Northern argues

that Nash's approach to res judicata is refuted by *Lawlor v. Nat'l. Screen Service Corp.*, 349 U.S.

322 (1955), where the Supreme Court held that a prior judgment could not bar claims which did

not exist and which could not have been sued upon in the prior case.  Northern points out that the

Supreme Court rejected an interpretation of res judicata that would effectively confer on a

defendant "a partial immunity from civil liability for future violations."[4]

> *Discussion*.

Before addressing the res judicata issue, the court notes three factors that make this case

unusually difficult.  First, the litigation involves an activity that could be continuous or

intermittent in nature (the migration of storage gas) and which could possibly be abated.  A

---

[4] Nash contends *Lawlor* is inapposite because the defendant in that case sought to engage in unlawful acts, whereas Nash "has simply continued to engage in lawful production of minerals" from leases on which it has a right to produce.  Doc. 24 at 7.

given well could produce storage gas, native gas, or some combination of both at a given time, and the type of gas produced could change over the course of time. Such matters are distinguishable from one-time acts of permanent character and have frequently proven difficult for courts to adjudicate.[5] This particular activity is underground, unseen, and not easily proven; all of which increase the difficulty of applying doctrines like res judicata and statutes of limitation. *Cf. Williams v. Amoco Production Co.*, 241 Kan. 102, 734 P.2d 1113, 1119 (1987) (gas leaking into aquifer initially caused temporary injury but became permanent during the litigation). Second, the Kansas law for determining ownership of stored natural gas changed in 1993. Prior to that time, injected gas was subject to the "law of capture," a rule that reflected the

---

[5] For example, in the context of claims for flooding of land, the Kansas Supreme Court has stated that "[t]he question when a cause of action for damages because of overflow of land accrues is one beset with difficulties, on which the authorities are in great conflict and exhibit considerable confusion. This is true even in our own jurisdiction where it must be admitted there is some contrariety in our decisions." *Henderson v. Talbott*, 175 Kan. 615, 620, 266 P.2d 273 (1954). In *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 476-77, 15 P.3d 338 (2000), the court stated (quoting 56 Am.Jur., Waters §443):

> 'The determination of the question whether the flooding of land gives rise to a single right or successive rights of action depends ordinarily upon whether the injury or the causative condition is permanent or temporary. The rule prevailing in most jurisdictions is that if the injury is permanent, or if the causative structure or condition is of such a character that injury will inevitably result and the amount of the damage can be determined or estimated, a single action may and should be brought for the entire damages, both past and prospective. But if the overflow is merely temporary, occasional, or recurrent, causing no permanent injury to the land, or if the situation involves other elements of uncertainty, such as the possibility or likelihood of the alteration or abatement of the causative conditions, or uncertainty in regard to the future use or improvement of the land, so as to prevent a reasonably accurate estimate of future damages, it is generally held that each [repetition] of the overflow gives rise to a new cause of action for which successive actions may be brought.' " [citation omitted]

migratory nature of oil and gas. But in 1993 the Kansas legislature declared that injected gas remains the property of the injector. Because of this change, the date on which storage gas migrated out of a storage area may affect title to the gas and the right to produce it. *See Northern Natural Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer, LLP.*, 2009 WL 3234155 (Kan., Oct. 9, 2009) (injector loses title to injected gas if it migrated to adjoining property before July 1, 1993). Third, although Nash's res judicata argument finds some support from rulings in the 2004 Nash litigation (No. 04-1295), that argument, taken to its logical conclusion, would mean that even if Nash is currently producing Northern storage gas, and even if that gas migrated out of the Northern's storage area after 1993, Nash nevertheless has an unfettered right to continue producing as much storage gas as it can, including by drilling new wells to increase its production. The public policy of res judicata favors an end to litigation, but such an outcome appears at odds with Kansas law declaring that the underground storage of natural gas promotes the public interest, K.S.A. § 55-1202, that injected storage gas "shall at all times be the property of the injector," and that when storage gas has migrated to an adjoining property (at least after July 1, 1993), "the injector ... shall not lose title to or possession of such gas...." K.S.A. § 55-1210.

Nash's motion to dismiss is brought under Rule 12(b)(6). The purpose of a motion to dismiss under 12(b)(6) is to test the legal sufficiency of the complaint assuming all the factual allegations in the complaint are true. *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir.1994). In making this determination, the court must accept all the well-pleaded factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of plaintiff. *See Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.2006). Rule 12(b)(6) does not require detailed

factual allegations, but the complaint must set forth the grounds of plaintiff's entitlement to relief through more than labels, conclusions and a formulaic recitation of the elements of a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The plaintiff must allege sufficient facts to state a claim which is plausible-rather than merely conceivable-on its face. *Id.* at 570. *See also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Although a motion under Rule 12(b)(6) is normally limited to the allegations in the complaint, when considering the defense of res judicata the court may also consider and take judicial notice of matters in the public record, including the court's own records from a prior case, at least where the facts from those records are undisputed. *See e.g., Giragosian v. Ryan*, 547 F.3d 59, 65-66 (1st Cir. 2008) (court may consider matters of public record in connection with 12(b)(6) motion based on res judicata); *Tilbury v. Aames Home Loan*, 199 Fed.Appx. 122, 125, 2006 WL 2578369 (3rd. Cir. 2006) (court may examine the facts as alleged in the pleadings as well as "matters of public record, orders, exhibits attached to the complaint, and items appearing in the record of the case."); *Day v. Moscow*, 955 F.2d 807, 811 (2nd Cir. 1992) (court may address res judicata in 12(b)(6) motion where relevant facts are shown by court's own records, of which court takes judicial notice).

The doctrine of res judicata, or claim preclusion, prevents a party from re-litigating a legal claim that was or could have been the subject of a previously issued final judgment. *Lewis v. Circuit City Stores, Inc.*, 500 F.3d 1140, 1147 (10th Cir. 2007) (citations omitted). In deciding the claim-preclusive effect of a federal diversity judgment, the court generally adopts the law that would be applied by state courts in the State in which the federal diversity court sits. *Id. Cf. Semtek Intern. Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001). The court will therefore look to Kansas law to determine the preclusive effect of the judgment in *Northern v.*

*Nash*, No. 04-1295, which was decided under the federal court's diversity jurisdiction. Under Kansas law, application of res judicata (claim preclusion) requires a showing of four elements: (1) the same claim; (2) the same parties; (3) the claims were or could have been raised; and (4) there was a final judgment on the merits. *Netwig v. Georgia-Pacific*, 266 F.Supp.2d 1279, 1284 (D. Kan. 2003) *(citing Neunzig v. Seaman Unified Sch. Dist. No. 345*, 239 Kan. 654, 661, 722 P.2d 569, 575 (1986)). The second and fourth elements are clearly satisfied here, as Case No. 04-1295 involved the same parties (Northern and Nash), and there was a final judgment on the merits. *See Netwig*, 266 F.Supp.2d at 1284 (dismissal based on statute of limitations is an adjudication upon the merits).

The issue thus turns on whether the two cases concern the same claim or cause of action, and whether the claims asserted here were or could have been raised in the prior case. Kansas courts have frequently relied on the *Restatement (Second) of Judgments* and American Jurisprudence 2d (Am.Jur.) in applying res judicata. *See e.g., Parker v. Kansas Neurological Institute*, 13 Kan.App.2d 685, 778 P.2d 390 (1989); *Waterview Resolution Corp. v. Allen*, 274 Kan. 1016, 58 P.3d 1284, 1290-91 (2002). Both the Restatement and Am.Jur. recognize the "transactional approach" for determining when two lawsuits constitute the same claim or cause of action. *See Restatement (Second) of Judgments* §24 (1982); *Am.Jur. Judgments* §479.[6]

---

[6] Am.Jur. also sets forth a slightly different variation, which includes an examination of whether the primary right and duty and delict or wrong are the same in each action. "Under this test, there is but one cause of action where there is but one right in the plaintiff and one wrong on the part of the defendant involving that right." *Am.Jur. Judgments* §478. Further, "some authority holds that traditionally four factors are considered when determining whether successive lawsuits involve the same cause of action: (1) whether the rights or interests established in the prior judgment would be destroyed or impaired by the prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two actions involve infringement of the same right; and (4) whether the two

Under that test, a valid final judgment extinguishes all rights of the plaintiff against the defendant "with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Restatement (Second) of Judgments* §24 (1982). "What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations of business understanding or usage." *Id.*

Under the foregoing factors, the court finds that the claims alleged in this case may qualify as a transaction or series of transactions separate from the 2004 litigation. Of course, the mere fact that Northern has asserted new theories of recovery does not make this a separate transaction. *See Restatement (Second) of Judgments* §25, comment d ("Having been defeated on the merits in one action, a plaintiff sometimes attempts another action seeking the same or approximately the same relief but adducing a different substantive law premise or ground. This does not constitute the presentation of a new claim when the new premise or ground is related to the same transaction or series of transactions...."). But "*subsequent conduct*, ... even if it is of the same nature as the conduct complained of in a prior suit, may give rise to an entirely separate cause of action." *Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 292 F.Supp.2d 1270, 1281 (D. Kan. 2003) (emphasis added) (*quoting Kilogar v. Colbert County Bd. of Educ.*, 578 F.2d 1033, 1035 (5th Cir. 1978)). With the exception of the J.C. No. 1 well, Northern's claims against Nash in this action involve wells that were not in existence when Case 04-1295 was

---

actions arise out of the same transactional nucleus of facts." *Id.*

filed. Northern could not have asserted claims such as conversion and unjust enrichment in 2004 for production of storage gas from wells that did not exist. *Waddell & Reed Financial, Inc. v. Torchmark Corp.*, 292 F.Supp.2d 1270 (D. Kan. 2003) ("claims that could have been brought" is defined in part as those claims in existence at the time the original complaint is filed). A taking of storage gas is by definition connected to production from specific wells. *Cf.* K.S.A. § 55-1210(c)(2) (injector may conduct tests on *any existing wells* on adjoining property). Moreover, the newer Nash wells appear to be significantly closer to the Northern storage field than the Nash wells litigated in the 2004 case. The timing and location of these newer wells could be significant because Northern claims the defendants have created pressure sinks that cause or increase gas migration and which unreasonably interfere with Northern's use and enjoyment of the Cunningham Field. Northern claims this nuisance is of a continuous nature. It claims to have suffered harm by having to install withdrawal and monitoring wells after the filing of the 2004 case, and in the development and implementation of a containment plan for the storage field. These allegations involve conduct subsequent to the filing of the 2004 case. *See Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190 (10th Cir. 2000) ("we agree with those courts holding the doctrine of claim preclusion does not necessarily bar plaintiffs from litigating claims based on conduct that occurred after the initial complaint was filed."); *Johnson v. Board of County Comm'rs of Johnson County, Kansas*, No. 99-2289-JWL, 1999 WL 1423072, at *3-4 (D.Kan. Dec. 9, 1999) ("Because a plaintiff has no obligation to expand his or her suit in order to add a claim that he or she could not have asserted at the time the suit was commenced, several circuits have held that res judicata does not bar a second lawsuit to the extent that suit is based on acts occurring after the first suit was filed.")

In connection with subsequent conduct, a change of circumstances can sometimes permit a second action to proceed. "Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first." *Restatement (Second) of Judgments* §24, comment f. The Restatement gives the following illustration:

> The government fails in an action against a defendant under an antitrust statute for lack of adequate proof that the defendant participated in a conspiracy to restrain trade. The government is not precluded from a second action against the same defendant in which it relies on conspiratorial acts post-dating the judgment in the first action, and may rely also on acts preceding the judgment insofar as these lend significance to the later acts.

*Id*. Subsequent to the filing of the 2004 litigation, Nash has allegedly drilled several new wells closer to the Cunningham Storage Field, it (along with the other defendants) has allegedly created pressure sinks that draw storage gas from the Cunningham field and interfere with its operation, and it has allegedly conspired with the two other defendants to collect and sell Northern storage gas. It is certainly plausible that changes in pressure could have a material effect on migration of underground storage gas, and a producer such as Nash could not reasonably expect that Northern's failure to timely challenge production from existing wells in 2004 means that any and all future production from any new Nash wells is beyond challenge. Under the transactional approach of the Restatement, the court concludes that such actions should not be considered part of the same transaction as Case No. 04-1295.[7] *Cf. Hatch v.*

---

[7] In Wright, Miller & Cooper's *Federal Practice and Procedure* § 4409, the authors note several examples which show "that claim preclusion often cannot apply in settings of continuing or interrupted and renewed conduct, and that the result may be burdensome repetitive litigation.

*Boulder Town Council*, 471 F.3d 1142, 1150 (10th Cir. 2006).

As noted by the U.S. Supreme Court in *Lawlor v. National Screen Service Corp.*, 349 U.S. 326, 327-28 (1955), it is not dispositive that "both suits involve[] 'essentially the same course of conduct.'" The *Lawlor* case involved a first suit claiming violations of antitrust laws – claims that were settled and dismissed with prejudice – followed by a second suit claiming similar violations occurring after the first judgment. The Supreme Court said "[s]uch a course of conduct – for example, an abatable nuisance – may frequently give rise to more than a single cause of action." Because the conduct complained of in *Lawlor* occurred subsequent to the first judgment, it was not barred. The Court rejected an argument that the second action was barred because injunctive relief was sought in the first action which, had it been granted, would have prevented the acts complained of in the second suit. This "novel contention" would effectively confer "a partial immunity from civil liability for future violations," something inconsistent with the law of res judicata. *Id*. at 329. Nash's res judicata argument would likewise confer upon it an immunity from liability for future production of Northern storage gas. This immunity, in Nash's view, would extend to all subsequently drilled wells throughout some undefined area. The judgment in Case No. 04-1295 cannot be considered a license for such future tortious conduct. If Northern can prove that Nash's newer wells are producing storage gas that migrated after July 1, 1993, Northern may be entitled to relief. And it is at least plausible, for purposes of a motion to dismiss, that the addition of these new wells in the Viola/Simpson formations, with accompanying changes in pressure, could cause gas migration from the Cunningham Storage

---

To the extent that greater protection is needed, it is better to rely on issue preclusion than on efforts to draw into claim preclusion matters that could not reasonably be advanced in the first litigation."

Field.

Northern's complaint contains claims for conversion (Count II) and unjust enrichment (Count III). Insofar as these claims are based upon production from Nash wells completed after the filing of Case No. 04-1295, the court concludes they are not barred by res judicata. Northern concedes that the J.C. No. 1 well was completed prior to that time and was litigated in Case No. 04-1295; accordingly Northern is "not asserting any claim for unjust enrichment or conversion with regard to Nash's production of storage gas from the J.C. No. 1 well." Doc. 19 at 5, n.1.

Northern also asserts claims for nuisance (Count IV), tortious interference with business relationship (Count V), and civil conspiracy (Count VI). Insofar as these claims are based upon conduct by Nash subsequent to the filing of Case No. 04-1295, the court concludes they are not barred by res judicata. As Northern points out, Kansas law has recognized that nuisances may be continuing in nature and may allow for multiple causes of action in some circumstances. *See McHugh v. City of Wichita*, 1 Kan.App.2d 180, 563 P.2d 497 (1977); *Simon v. Neises*, 193 Kan. 343, 395 P.2d 308, 312-13 (1964) ("where one creates a nuisance, and permits it to remain, so long as it remains it is treated as a continuing wrong, and giving rise, over and over again, to causes of action.") [citation omitted]; *Klassen v. Central Kan. Co-op. Creamery Ass'n.*, 160 Kan. 697, 165 P.2d 601 (1946) ("To hold as argued by defendant would mean that a defendant could maintain a nuisance to the damage of his neighbor and should he be compelled to pay damages on one occasion he could then with impunity maintain the same nuisance to the end of time. Such is not the law."). *Cf. Winkel v. Miller*, 288 Kan. 455, 468, 205 P.3d 688 (2009) (nuisance claim was barred where no material change of circumstances occurred after the first judgment). Viewed in a light favorable to Northern, these counts plausibly allege claims for

relief that arose after the filing of Case No. 04-1295 and which are based upon a materially different group of facts than the prior case.

Northern also asserts a claim for title, declaratory and injunctive relief, including "injunctive relief pursuant to K.S.A. § 55-1210(d) and/or common law ... enjoining further production and sale of Northern's previously injected storage gas...." Northern asserted a similar claim in No. 04-1295. But because the instant case involves a transaction separate from No. 04-1295, the prior judgment does not bar this claim. "A combination of facts constituting two or more causes of action does not congeal into a single equitable cause of action merely because equitable relief is also sought." *Lawlor*, 349 U.S. at 329. The court notes Nash's contention that Northern is merely trying to circumvent the Tenth Circuit's ruling in *Northern Natural Gas Co. v. Nash Oil & Gas Inc.*, 526 F.3d 626, 632-33 (10th Cir. 2008), where the court held that Northern's claim for injunction was properly dismissed because it only asserted a free-standing claim under K.S.A. § 1210(c). *See id.* ("The language of the provision does not ... indicate that the legislature further intended to replace or supplement traditional common law claims with a new statutory cause of action."). As noted above, the fact that the instant case is based on a separate transaction is sufficient to preclude the bar of res judicata. But insofar as Nash is going beyond res judicata and arguing that Kansas substantive law does not allow relief under the facts alleged by Northern, the court notes that Northern has asserted a common law claim for injunctive relief (as well as under K.S.A. § 55-1210), which distinguishes this case from the Circuit's rejection of a "free-standing" claim based solely on the statute. Under the facts alleged, the court would have equitable jurisdiction to grant relief to prevent a continuing forfeiture of Northern's property.

Nor is the court persuaded by Nash's argument that *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329 (10th Cir. 1988) compels a different result. *Petromanagement* was based on application of the principle that a contract is considered a complete "transaction" for purposes of res judicata, such that all claims of contractual breach not brought in an original action on the contract would thereafter be barred. *See id.*, 835 F.2d at 1336. The instant case is not based in contract, but upon the alleged migration and production of storage gas from various wells. As discussed above, differences in time, location, installation of new wells, and conduct engaged in subsequent to the filing of the prior case all lead the court to conclude that this action is based on a transaction separate from the prior case. There is no "unit of litigation" in this case comparable to the uniform contracts at issue in *Petromanagement*. *Id.* at 1331. *See Stanfield v. Osborne Industries, Inc*., 263 Kan. 388, Syl. ¶ 5, 949 P.2d 602 (1997) (for purposes of claim preclusion, the term claim "connotes a natural grouping or common nucleus of operative facts.").

For the reasons stated above, the court finds that the doctrine of res judicata (claim preclusion) does not require dismissal of the complaint against Nash under Rule 12(b)(6).

III. *Motions to Dismiss by defendants Nash (Doc. 33); L.D. Drilling (Doc. 21), and Val Energy (Doc. .*

Nash has also filed a second motion to dismiss which asserts that Northern has engaged in "claim splitting." Doc. 33. This argument is premised on the fact that Northern has filed two actions, No. 08-1400 and 08-1405, which contain overlapping claims for relief. Nash argues the two cases arise from the same transaction and constitute a single alleged wrong – the loss of storage gas – such that the filing of the second action constitutes a violation of the rule against

claim splitting. Nash concedes that the scope of Northern's complaint in Case No. 08-1400 may have been limited by operation of K.S.A. § 60-518 because that complaint amounted to re-filing of a previously dismissed action (Case No. 08-1077-MLB).[8] But it argues that Northern's failure to name Nash as a defendant in the 08-1077 case or to amend its complaint in that action precludes the bringing of piecemeal litigation as Northern has subsequently done in Case Nos. 08-1400 and 08-1405.

Defendants L.D. Drilling and Val Energy make essentially the same arguments for dismissal. *See* Docs. 22, 34. L.D. Drilling argues that "[b]ecause all of Northern's claims or causes of action against L.D. Drilling and against Val Energy and Nash Oil and Gas could and should have been brought in the earlier and still-pending case, No. 08-1400, Northern's claims against L.D. Drilling in this wholly unnecessary later case, No. 08-1405, should be dismissed." Doc. 22 at 5-6. L.D. Drilling argues there are no special factors warranting an exception to the rule against claim splitting. Like Nash, it contends that Northern's apparent attempt to obtain the benefits of the savings statute is a problem "wholly of its own creation ... and cannot justify Northern's burdening the Court and the defendants with duplicative suits." *Id.* at 9. Val Energy likewise contends that although K.S.A. § 60-518 limited the scope of Northern's complaint in 08-1400, Northern's failure to amend the complaint "cannot now be used as a sword upon which to engage Val Energy in piecemeal litigation, as Northern has done...." Doc. 34 at 4.

Northern argues that the two pending actions are not duplicative and that special factors

---

[8] On March 14, 2008, Northern filed No. 08-1077 against L.D. Drilling and Val Energy, but subsequently dismissed those claims without prejudice. On December 19, 2008, Northern filed No. 08-1400 against L.D. Drilling and Val Energy, in what was essentially a re-filing of the previously dismissed action. Several days later, Northern filed No. 08-1405 adding certain additional claims against these two defendants and adding claims against defendant Nash.

weigh against dismissal of this action.  It argues it could not have asserted all of its claims in No. 08-1400 due to the Kansas savings statute, which places certain limitations on refiling of previously dismissed actions. Northern says it was limited in No. 08-1400 to re-asserting the same claims previously dismissed, such that it had to assert its additional claims and its claims against Nash in a separate action, or else it could not obtain the benefit of the savings statute. Even if the court were to conclude that the two cases are duplicative, Northern argues the proper remedy would be to consolidate the cases, not to dismiss this action.  Northern has moved for consolidation of the two actions.  Doc. 30.

The court rejects the argument that res judicata requires dismissal in these circumstances, although res judicata does include a prohibition on claim splitting.  A person having only a single cause of action is generally not permitted to split up the cause of action and maintain more than one suit for different parts of it.  *See* Am.Jur. Actions §103.   But the penalty for doing so is that an adjudication on the first action is, under the doctrine of res judicata, a bar to the maintenance of the second action.  *Id*.  In this instance, the first action (No. 08-1400) and the second (No. 08-1405) are both pending, without a final judgment in either action.  As such, the bar of res judicata does not apply and does not require dismissal of this action.

Some Kansas decisions have identified a rule against splitting a cause of action and have at times characterized it as something separate from the law of res judicata.  *See e.g., Home State Bank v. P.B. Hoidale Co., Inc.*, 239 Kan. 165, 718 P.2d 292 (1982).  This judicially created rule against claim splitting "is based upon varied and justifiable concerns: preserving judicial economy and convenience; avoiding repetitive or fragmented litigation; and protecting a party from multiple harassment and expense over the same claim."  *Diederich v. Yarnevich*, 40

Kan.App.2d 801, 196 P.3d 411 (2008) [citation omitted].

Northern has set forth a facially plausible reason why it refrained from asserting all of its claims in No. 08-1400 – namely, the Kansas savings statute, which can be applied only when an originally dismissed action and a subsequently filed action are "substantially similar." Kansas courts have construed this limitation to mean that both the dismissed action and the re-filed action must involve exactly the same parties. *See Taylor v. Int'l. Union of Electronic, Elec., Salaried, Mach., and Furniture Workers*, 25 Kan.App.2d 671, 968 P.2d 685, 689 (1998) ("where the relief sought is the same in both actions, but defendants are different, the actions are not substantially the same"); *Karlin v. City of Beloit, Ks.*, 2008 WL 4642284, *5 (D. Kan., Oct. 17, 2008). The record suggests that Northern's filing of two separate actions was thus an attempt to claim the benefit of the savings statute, which – assuming the statute applies here – it could not do without refiling substantially the same claims previously dismissed. *See Hartsel, supra.* But the court sees no Kansas authority for Nash's argument that any related claims that Northern did not include in that initial complaint are thereby forfeited and must be dismissed. Moreover, according to Northern some of its claims arose after the dismissal of the initial action (No. 08-1077), and thus could not have been included in that original complaint. Nothing in the saving statute requires forfeiture of such claims. Assuming for the sake of argument that Northern's attempt in No. 08-1405 to assert additional claims beyond those alleged in its original complaint (08-1077) contravenes the limitations of the savings statute, as defendants argue, the consequence of doing so would not be automatic dismissal of this action for claim splitting. Rather, the result would be that the grace period provided by K.S.A. § 60-518 would not be available. In other words, if Northern exceeded the limits of K.S.A. § 60-518, then Northern

26

cannot obtain the benefit of the statute and its claims might be subject to a statute of limitations defense. But that issue is not currently before the court, and the court expresses no opinion as to how the statute of limitations might apply in these circumstances. As to the issue at hand, the court rejects the argument that res judicata or claim splitting requires dismissal of this action.

Defendants' reliance on authorities such as *Oxbow Energy, Inc. v. Koch Industries, Inc.*, 686 F.Supp. 278 (D. Kan. 1988) and *Meyers v. Colgate-Palmolive Co.*, 102 F.Supp.2d 1208 (D. Kan. 2000) do not show that dismissal is warranted. In *Oxbow*, the plaintiff filed a second action in an attempt to get around a ruling by the judge in the first action denying plaintiff's request to amend the complaint. The judge in the second action dismissed the case because consolidation "would in effect have reversed [the first judge's] decision to deny plaintiffs' motion to amend." *Oxbow*, 686 F.Supp. at 282. In *Myers*, the court did not consider whether consolidation was appropriate to cure the multiple filing, finding instead that dismissal was warranted because plaintiff had been given an opportunity to amend her complaint in the first action but failed to do so. *Myers*, 102 F.Supp.2d at 1224. Neither of these circumstances are present in the instant case.[9]

_____

[9] In a Reply Brief, L.D. Drilling cites Rule 11(b) and argues Northern acted in bad faith because it filed No. 08-1077 for an improper purpose, with the intention of dismissing the action. Doc. 37 at 2. In support of this assertion, defendant cites an affidavit of Mr. Carmichael, who served as counsel for Val Energy in No. 08-1077. The affidavit states that Northern's counsel informed Mr. Carmichael on June 29, 2008, that Northern was "dismissing the suit [08-1077] to extend the statute of limitations for an additional six months." Doc. 37, Exh. 1. The court finds no inference of bad faith from the facts alleged by defendant. As an initial matter, it is speculation to infer Northern's intent at the time of filing from its conduct months later. Moreover, the Kansas saving statute "is intended to give a party who within the proper time brought an action which was disposed of otherwise than upon the merits after the statute of limitations had run [6 months] of grace in which to reinstate his case and obtain a determination upon the merits." *See v. Hartley*, 257 Kan. 813, 822, 896 P.2d 1049 (1995) (citation omitted). Voluntarily dismissing an action is "a failure other than upon the merits" and is not, in itself,

Under the circumstances presented, the court concludes it has discretion to dismiss the second action, to stay it, or to consolidate the two suits. *See e.g., Twaddle v. Diem*, 200 Fed.Appx. 435, 438-39, 2006 WL 2817538 (6th Cir. 2006) (unpublished); *Hartsel Springs Ranch of Colorado, Inc. v. Bluegreen Corp*., 296 F.3d 982, 989-90 (10th Cir. 2002). *Cf. Brown-Wilbert, Inc. v. Copeland Buhl & Co.,* 732 N.W.2d 209, 224 (Minn. 2007) (the prohibition against claim splitting would support a dismissal with prejudice of the second claim only where the elements of res judicata are also present). As note above, the rule against claim splitting is designed to further judicial economy, to avoid repetitive or fragmented litigation, and to protect a party from multiple harassment and expense over the same claim. *Diederich v. Yarnevich*, 40 Kan.App.2d 801, 196 P.3d 411 (2008). In the instant case, these concerns can best be remedied by consolidating the two actions pursuant to Fed.R.Civ.P. 42. *See Sutcliffe Storage & Warehouse Co. v. United States*, 162 F.2d 849, 851 (1st Cir. 1947) ("Normally, the district court would be acting quite within its discretion in taking steps to consolidate or otherwise avoid the duplication of such closely similar cases,..."); *In re Stonebridge Life Ins. Co.*, 279 S.W.3d 360, 363 (Tx. Ct. App. 2008) ("where a split claim is filed as separate suits before the same court, it is incumbent on the trial court, when requested, to apply the single-action rule and avoid adjudicating a single action in piecemeal fashion-whether this means declining to sever a single action or consolidating an already-split action."). Consolidation of these two actions will be sufficient to preserve judicial economy and avoid prejudice arising from the multiple actions. Accordingly, the defendants' motion to dismiss will be denied, and Northern's motion to consolidate Case Nos. 08-1400 and 08-1405 will be granted.

---

evidence of bad faith.

IV. *Northern's Motion to Dismiss Nash Counterclaims (Doc. 108)*.

In its answer, Nash asserted several counterclaims against Northern, including trespass, nuisance, and unjust enrichment. Doc. 101. (Additional counterclaims for loss of reserves and slander of title have now been dismissed by stipulation and are no longer at issue. *See* Doc. 124). Northern has moved to dismiss the counterclaims pursuant to Rules 12(b)(1) and 12(b)(6). Doc. 108.

Nash alleges that by virtue of its status as assignee of the oil and gas leases underlying the wells in question, it has the exclusive right to explore for and produce oil and gas in the subsurface strata of these leases. Doc. 101, ¶¶7-11. As to four of the five leases involved, Nash allegedly possesses the exclusive right to inject gas, water, other fluids, and air into subsurface strata to produce and store oil and gas from and under the lease. *Id*. Nash alleges that it has the exclusive right to inject and store gas under these leases, and that Northern has no legal authority to do so. ¶ 15. Nash's trespass claim alleges that if Northern storage gas has migrated to the leases, then Northern has intentionally, recklessly or negligently caused it to do so. ¶18. Northern has allegedly caused substantial damage to the value of Nash's property rights, and the intrusion constitutes an intentional or negligent trespass for which Northern is liable. Alternatively, it is allegedly an inherently dangerous activity for which Northern in strictly liable. ¶22. The nuisance claim alleges that the intrusion caused by Northern has substantially interfered with Nash's use and enjoyment of its property rights, that it has caused damage to Nash including litigation costs and injury to reputation, and that it constitutes a continuing private nuisance. ¶¶24-28. The unjust enrichment claim alleges that Northern has knowingly stored gas from the Cunningham Storage Field in the lands underlying the Nash leases, without

providing just compensation to Nash as the exclusive holder of the right to inject and store gas under such lands. ¶31. It alleges Northern has obtained a benefit in the form of free storage capacity and has been unjustly enriched. ¶32.

Northern first contends Nash lacks standing because it does not own the strata underlying the wells at issue. It argues that Nash, as a mineral lessee, does not own the strata bearing minerals under its leases and does not have a possessory interest therein. As such, it argues Nash cannot show it suffered any injury from Northern's actions. Doc. 109 at 4. Northern argues Nash lacks standing to assert claims for trespass, nuisance, and unjust enrichment, and the court should dismiss the claims for lack of subject matter jurisdiction pursuant to Rule 12(b)(1). Additionally, Northern argues Nash's factual allegations fail to state a claim for relief on these claims. It contends the trespass claim fails because Nash has not alleged a possessory interest or that it was reasonably foreseeable to Northern that its injection of gas could result in invasion of Nash's possessory interest. *Id*. at 7. It contends the claim of nuisance fails because Nash does not allege that Northern intended to interfere with Nash's use and enjoyment of the strata, and does not plead facts to show that the alleged interference was unreasonable. *Id*. at 8. As for unjust enrichment, Northern argues that Nash fails to allege facts showing it conferred any benefit on Northern. *Id*. at 9.

Nash contends that by virtue of its leases, it has the exclusive property rights to explore, develop, and store minerals in the leased premises. Nash contends this interest is sufficient to confer standing to assert claims for injury to its interests. It further contends that it has alleged sufficient facts to support claims for trespass, unjust enrichment, and nuisance.

The court finds that for purposes of the instant motion, Nash's allegations are sufficient

to support Nash's standing to assert claims for relief for injury to its property interests. Nash alleges that by virtue of its leases, it has the exclusive right to produce oil and gas from these leases and the exclusive right to store oil and gas therein. The court must accept these allegations as true for the instant motion. Northern's Reply Brief challenges whether the latter allegation is true, arguing that Nash's leases did not convey any vested estate in the subsurface strata and that they only conveyed a right to store produced or manufactured hydrocarbons on the surface and not underground. Doc. 133 at 3-4. But Northern concedes that a determination of Nash's interest would require an examination of the leases. *Id*. at 4 ("A review of Nash's leases ... reveals that Nash does not have the right to store natural gas in the underlying strata."). The instant motion is not evidentiary in nature, however; it is based solely on the facial allegations in the pleadings. No evidence has been submitted in connection with the motion and no request has been made to convert it to a summary judgment motion. Under the circumstances, Nash's allegation that it holds the exclusive right to store natural gas under the leases in question, and the alleged injury to that interest caused by the plaintiff, are assumed to be true and are sufficient to defeat a motion to dismiss based on an alleged lack of standing. *Cf. United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1206 (10th Cir. 2001) (requiring evidence of ownership, as opposed to allegations of ownership, is antithetical to the standards for reviewing 12(b)(1) motions to dismiss for lack of facial standing).

The court further finds Nash has stated claims for relief under theories of trespass, nuisance and unjust enrichment. Insofar as Northern challenges these claims based on the assertion that Nash does not have an exclusive right to store natural gas in the strata under its leases, the court rejects that challenge for the reason stated above. As for Northern's argument

that the trespass claim fails because Nash has not alleged that it was "reasonably foreseeable" that storage gas would invade Nash's possessory interest, Nash has adequately pled that the intrusion by Northern was "negligent," a term which incorporates the concept of foreseeability, and has further alleged that the intrusion was intentional and the result of an abnormally dangerous activity. *Cf. United Proteins, Inc. v. Farmland Industries, Inc*., 259 Kan. 725, 729, 915 P.2d 80 (1996). Nash further alleges that the resulting interference caused actual and substantial damage. *See* Doc. 101, ¶¶18, 22. These allegations are sufficient to state a claim for trespass under Kansas law. Similarly, the nuisance claim by Nash incorporates all of the foregoing allegations. The court finds Nash has adequately pled the elements of nuisance, including that the interference by Northern was intentional and has caused substantial and continuing interference with Nash's use and enjoyment of its property rights. *Id*. ¶¶23-25. Finally, assuming Nash has the exclusive right to store gas under these leases, as it alleges, the court agrees with Nash that Northern's unprivileged use of the leases for storage of its gas would constitute the conferral of a benefit upon Northern and could support a claim for unjust enrichment. As such, Northern's motion to dismiss these claims will be denied.

V. *Conclusion*.

Nash Oil & Gas's Motion to Dismiss (Docs. 15), L.D. Drilling's Motion to Dismiss (Doc. 21), Nash Oil & Gas's Second Motion to Dismiss (Doc. 33), Val Energy's Motion to Dismiss (Doc. 34), and Northern Natural Gas Company's Motion to Dismiss (Doc. 108) are hereby DENIED.

Plaintiff Northern's Motion to Consolidate (Doc. 30) is hereby GRANTED. The court orders that Case No. 08-1400 and the instant case (No. 08-1405) be consolidated for purposes of

all pretrial proceedings and for trial.  The instant case, No. 08-1405, is hereby designated as the lead case, and all future filings in the consolidated action shall be made only in Case No. 08-1405.

IT IS SO ORDERED this __6th___ Day of November, 2009, at Wichita, Ks.

s/ Wesley E. Brown
Wesley E. Brown
U.S. Senior District Judge