**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| NORTHERN NATURAL GAS COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 08-1405-WEB-DWB |
| L.D. DRILLING, INC.; VAL ENERGY, INC.; and NASH OIL & GAS, INC., et.al., | ) ) ) | *Consolidated with* Case No. 08-1400-WEB-DWB |
| Defendants. | ) ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Now before the Court is the following motion:

> Plaintiff's Motion to Compel Entry Onto Land to Inspect and
> Test and supporting memorandum (Doc. 122, 123), Defendants'
> Joint Memorandum in Opposition (Doc. 132),[1] and Plaintiff's
> Reply Brief (Doc. 134).

---

[1] Defendants previously filed a Joint Motion for Protective Order (Doc. 115) seeking an order that would entirely deny Northern both the new well-testing and the re-testing Northern seeks through Rule 34 requests and by Northern's present Motion to Compel. The Court ruled on a portion of Defendants' prior motion in its Memorandum and Order of February 1, 2010 (Doc. 222); however, the Court specifically withheld ruling on Defendants' request to deny Northern's Rule 34 request for testing and re-testing of wells until all newly added parties had entered their appearance. (Doc. 222 at 3.) In deciding the present motion to compel, the Court will consider not only the briefing of the present motion to compel, but will also consider the briefing of Defendants' prior Joint Motion for Protective Order. (Doc. 115.)

The above motion is fully briefed and, after a careful review of the submissions of the parties, the Court is prepared to rule.

## BACKGROUND

Litigation concerning Northern's Cunningham Storage Field has been ongoing between Northern and various oil and gas companies and landowners for several years in several different cases. Judge Brown has reviewed this history and background in his Memorandum and Orders of May 12, 2009 (Doc. 60) and November 6, 2009 (Doc. 152),[2] and the Court incorporates that background and history by reference here.

Additional developments have occurred recently that were not discussed in the above-referenced opinions. On September 14, 2009, Northern filed a new application with the FERC by which it seeks to expand the certified boundaries of its Cunningham Storage Field to the North by adding approximately 14,240 acres. If granted, Defendants' wells that are the subject of this action and of Northern's Rule 34 request for testing would be located within the newly-certified boundaries of the storage field. (Doc. 141.) As a result of the FERC proceeding, Northern then conducted additional well tests in November, 2009. *See* Northern's Ex's 13 &

_____

[2] The November Memorandum and Order is also published as Northern Natural Gas Company v. L.D. Drilling, Inc., et.al., Case No. 08-1405-WEB, 2009 WL 3739735 (D.Kan., Nov. 6, 2009).

14, December 14, 2009 Hearing on Northern's Motion for Preliminary Injunction (hereafter referred to as the "12/14/2009 Injunction Hearing.")[3]

Also, on December 2, 2009, Northern filed an action in the District Court of Pratt County, Kansas entitled *Northern Natural Gas Company v. ONEOK Field Services Company, L.L.C., et. al.,* Case No. 2009-CV-111 (hereafter referred to as the "State Case.") (Doc. 159.) The petition in that case alleges that the defendants purchase gas from 24 wells owned or operated by L.D. Drilling, 4 wells owned or operated by VAL Energy, and 6 wells owned or operated by Nash. (Doc. 159-1 at 10-11.) The petition further alleges that by purchasing, transporting and reselling gas from these wells, which Northern alleges is Northern's storage gas, the defendants in the State Case have exercised ownership over Northern's storage gas without authority and have therefore committed conversion. (Doc. 159-1 at 12-13.)

In the Injunction Hearing held on December 14, 2009 in this case, Northern presented the testimony of one of its expert witnesses, Dr. Paul Boehm. Dr. Boehm's primary areas of practice are geochemistry and environmental chemistry with an emphasis and specialization in hydrocarbons. (Doc. 172 at 28.) Dr. Boehm testified that it was his conclusion that the source of the gas in the four Nash wells

_____

[3] The transcript of the Injunction Hearing is (Doc. 172.)

(CRC 1, CRC 2, Staab No. 1 and Trenkle) was storage gas from the Cunningham Field. (Doc. 172 at 64.) Northern did not call their other two expert witnesses, Mr. Brush and Mr. Cook, but relied on the affidavits filed by those witnesses as exhibits to Northern's motion for preliminary injunction.[4] (Doc. 172 at 110.) Nash did not call any witnesses. *Id*. The District Court then took the motion under advisement. (Doc. 172 at 120.) Shortly thereafter, the District Court entered an Order denying Northern's Motion for Preliminary Injunction, finding that there was no evidence before the court that would support any finding that Northern will suffer irreparable harm without issuance of the requested injunction. (Doc. 166 at 13.)

By Memorandum and Order of December 18, 2009, the undersigned magistrate judge granted Northern's motion to amend its complaint to add as new defendants several individuals and entities who were alleged to be non-operating working interest owners or overriding royalty interest owners in the wells operated by Defendants. (Doc. 165.) Those parties have now been served and have filed answers. Northern did not, as part of its motion to amend, seek to join any of the

---

[4] The Affidavit of Randal M. Brush, P.E. is Doc. 105-1, and the expert report of Thomas W. Cook, a Registered Professional Geologist is Doc. 105-3.

royalty owners (*i.e.*, landowners) who owned the land upon which the subject wells are located.

Finally, the Court has been advised that two of the three original defendants in this case -- L.D. Drilling, Inc. and Nash Oil & Gas, Inc. -- have now been added as third-party defendants in the State Case, and that they have filed a motion for summary judgment in that case seeking a declaratory judgment that K.S.A. 55-1210 does not permit Northern to retain title to storage gas which has migrated beyond property adjoining Northern's certificated storage field or, in the alternative, seeking to have the state district court certify that issue to the Kansas Supreme Court. (Doc. 244.) In response, Northern filed a motion in the State Case seeking a stay of that case pending final resolution of the present federal court case. (Doc. 244-1 & 244-2.) At a hearing on March 12, 2010, the state district judge denied Northern's motion to stay the state case and set a deadline of April 1, 2010 for submissions concerning the pending motion for summary judgment.[5]

---

[5] This information was provided to the Court by a letter of March 19, 2010, from counsel for L.D. Drilling in response to a letter of March 18, 2010, from counsel for Northern.

# DISCUSSION

The subject of Northern's motion to compel and Defendants' motion for a protective order is Northern's service of requests pursuant to Fed. R. Civ. P. 34 to L.D. Drilling, Inc. (Doc. 123-2), to VAL Energy, Inc. (Doc. 123-3), and to Nash Oil & Gas, Inc. (Doc. 123-4) to allow Northern's entry onto the land and access to the wells operated by those entities for the purpose of conducting a gas sample collection program in accord with a Natural Gas Sampling Plan attached to each notice. Each of the defendants responded to the Rule 34 request and objected to the proposed entry and sampling. (Doc. 123-7 to 123-9.)

Fed. R. Civ. P. 34(a)(2) provides that a party may serve on another party a request within the scope of Rule 26(b)

> To permit entry onto designated land or other property possessed or controlled by the responding party, so that the requesting party may inspect, measure, survey, photograph, test or sample the property or any designed object or operation on it.

In 1970, Rule 34 was amended in two respects that are relevant to this case: (1) the rule was modified so that it no longer required a showing of "good cause"; and (2) the rule was expanded to include testing and sampling as well as inspecting or photographing tangible things. Advisory Committee Notes, 1970 Amendments.

Sixteen years prior to the 1970 Amendments, the Tenth Circuit addressed the provisions of Rule 34 in connection with a plaintiff's request to enter on land under defendant's control in order to make a deviational and directional survey to determine whether an oil well drilled by defendant had deviated to such an extent that it encroached on, and was bottomed underneath plaintiff's land, thus allowing defendant to produce oil from plaintiff's land. Williams v. Continental Oil Co., 215 F.2d 4 (10th Cir. 1954). While a majority of the Tenth Circuit opinion deals with the question of whether plaintiff had established "good cause" to obtain entry on defendant's land, a requirement no longer part of Rule 34, the opinion also contains helpful insight on the issues raised in the present motions.

First, the Court noted that there was evidence presented that a directional survey is the recognized and accepted method of ascertaining with certainty the direction taken by a crooked hole of an oil well. 215 F.2d at 8. Second, there was no testimony that indicated that the testing had caused substantial injury or damage to other wells where the survey had been used. _Id._ Third, there was one method -- and only one -- known to those engaged in the business by which it could be determined with certainty and sureness the exact location of the underground terminus of the hole, _i.e._, a directional survey. _Id._ Therefore, such a survey was the only way to prove or disprove the crucial fact in the case, and plaintiff had no

other means of evidence that could established with the same certainty the location of the bottom of the well.  *Id.*  Fourth, this was not an instance where the desired survey was "cumulative" of other available procedures to establish the critical fact. *Id.*  After considering these factors, the Tenth Circuit concluded that the trial court had erred in finding that plaintiff had not established good cause to enter on the land and to conduct the survey.[6]

As Rule 34(a) specifically states, any discovery request served under that rule must be "within the scope of Rule 26(b) . . . ."  Thus, unless otherwise limited by court order, parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.  Fed. R. Civ. P. 26(b)(1).  For good cause, the court can also order discovery of any matter relevant to the subject matter involved in the action.  *Id.*  Relevant information need not be admissible at trial if the requested discovery appears reasonably calculated to lead to the discovery of admissible evidence.  *Id.*

---

[6]  In a dissent, Chief Judge Phillips noted that the trial court was vested with a wide discretion in determining whether good cause had been proven and that the trial court should not be reversed absence a showing of a clear abuse of discretion.  215 F.2d at 9. He also viewed plaintiff's request as being in the category "of what is commonly characterized as a 'fishing expedition,' which should not be countenanced."  *Id.*  Finally he noted evidence that the survey might result in damage to the well and that the bond offered by plaintiff was not sufficient should the survey cause the loss of the well.  *Id.*

In this case, Northern's request for sampling and testing of Defendants' wells is relevant to Northern's claim that those wells are producing Northern's storage gas. It is undisputed that gas samples may provide _some_ evidence that is relevant to the determination of whether the gas being produced by defendants is native gas or Northern's storage gas. Defendants do not appear to directly contest the relevancy of Northern's request, but claim that the discovery should be denied (1) because it seeks to obtain defendants' "trade secrets;" (2) because K.S.A. 55-1210(c)(2) limits well testing to wells located on property adjoining Northern's storage area, whereas most of the wells which Northern seeks to test are not on property adjoining the storage area.

Before reaching defendants' specific objections, it should be noted that any discovery contemplated by Fed. R. Civ. P. 26(b)(1) is expressly subject to the limitations of Fed. R. Civ. P. 26(b)(2)(C) which states:

> _When Required._ On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:
>
> **(i)** the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

**(ii)** the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

**(iii)** the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

After reviewing the Advisory Committee Notes to the 2000 revisions of Rule 26, the Tenth Circuit has noted that the 2000 amendments were meant to involve the court more actively in regulating the breath of sweeping or contentious discovery, and that the provisions of Rule 26(b)(1), which makes all discovery subject to the limitations set out in Rule 26(b)(2)(C)(i through iii), was added to emphasize the need for active judicial use of subsection (b)(2) to control excessive discovery.  In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1189 (10th Cir. 2009).

In addressing defendants' argument concerning the fact that many of the wells which Northern seeks to test are not located on "adjoining property" as that phrase is used in K.S.A. 55-1210, the court acknowledges the disagreement of the parties about the meaning of the phrase "adjoining property."  Defendants contend that to be adjoining, property must be adjacent to, abut or touch the certified boundaries of Northern's Cunningham Field.  Northern contends that to qualify as adjoining, property only needs to be adjacent to, abut or touch any area in which

10

Northern has a legal right to store gas (sometimes referred to by Northern as their "Storage Rights Area,") even though that area lies outside the certified boundaries of the Cunningham Field. This Court has previously concluded that Northern's storage rights area is properly considered a part of its underground storage field despite the fact that the area was not certified by either the FERC or KCC. (Doc. 60 at 22.) While defendants have appealed that Order to the Tenth Circuit Court of Appeals,[7] until a decision by the Tenth Circuit, that ruling remains the law of the case. As such, the court will apply that definition in considering defendants' objections.

### 1. Wells on adjoining property.

As noted above, the Court has already determined that four Nash wells -- CRC 1, CRC 2, Staab No. 1 and Trenkle -- are located on "adjoining property" within the meaning of K.S.A. 55-1210. (Doc. 60 at 22.) As such, the Court allowed Northern to test those four wells pursuant to the provisions of K.S.A. 55-1210(c)(2), and those tests were taken in the summer of 2009. *See* Northern's Ex. 12, 12/14/2009 Injunction Hearing. After filing the new FERC application, Northern was able to obtain additional samples from these same four wells on

---

[7] Tenth Circuit Appeal No. 09-3135.

November 23, 2009 through the FERC proceedings.  *See* Northern's Ex's 13 & 14, 12/14/2009 Injunction Hearing.[8]

At the 12/14/2009 Injunction Hearing, Dr. Boehm testified on behalf of Northern that in reaching his conclusion that the four Nash wells were producing Northern's storage gas, he prepared an exhibit - Exhibit 16 -- which set out all of the data on the four Nash wells.  (Doc. 172 at 49.)  On direct examination he was asked about the quality and quantity of the data concerning the Nash wells.  He responded that the quality and reliability was "excellent."  (Doc. 172 at 49.)  In response to the next question concerning whether the number of samples was sufficient to evaluate the possible sources of the gas, he stated:

> A.    These are a lot of samples from the four Nash wells. We've essentially sampled all of the wells at least twice and three of the four wells three times, in duplicate each time. This is a very substantial amount of data and compared with the rest of the data that I presented to do my analysis, it's really a tremendous data set.

(Doc. 172 at 50, lines 3-8.)  Dr. Boehm also presented another exhibit -- Exhibit 19 -- which plotted gas samples taken from various wells.  On that exhibit, green circles  represented native Viola gas, red circles represented samples from the May

---

[8] In a January 21, 2010 letter to the Tenth Circuit in the pending appeal, Northern stated that these tests were "from the November 2009 FERC sampling event . . . ."

and June 2009 sampling of wells, and yellow boxes represented the most recent gas samples taken in November 2009. (Doc. 172 at 56.) Dr. Boehm pointed out that in considering the gas composition of storage gas the red circles and the yellow squares that were within the red "boxes" shown on the exhibit had a "99 percent confidence interval" that they represented storage gas. (Doc. 172 at 56-57.)

After considering this testimony (which was not available at the time Northern filed its motion to compel in August 2009), the Court finds that any re-testing of the four Nash wells -- CRC 1, CRC 2, Staab No. 1 and Trenkle -- would be unreasonably cumulative or duplicative, and Northern has had ample opportunity to obtain the requested information by discovery in this case (and through the FERC proceedings).[9] As such, pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i) and (ii), the court must limit this requested discovery. Therefore, insofar as Northern's motion to compels seeks to require the re-testing of the four Nash wells, the motions is **DENIED.**

### 2. Wells on non-adjoining property.

---

[9] The Tenth Circuit considered whether requested entry on land for purposes of testing was cumulative as part of its "good cause" determination in Williams v. Continental Oil Co., 215 F.2d at 8.

Before addressing the two specific objections by Defendants to any testing of their wells that do not adjoin Northern's storage area, the Court believes that it is important to review the evidence presented during the 12/14/2009 Injunction Hearing concerning wells North of the Cunningham Field but which are not on "adjoining property."

Northern's Rule 34 requests identify the wells that it wishes to test by name and by date of completion. *See e.g.*, Doc. 122-2. While this may be a sufficient description for Defendants to identify which wells are involved, that information is not particularly helpful to the Court. In an attempt to determine the location of these wells, the Court has reviewed all of the maps which were used by Northern as exhibits in the December Injunction Hearing. Even then, some of the well names are difficult to specifically identify, particularly where there are numerous wells with the same name but with different well numbers.

It appears that Northern is seeking to test 25 wells of L.D. Drilling, 4 wells of VAL and 4 wells of Nash (not counting the CRC 1, CRC 2, Staab No. 1 and Trenkle which are discussed above and which have been tested at least twice before). From the Court's review of the Rule 34 requests and the maps used by Northern as exhibits at the 12/14/2009 Injunction Hearing, it appears that none of

these wells are on property that is currently adjoining Northern's "Storage Rights Area" as previously defined by the Court.

In Dr. Beohm's testimony at the 12/14/2009 Injunction Hearing he identified an exhibit -- Exhibit 11 -- that showed other wells for which Northern had data. (Doc. 172 at 44.)  These wells include the Guthrie and Henrichs wells which are observation wells drilled recently by Northern.  Also shown are other wells located north of the Trinkle and Staab wells for which Northern has been able to obtain data from the KCC.  (Doc. 172 at 44.)  Finally, five or six miles north of the certified boundaries of the Cunningham Field is the Schwertfeger well which Northern has been able to test repeatedly in the last year (apparently by consent of the operator).  (Doc. 172 at 44.)  Also shown on that chart are the Nash wells and the Holland and Vernon wells.[10]

Northern's counsel indicated in questioning Dr. Boehm that Dr. Boehm had "provided a substantial amount of information about these wells in [his] affidavit," and counsel asked his findings about those wells. (Doc. 172 at 44.)  Dr. Boehm responded

_____

[10]  During the November 2009 FERC testing, Northern was apparently able to test Nash's Holland 1-26 well in addition to the four Nash wells that had previously been tested pursuant to this Court's Order.  *See e.g.*, Exhibits 13 & 14, 12/14/2009 Injunction Hearing.

A.   These wells to the north of the Nash wells, all of them
in this grouping, are producing storage gas. The further north
we go to the Schwertfeger well, we start to see a mix of
storage gas and native gas, which we can clearly define because
we know what the two -- what the compositions of the two
sources are, native and storage gas. So when we see a mixture,
we can identify that in the sample. So mostly storage gas being
produced; further north than the area, we see a mix of
native and storage.

(Doc. 172 at 44, lines 23-25 through 45, lines 1-6.)  As to Northern's two

observation wells, Dr. Boehm testified that it was his opinion that the Guthrie well

produced 100 per cent storage gas, while the Henrichs well is 100 per cent native

gas.  (Doc. 172 at 45.)

    While the Court is not certain that all of the wells which Northern now seeks

to test are identified on the maps presented as exhibits at the 12/14/2009 Injunction

Hearing, it does appear that most of those wells are found on Northern's Exhibit

25, and those wells are generally located to the north and west of the Nash wells

that have been previously tested, and to the south and west of the Swertfeger well.

*Cf.* Exhibit 11 and Exhibit 25, 12/14/2009 Injunction Hearing.[11]  As such, these

wells fall in the general area where Dr. Boehm, based on information already

---

[11]  It appears that the wells Northern wants to test are identified on the map
attached as Exhibit 1 to Northern's Objection to [the Magistrate Judge's] Memorandum
and Order Pursuant to Rule 72(a).  (Doc. 169 at 6; Doc. 169-1.)

available to Northern, has determined that several wells are producing storage gas or at least a combination of storage and native gas.

Because Dr. Boehm was able to testify about the grouping of wells that are located north of the Nash wells, and was able to testify, without qualification, that all of those wells were producing storage gas, there is some question whether the requested testing of all thirty-three of Defendants' wells is actually necessary. This was further highlighted in a pleading filed by Northern after the 12/14/2009 Injunction Hearing, where Northern stated that Dr. Boehm had "conducted an extensive investigation which collected samples and gas analysis data from numerous wells within, around and north of the Cunningham Storage Field, including numerous wells operated by Defendants." (Doc. 169 at 4.) After describing Dr. Boehm's studies in some detail, Northern concluded that "[A]pplying these distinguishing characteristics to the court ordered testing as well as FERC and other available gas composition and isotopic information from Defendants' Wells confirms that Defendants are producing Northern's storage gas." (Doc. 169 at 5.) Finally, Northern noted that Dr. Boehm's study and analysis was not limited solely to the Nash wells located near the storage field, but stated that "Dr Boehm's testimony and exhibits included Defendants' wells

significantly beyond one mile from the storage rights boundary and confirmed they were producing migrated storage gas in whole or in part." (Doc. 169 at 5.)

All of these statements, made several months after Northern requested entry on Defendants land to test their wells, and after Northern had obtained additional testing through the FERC proceedings, suggests that any further well testing might well be unreasonably duplicative or cumulative. If that is correct, the Court must limit that discovery pursuant to Fed. R. Civ. P. 26(b)(2)(C)(i). However, because there may be some uncertainty as to precisely which wells Dr. Boehm was referring to in his testimony at the 12/14/2009 Injunction Hearing, the Court will not limit or prohibit the requested discovery under the provisions of Fed. R. Civ. P. 26(b)(2)(C) at this time.[12] Therefore, the Court will proceed to address both of the objections raised by Defendants to the requesting well testing.

---

[12] While Defendant Nash criticized Dr. Boehm's analysis and conclusions at the 12/14/2009 Injunction Hearing, Nash did not put on any expert testimony of its own at that time.

<u>A.</u>    <u>The Trade Secret Claim.</u>

In opposing Defendant's request to any sampling of their gas wells,

Defendants first argue that allowing sampling would effectively expose their trade

secrets or other confidential commercial information  to Northern who they

contend is their competitor in acquiring leases on properties north of the

Cunningham Storage Field.  *See* Doc. 115 at 3-5, 11-12; Doc. 115-3 (Affidavit of

L.D. Davis).  Mr. Davis states in his affidavit that

> [i]nformation about the physical and chemical
> composition of material produced from oil and/or  gas
> wells, including gas, oil, other hydrocarbons, and other
> matter including but not limited to helium, nitrogen, and
> water . . . is generally considered within the oil and gas
> industry, and considered by me personally, to be
> economically valuable information, and to derive its
> economic value to those that possess it from its not being
> generally known to, or readily ascertainable to, other
> persons who might otherwise make use of and find such
> information valuable.

(Doc. 115-3 at 1-2.)  Defendants argue that the court must balance Northern's need

for the trade secrets against the claimed injury to Defendants that would result

from disclosure, citing <u>Centurion Indus., Inc. v. Warren Steurer & Assocs.,</u> 665

F.2d 323, 325 (10th Cir. 1981).

Northern disputes the characterization of gas samples as trade secrets, citing Freeman v. Bureau of Land Management, 526 F. Supp.2d 1178, 1190-92 (D. Or. 2007) for the proposition that the mineral composition in an ore deposit is not a plan, formula, process or device and thus cannot be protected as a trade secret. (Doc. 127 at 7.) Northern also argues that there is a significant difference between protection from disclosure of things such as seismic data and accompanying analytical methods for projecting the location of subsurface oil and gas reservoirs, which are normally treated as trade secrets, and mere gas composition information. *Id.* Northern emphasizes that it is not seeking Defendants' projections of reserve estimates or analysis of seismic data, and that allowing the well sampling requested by Northern will not cause Defendants to reveal how they select well locations, operate their drilling rigs, etc. (Doc. 127 at 9.)

The Federal Rules of Civil Procedure provide that a court may enter a protective order, for good cause, to protect a party from oppression or undue burden or expense by

> requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way . . . .

Fed. R. Civ. P. 26(c)(1)(G).  The Tenth Circuit has long held that there is no

absolute privilege for trade secrets and other similar confidential information.

Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d 323, 325 (10th Cir.

1981).  *See also*, In re Cooper Tire & Rubber Co., 568 F.3d 1180, 1189 (10th Cir.

2009).   These Tenth Circuit cases have established the procedure for dealing with

trade secret claims during discovery.  In order to prevent disclosure, a party

seeking a protective order must first establish that the information sought is a trade

secret, and then demonstrate that its disclosure might be harmful.  If the party

seeking a protective order makes such a showing, then the burden shifts to the

party seeking discovery to establish that the disclosure of the trade secret is

relevant and necessary to the action.  If the party seeking discovery meets that

burden, then trade secrets should be disclosed unless they are privileged or

production would be unreasonable, oppressive, annoying or embarrassing.

After examining the case cited by Northern for the proposition that the

mineral composition in an ore deposit is not a plan, formula, process or device and

thus cannot be protected as a trade secret (Freeman v. Bureau of Land

Management,), the court is not convinced that it governs the present case.  While

Freeman does involve a claim of a trade secret, the case is decided under the

Freedom of Information Act (FOIA), and not in the context of a discovery dispute

under the federal rules.  Moreover, Rule 26(c)(1)(G) covers more than "trade secrets," it also covers "other confidential research, development, or commercial information."  Defendants have come forward with an affidavit of Mr. Davis stating that information such as gas composition is considered both by him and by the industry as valuable confidential economic or commercial information.

However, even assuming *arguendo*, that the court were to accept the characterization of gas composition information as confidential commercial information which is protected by the rule, in order to meet the Tenth Circuit tests for protecting that information, Defendants must also establish that disclosure of this information would be harmful to them.  Defendants claim the harm in this case is due to alleged competition between Defendants and Northern to acquire leases north of the Cunningham Storage Field.  While this competition to obtain more lease acreage may undoubtedly exist, Defendants have not adequately established how the disclosure of gas composition information would be helpful to Northern, or harmful to Defendants, in connection with either party's negotiations with landowners in an attempt to acquire lease rights to their properties.  Here, Northern wants to acquire more gas storage leases, not leases for the production of active oil or gas wells, while Defendants want to acquire oil and gas leases in order to explore for and produce oil and/or gas.  The court is at a loss to see how

Defendants are competitively harmed if Northern knows the gas composition of gas produced from the wells Northern now seeks to sample in these circumstances.

Thus, even though the gas composition information may be considered as confidential commercial information, because Defendants have failed to establish any harm to them from Northern's sampling of gas produced by the wells, and because the gas composition information is relevant and important to the issue of whether the gas being produced is native gas or storage gas, sampling of the wells cannot be prohibited simply because the information sought may be "trade secrets."

Finally, even if Defendants were able to clearly establish that they would be harmed by disclosure of gas sampling information pertaining to their wells, any balancing of the harm to Defendants with Plaintiff's need for the gas composition information weighs in favor of allowing the testing. While gas composition studies and comparisons may not be the <u>only</u> way to prove whether gas is storage gas or native gas, it clearly is a recognized and important test that can be accorded significant weight in certain circumstances.[13]

---

[13]  In <u>Williams v. Continental Oil Co.</u>, 215 F.2d at 8, the Tenth Circuit pointed out that the requested entry on Defendant's land to conduct a deviational and directional survey test was the only established way to determine whether a well had been drilled under Plaintiff's land by mistake.

## B.     The Adjoining Property Issue.

Defendants' next contend that because the wells Northern now seeks to test are all on property which does not adjoin the certified boundaries of Northern's Cunningham Field (and likewise are on property which does not adjoin any of Northern's Storage Rights Area), Northern should not be entitled to conduct well tests and take gas samples.   This involves consideration of the statutory interpretation of K.S.A. 55-1210, and the interplay between K.S.A. 55-1210 and Fed. R. Civ. P. 34.

The Court has previously discussed the parties conflicting interpretations of various subparagraphs of K.S.A. 55-1210.  *See* Doc. 165 at 5-11.  Simply stated, Northern contends that under K.S.A. 55-1210(a), it retains title to all gas it has injected into its storage area regardless of how far that gas may migrate away from its storage field, and that it is therefore entitled to recover the value of any such injected gas in this federal diversity action for common law conversion. Defendants counter that KS.A. 55-1210(c)(1) only protects an injector's right to retain title to gas that migrates to property which adjoins the storage field, and that Northern therefore cannot maintain an action for common law conversion as to gas that migrates beyond such adjoining properties.  Both parties have previously advised the Court, either during scheduling conferences or in written pleadings,

that this issue of statutory interpretation is a purely legal issue as to which no discovery is necessary. *See e.g.*, (Doc. 198 at 1) ("There is no justification for the Court to delay ruling on the pure question of law presented in Northern's objection --  whether the Kansas Legislature abolished the Rule of Capture without geographic or geologic limitation.")

If Northern's interpretation of the statute is adopted, the gas composition of gas produced from Defendants wells that are located on properties that do not adjoin Northern's storage field is clearly relevant to Northern's conversion claim and the question of whether gas produced by those wells is native gas or storage gas.  On the other hand, if Defendants' interpretation of the statute is adopted, Northern is not legally entitled to seek recovery of the value of gas that migrated from its storage field to Defendants' wells since none of those wells (except the four Nash wells discussed above) are located on property that adjoins Northern's storage rights area.  In that case, any evidence of the gas composition of gas being produced from those wells would not be calculated to lead to the discovery of any admissible evidence, and as such would not be discoverable.  *See* Fed. R. Civ. P. 26(b)(1).

While both parties admit that interpretation of K.S.A. 55-1210 is critical to the issues in this case, Defendants have not seen fit to seek an ruling from this

court as to the correct interpretation of the statute by filing an early dispositive

motion.[14]   Northern has attempted to raise the statutory interpretation issue, but

did so through the unusual procedure of seeking to appeal a discovery ruling on

their motion to amend that was, in fact, favorable to them.  *See* Doc. 169.[15]  The

Court has refused to consider this key issue unless it is raised in an appropriate

procedural fashion.  (Doc. 199.)

---

[14]   In their September 3, 209, Reply in support of the motion for protective order, Defendants discussed the statutory interpretation issue, described it as dispositive and stated their intent to raise this issue on summary judgment "as soon as practicable."  (Doc. 137 at 5.)

[15]   In seeking review of the magistrate judge's order allowing Northern to amend their complaint and join additional parties, Norther cited <u>Hayes Sight & Sound, Inc. v. ONEOK, Inc.</u>, 281 Kan. 1287, 136 P.3d 428 (2006) to support its argument that an injector can recover gas that has migrated even beyond any adjoining property.  (Doc. 169 at 17.)  The quotation cited, however, is not as definitive as Northern suggests.  The Kansas Supreme Court stated that "[s]ection (c)(1) provides that migration does not <u>necessarily</u> cause the injector to lose title to stored gas . . . ."  281 Kan. at 1327 (emphasis added).  Furthermore, later in its opinion, the Kansas Supreme Court continued its discussion of subparagraph (c)(1):

> Subsection (c)(1), for example, is one of the subsections that
> defendants refer to in arguing that the statute protects only the
> gas owners' rights.  Subsection (c)(1), however, does not
> create title in natural gas.  Instead, it provides <u>some protection</u>
> to the titleholder when gas migrates.

281 Kan. at 1329 (emphasis added).  By using qualifiers such as "necessarily" and "some protection," the Kansas Supreme Court stops short of resolving the question of what protection, if any, is available to a gas injector when its gas migrates beyond any adjoining property.

Now, two of the Defendants, Nash and L.D. Drilling, have sought a ruling on this issue of statutory interpretation in the State Case either through a ruling on a motion for summary judgment and/or through a certified appeal to the Kansas Supreme Court. That matter is apparently on a fast track for determination as noted above. As discussed above, that ruling will be pivotal to any decision concerning the testing of Defendants' wells on non-adjoining property.

If Northern's interpretation of K.S.A. 55-1210 is adopted and Northern's claim for conversion is allowed to continue as to gas produced from wells located on non-adjoining property, Defendants still argue that Northern's right to test any wells on non-adjoining property pursuant to Fed. R. Civ. P. 34 is constrained due to the specific limitation on testing found in K.S.A. 55-1210(c)(2). This brings into question the interplay, if any, between the testing provisions of the Kansas statute and the right to conduct tests pursuant to Fed. R. Civ. P. 34. Stated simply, do the testing provisions of the Kansas statute, which restrict testing to wells on adjoining property, trump the testing rights available to a litigant in a federal case under Fed. R. Civ. P. 34.

Northern argues that this is not a statutory action for testing under the provisions of K.S.A. 55-1210(c)(2), and that in this federal diversity case seeking damages under the common law theory of conversion, Northern is entitled to

testing under the discovery procedures set out in Rule 34. (Doc. 127 at 11.)

Defendants argue that the Kansas Statute is substantive in nature and therefore governs in this federal diversity case rather than the procedural provisions of Rule 34. (Doc. 115 at 8.) They argue that the Kansas Legislature, in limiting testing to adjoining property, has expressed a state public policy that should also govern Northern's right conduct tests in this diversity case, and to allow broader testing pursuant to Rule 34 would render the statutory provisions for testing wholly irrelevant.[16] Northern then responds that K.S.A. 55-1210 and Rule 34 can co-exist and do not limit each other. (Doc. 127 at 10.)[17] But, if the two cannot co-exist, then Northern argues that a federal litigant's rights under Rule 34 cannot be abrogated since the state law would violate the Supremacy Clause of the U.S. Constitution. (Doc . 127 at 11.)

In order to decide this issue, the Court will be required to determine whether the Kansas statutory provision concerning testing is substantive in nature or is merely a procedural right. If the statutory right to testing is considered as

---

[16] For example, Defendants point out that K.S.A. 55-1210 requires that any injector wishing to test wells is responsible for all costs and expenses of testing, including any lost production that may occur if the wells are shut in, whereas Rule 34 does not impose similar conditions on the right to conduct such tests. (Doc. 115 at 9.)

[17] For example, Northern points out that K.S.A. 55-1210 limits the right to conduct well tests to entities that are "injectors," whereas Rule 34 can be utilized by any litigant whether or not they are an injector. (Doc. 127 at 10-11.)

substantive state law, then that law governs over federal procedural rules in a federal case based on diversity of citizenship. *See e.g.,* Erie R. Co. v. Tompkins, 304 U.S. 64. 58 S.Ct. 817, 82 L.Ed. 1188 (1938). As previously noted, however, if Defendants' interpretation of K.S.A. 55-1210 is adopted, this issue becomes moot since Northern would have no right to claim conversion as to gas that migrated beyond property that adjoins their storage rights area, and therefore the testing of wells on non-adjoining property would not be calculated to lead to discoverable evidence.

After considering all the circumstances and arguments of the parties, and because all parties agree that the legal issue of statutory interpretation is critical to the claims in this case, the Court concludes that ruling on the motion to compel testing of the thirty-three wells which are not located on adjoining property should be taken under advisement until the court has ruled on the motions for summary judgment and interpretation of K.S.A. 55-1210 in the State Case.[18] While this will necessarily extend the time to complete discovery in this case and move this case

---

[18] Depending upon the result in the State Case and any certification of issues or appeal to the Kansas Supreme Court, this Court may well consider the wisdom of also certifying the same or similar related issues to the Kansas Supreme Court for ruling. Defendants have also asked the Tenth Circuit to certify the adjoining property issue in the pending appeal to the Kansas Supreme Court (Tenth Circuit Appeal No. 09-3135, Motion filed 12/23/2009), and Northern has opposed any such certification. (Tenth Circuit Appeal No. 09-3135, Response filed 1/6/2010).

to trial, the Court believes it to be the most prudent course of action.  Northern is not prejudiced by this procedure since the proceeds of the sale of gas from these wells is being held in suspense by the gas purchasers pending a ruling in the State Case where the gas purchasers are named defendants.  Furthermore, to the extent that Northern intended to use the gas samples in this case to prove issues in the pending FERC proceedings, it appears that Northern can seek permission for testing through the FERC as they have done in the past.[19]

The Court recognizes that it is very likely that any expert testimony elicited by Defendants in this case would, of necessity,  address the issue of the composition of gas being produced from Defendants' wells as part of their expert testimony and to refute the testimony of Northern's experts.  This is true even if Defendants' experts may not believe that Northern's gas composition analysis is the best method for determining whether the gas being produced is native gas, storage gas or a combination of both.  If Defendants' experts do address the issue of gas composition, it is also likely that they would need to have samples of gas from Defendants' wells for testing and analysis.  The Court cautions Defendants

---

[19]  A delay in obtaining the results of the requested well tests may also avoid any disputes that might arise in connection with the procedures required by the Court's prior Protective Order concerning Northern's submission of confidential information to the FERC or the Kansas Corporation Commission.  *See* Doc. 222 at 11, ¶ 15.

that if they seek to prepare and present expert testimony concerning the gas composition of gas produced from the non-adjoining wells, and if they take gas samples from those wells for analysis and consideration by their expert witnesses while this portion of Northern's motion to compel is under advisement, the Court will consider that Defendants have effectively waived any objections they have previously made to Northern's requested testing since Northern would be entitled to have access to those gas samples for purposes of rebutting Defendants' expert testimony.

## STATUS OF RELATED PROCEEDINGS

Because the parties are litigating similar or related questions in (at least) three separate forums, and because the Court is deferring a ruling on Northern's motion to compel until a ruling is issued in the State Case, it is important that this Court be kept advised of the proceedings in both the State Case and also in the FERC proceedings. Accordingly, Northern shall submit a written report concerning the status of the FERC proceedings, including any deadlines and significant filings, not later than **April 16, 2010**, and shall update that report every thirty (30) days thereafter. Similarly, Defendants shall submit a written report concerning the status of the state court case, including any deadlines and significant filings, not later than **April 16, 2010**, and shall update that report every

thirty (30) days thereafter. To the extent that either Plaintiff or Defendants believe that the reports being submitted by the other side are incomplete or inaccurate, they may submit written supplements to reports filed by their opponents within fourteen (14) days after submission of each such report. These reports and supplements shall be filed electronically.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Compel Entry Onto Land to Inspect and Test and supporting memorandum (Doc. 122), is hereby DENIED in PART and TAKEN UNDER ADVISEMENT in PART as follows:

A.     The motion is DENIED as to the request to re-test the four Nash wells known as the CRC 1, CRC 2, Staab No. 1 and Trenkle wells; and

B.     The motion is TAKEN UNDER ADVISEMENT as to the request to test the 25 wells of L.D. Drilling, the 4 wells of VAL and the 4 wells of Nash which are located on property that is not adjoining Northern's Storage Rights Area pending a ruling in the state court case concerning interpretation of K.S.A. 55-1210.

Dated at Wichita, Kansas, on this 26th day of March, 2010.

  s/ DONALD W. BOSTWICK
Donald W. Bostwick
United States Magistrate Judge