IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,

        Plaintiff,

v.                                              Case No. 08-1405-JTM

L.D. DRILLING, INC.,
VAL ENERGY, INC.,
NASH OIL & GAS, INC., *et al.*,

        Defendants.

**MEMORANDUM AND ORDER**

This matter is before the court on Nash Oil & Gas, Inc.'s Motion for Judgment on the Pleadings. (Dkt. 620). The motion argues that Northern's claims are barred by *res judicata*. The argument is essentially the same one made by Nash and rejected by Judge Brown in 2009 (Dkt. 152), but Nash contends the "landscape has changed significantly" and that the matter should be reconsidered. Nash's arguments are no more persuasive than they were in 2009, however, and the court accordingly denies the motion.

**I. Rule 12(c) standards**

The court analyzes a motion for judgment on the pleadings under the same standards governing a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Park Univ. Enters., Inc. v. Am. Casualty Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). "To survive a motion to dismiss, a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *The Estate of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1106–07 (10th Cir. 2016), *cert. denied sub nom. Lockett v. Fallin*, 137 S. Ct. 2298 (2017) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a motion to dismiss, the court must accept as true all well-pleaded allegations and view those allegations in the light most favorable to the non-moving party. *See Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

**II. Background**

An overview of the litigation surrounding the Cunningham Storage Field is necessary to address Nash's arguments. Northern sued Trans Pacific Oil Corp. ("Trans Pac") in 2002, claiming that Trans Pac's two "Park Wells" just northwest of the storage field boundary were producing Northern storage gas. *Northern Nat. Gas Co. v. Trans Pacific Oil Corp.*, No. 02-1418-JTM (D. Kan. filed No. 19, 2002). In 2004, Northern sued Nash Oil & Gas, claiming Nash was producing storage gas from four wells located about four miles due north of the Park Wells. *Northern Nat. Gas Co. v. Nash Oil & Gas, Inc.*, No. 04-1295-JTM (D. Kan. filed. Sept. 3, 2004). In 2005, in the *Trans Pacific* case, a jury found Northern storage gas had *not* migrated to the two Park Wells after July 1, 1993.[1] The Tenth Circuit subsequently affirmed the judgment. *Northern Nat. Gas Co. v. Trans Pacific Oil Corp.*, 248 F.App'x 882, 2007 WL 2753079 (10th Cir. 2007).

In March of 2007, this court granted Nash's motion for summary judgment in Case No. 04-1295, on two separate grounds. First, it found Northern's claims for conversion

---

[1] This was the effective date of K.S.A. § 55-1210, which established a storage field operator's property rights to natural gas injected into its storage field.

and unjust enrichment were barred by the statutes of limitations (two and three years, respectively), because Northern had reason to believe by 2000 that the challenged Nash wells were producing storage gas. Second, the court found the claims were barred by the collateral estoppel (issue preclusion) effect of the *Trans Pacific* judgment, because Northern's expert testified there was a single migration pathway from the storage field to the Trans Pac wells to the Nash wells, which was merely "an extension of the theory presented [and rejected by the jury] in the [Trans Pac] case." (Dkt. 136 at 13). On appeal, the Tenth Circuit affirmed the finding that the claims were barred by the statute of limitations. *Northern Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626 (10th Cir. 2008).

Meanwhile, in 2005, the Federal Energy Regulatory Commission (FERC) found Northern had shown that storage gas was migrating beyond the storage field's boundaries, and it authorized Northern to install additional withdrawal and monitoring wells. Northern installed observation wells to the east of the Park Wells. Northern alleges that as a result, it obtained evidence that storage gas was migrating across a two-mile wide area of the northern boundary, rather than through a narrow channel as it originally believed. In October 2008, FERC authorized Northern to expand the field boundary by 1,760 acres, finding storage gas had migrated at least to the two Park Wells and into the southern part of a larger 4,800 extension area proposed by Northern.

Northern filed suit against Trans Pac in November 2008, alleging Trans Pac had produced storage gas from the Park Wells after the date of the prior jury verdict. The suit was settled in February 2009. *Northern Nat. Gas Co. v. Trans Pacific Oil Corp.*, No. 08-1365-WEB (D. Kan.).

Northern filed the instant suit on December 23, 2008, against L.D. Drilling, Inc., Val Energy, Inc., and Nash Oil & Gas, Inc. (Dkt. 1). Among other things, the suit challenges production from 25 wells to the north of the 2008 storage field boundary, including five wells completed by Nash subsequent to the filing of Northern's 2004 suit against Nash. The claims in both the initial complaint and the Third Amended Complaint (Dkt. 564) include (among others) conversion,[2] unjust enrichment, and nuisance.

In May of 2009, Judge Brown granted Northern a preliminary injunction allowing it to test the Nash wells for the presence of storage gas. (Dkt. 60). In November of 2009, Judge Brown denied Nash's motion to dismiss the complaint. (Dkt. 152). He rejected Nash's *res judicata* argument, finding that under the Restatement's "transactional approach" for determining when two lawsuits constitute the same claim or cause of action, Northern's claims amount to a separate cause of action from the 2004 lawsuit. Judge Brown noted the wells at issue here (with one exception) were not in existence when the 2004 suit was filed, and he found Northern was challenging conduct that occurred after the filing of the first suit. He noted that the wells in this suit were in a different location and were significantly closer to the storage field boundary. Northern alleged that pressure sinks caused by the new wells, and their production of large amounts of water, were unreasonably interfering with Northern's use of the storage field, such that their operation constituted a continuing nuisance. Because "[t]hese allegations

---

[2] At oral arguments on January 8, 2018, counsel for Northern announced that Northern would not be pursuing its conversion claim. Accordingly, the parties should file a signed stipulation of dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), or Northern should file a motion to voluntarily dismiss the claim pursuant to Rule 41(a)(2).

4

involve conduct subsequent to the filing of the 2004 case," Judge Brown concluded "that such actions should not be considered part of the same transaction as Case No. 04-1295." (*Id*. at 19).

In December of 2009, Judge Brown denied Northern's request for an injunction to shut-in the Nash wells. (Dkt. 166). Although he found "strong evidence that the gas being produced by the four Nash wells is storage gas from the Cunningham Storage Field," he found no irreparable harm because the money from Nash's gas sales was being held in suspense.

On June 2, 2010, FERC granted Northern authority to condemn a 12,320-acre portion of the Viola and Simpson formations north of the existing field—the 2010 Extension Area—including the acreage where Nash operated the aforementioned wells. Northern commenced a separate condemnation action. *Northern Nat. Gas Co. v. Approx. 9917.53 Acres*, No. 10-1232-JTM (D. Kan. filed July 16, 2010).

In September 2010, Judge Brown granted the defendants partial summary judgment on Northern's conversion claim. He found the claim was barred as to any gas production before June 2, 2010 (the date of the FERC certificate), due to the collateral estoppel effect of a Pratt County District Court judgment which held that Northern did not have title to any gas produced by defendants in the Extension Area before that date.

In December 2010, Judge Brown granted Northern's motion for a preliminary injunction to shut-in defendants' wells in the 2010 Extension Area. (Dkt. 420). He found Northern was likely to prevail on a nuisance claim and would suffer irreparable harm

from interference with the storage field absent an injunction. The order was upheld by the Tenth Circuit in 2012. (Dkt. 515).

In 2013, the Kansas Supreme Court affirmed the Pratt County District Court judgment, finding that Northern lost title to any storage gas that "migrated horizontally beyond property adjoining Northern's certified storage field," that such gas was subject to the rule of capture, and that Nash and the other defendants "possessed title to gas produced from their wells before June 2, 2010." *Northern Nat. Gas Co. v. ONEOK Field Svcs. Co.*, 296 Kan. 906, 296 P.3d 1106 (2013). The Supreme Court remanded the case to the Pratt County District Court "to resolve any claims that may exist regarding matters after June 2, 2010…." *Id*. at 942.

In the condemnation case (No. 10-1232), the district court appointed a Commission to determine just compensation. The court instructed the Commission to include the value of all economically recoverable hydrocarbons in the 2010 Extension Area (i.e., including storage gas) in the condemnation award.[3] The instruction was based on the court's finding that issuance of the FERC certificate on June 2, 2010, caused no change in ownership of gas in the Extension Area, and that the landowners still owned any gas

---

[3] The Commission noted it was "essentially undisputed" at its hearings that gas was leaking out of the storage field across a lengthy fault that was originally thought to form a physical barrier to gas migration across the northern boundary of the Cunningham Storage Field. (Case No. 10-1232, Dkt. 888 at 6). The Commission also made a number of findings concerning the migration, including: the Viola formation in the 2010 Extension Area was completely saturated with water prior to 1978, with no accumulation of native gas of any consequence there; that during fill-up of the storage field, about 1.4 BCF of a mixture of storage and native gas migrated to area of the Young 1-26 and Holland 1-26 wells; that no further migration occurred until defendants' production began in the Extension Areas in 1995; and thereafter about 3.5 BCF of gas accumulated in the 2010 Extension Area to replace water produced from the Viola. (*Id*. at 35-36).

6

under their property on March 30, 3012, the date of taking.[4] The Tenth Circuit recently reversed that finding, concluding that Northern acquired ownership of all storage gas in the Extension Area contemporaneously with issuance of the FERC certificate on June 2, 2010, such that Northern owned the gas on the date of taking. *Northern Nat. Gas Co. v. L.D. Drilling*, 862 F.3d 1221 (10th Cir. 2017).

**III. Discussion**

Nash argues *res judicata* bars Northern's claims because "Northern has again sued Nash in the same Court, again alleging that Nash has been unlawfully producing Northern's storage gas north of the Cunningham Storage Field." (Dkt. 621 at 11). Northern's addition of a nuisance claim makes no difference, Nash argues, because Northern could have asserted a nuisance claim in the 2004 suit. Nash argues its new wells and new production after 2004 did not create a new cause of action because the "act that gave rise to the lawsuit was the same in the prior action as it is now," and "[a]ny issue raised by Nash's continued gas production was decided in the first action." (*Id*. at 13-14). Nash argues that because "the source of the migration was continuous, and Nash's production was continuous, it is logical to view all of Nash's production as part of a single transaction or series of transactions." (*Id*. at 15).

The court previously rejected these arguments essentially because Northern's claims are based on conduct subsequent to the filing of the 2004 lawsuit. (Dkt. 152). That finding was in keeping with the law concerning *res judicata*. "Material operative facts

---

[4] The Pratt County District Court subsequently entered judgment in the state action, finding that issuance of the FERC certificate had no effect on ownership of gas in the 2010 Extension Area. That judgment is currently on appeal to the Kansas Supreme Court.

7

occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be the basis of a second action not precluded by the first." (*Id.* at 19) (citing *Restatement (Second) of Judgments* § 24, comment f.). Thus, "subsequent conduct, … even if it is of the same nature as the conduct complained of in a prior suit, may give rise to an entirely separate cause of action." (Dkt. 152 at 17) (citations omitted).

The court again concludes that the instant suit is based on Nash's conduct subsequent to the 2004 suit and is properly regarded as a separate action under the Restatement test. Nash's contention that resolution of the dispute over four of its wells in 2004 precludes any future challenges defies common sense. This case involves wells that were not in existence at the filing of the 2004 case.[5] The wells are in a different location significantly closer to the storage field. They are approximately one mile east and one mile (or more) south of the wells challenged in 2004. Northern alleges that installation of the newer wells "down-structure (deeper) in the Viola formation … rather than up-structure (shallower) locations, as would be done in developing a naturally defined geologic reservoir, shows that the Defendants understood early in the process of drilling their wells that the source of the gas was the Cunningham Storage Field and the high risk they created for continued viability of the storage field by destruction of containment and loss of storage gas." (Dkt. 564 at 21). Northern further alleges that pressure sinks caused

---

[5] The lone exception is the J.C. No. 1 Well, which Northern previously conceded was subject to the court's 2004 holding that Northern's claims for conversion and unjust enrichment were barred by the statute of limitations.

by defendants' wells resulted in increased gas migration along a two-mile wide migration pathway, resulting in unreasonable interference with Northern's operation of the storage field. Northern alleges it was harmed by the interference because it had to design and implement remedial measures to overcome the increasing migration.

All of the foregoing weighs in favor of the conclusion previously reached—i.e., that Northern's claims are sufficiently distinct in time, space, origin, and motivation to be considered separate from its claims in the 2004 lawsuit. Northern obviously could not have claimed conversion or unjust enrichment in 2004 with respect to non-existent production from non-existent wells. Its nuisance claim alleges that defendants' addition of a number of new wells close to the storage field—with 19 wells having been added in the Extension Area after the 2004 suit was filed—has caused significant new migration that constitutes a continuing nuisance. That is not impermissible "splitting" of a claim, even if Northern could have theoretically asserted a nuisance claim in the 2004 suit. *Cf. Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 326, 327-28 (1955) (claim based on subsequent conduct was not barred by prior judgment; "[s]uch a course of conduct—for example, an abatable nuisance—may frequently give rise to more than a single cause of action."). As the court noted previously, "[i]t is certainly plausible [that] changes in pressure could have a material effect on migration of underground storage gas, and a producer such as Nash could not reasonably expect that Northern's failure to timely challenge production from existing wells in 2004 means that any and all future production from any new Nash wells is beyond challenge." (Dkt. 152 at 19). The addition of a plethora of new wells close to the storage field is subsequent conduct that could conceivably support a continuing

9

nuisance claim. Given this subsequent conduct, as well as the practical difficulties in proving the source of gas production from a third-party well, the dismissal of a challenge to production from four wells in 2004 should not preclude a challenge to production from different wells drilled years later in sections a mile or more away.[6] *See Restatement (Second) of Judgments* § 24, comment b (the transaction test is a pragmatic one to be applied with attention to the facts of the case).

**IT IS THEREFORE ORDERED** this 30th day of March, 2018, that defendant Nash's Motion for Judgment on the Pleadings (Dkt. 620) is DENIED.

                                                                                          ___s/ J. Thomas Marten_____
                                                                                           J. THOMAS MARTEN, JUDGE

---

§ [6] *Cf. Commissioners' Report*, Case 10-1232, Dkt. 888 at 9 ("[T]he evidence overwhelmingly showed, and the experience of several of the commissioners (three of whom have petroleum engineering backgrounds) confirmed, that evaluation of the physical phenomena associated with the underground migration of fluids in hydrocarbon reservoirs is far from an exact science. Instead, it is often an exercise in trial and error in which seemingly reasonable approximations are initially made based on limited, even scant, data, and then refined, revised, or discarded altogether as additional wells are drilled and new data is collected that invariably conflicts to some degree with prior models and assumptions.").