# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS CO.,
      Plaintiff,

    vs.                            No. 08-1405-JTM

L.D. DRILLING, INC.,
     *et al.*,
        Defendants.

## MEMORANDUM AND ORDER

A number of the motions are before the court in the present dispute over the effects of the migration of natural gas which plaintiff Northern Natural Gas injected into a storage field. The gas subsequently migrated to other property. Northern brings claims for private nuisance against the Producer defendants who obtained the gas, based on the allegation that the production caused an unreasonable interference with its storage field. It also brings a claim for unjust enrichment against other interest owner defendants, alleging that they unfairly profited from the extraction. The parties have filed motions which seek to exclude certain evidence, as well as motions for summary judgment on various aspects of the case. The court first addresses the evidentiary motions.

## A. Evidentiary Motions

### 1. Motion to Exclude Expert Keeney

Northern (Dkt. 727) moves to exclude the testimony of George N. Keeney, III, an expert retained by L.D. Drilling, and the opinions contained in his October 17, 2018 report, which was subsequently adopted by other defendants in the action. Keeney was retained to assess the damages that Northern claims it incurred in mitigating the alleged nuisance created by the producer defendants. Northern argues that Keeney's opinions are speculative and unreliable.

Effectively conceding that some of Northern's arguments are well-founded, the defendants argue that Northern's request to exclude the entirety of Keeney's testimony is "overreaching" and that the court should not "exclude *all* of Keeney's testimony and opinions." (Dkt. 752, at 1, 5) (emphasis in original). Having reviewed the pleadings, the court agrees that substantial portions of Keeney's proposed opinions and testimony have not been shown to be reliable and are hereby excluded.

Keeney is a CPA and has been certified by the American Institute of CPAs in Financial Forensics. He has 38 years of experience in the oil and gas industry. He has frequently offered expert opinions in Oklahoma litigation. In his report, Keeney breaks down Northern's claimed damages as falling into six categories:

| | |
|---|---|
| Gas Purchase | $ 36,629,738 |
| Financial Hedging | 16,888,276 |
| Construction & Expansion | 20,007,434 |
| Experts and O&M Costs | 5,595,775 |

|                                                    |            |
| -------------------------------------------------- | ---------- |
| Experts and O&M Costs Northern in-house            | 2,800,471  |
| Profits Disgorgement/Unjust Enrichment             | 30,443,753 |

He then presents five opinions as to these claimed damages. He believes the gas purchase amounts claimed are invalid because Northern has failed to account for the production by non-defendant producers Phillips and Trisum prior to 1984. (Dkt. 728-1, at 4). Second, he contends that the reason for Northern's gas purchases "was more economic than operational," because the timing of the purchases indicates that Northern bought gas when the market price was high, rather than when it was low. (*Id*. at 5). Keeney expressly linked this conclusion in his report to a supposed lack of supporting information:

> No evidence has been provided that indicates the purchased gas was actually injected into the storage facility; in February of 2010 the purchased volume exceeds the injected volume by 16 times. Inclusion of the entirety of purchased gas in the NNG claim is inappropriate. I have searched, but found no NNG internal documents that support its claim that it was necessary to purchase the gas for operational reasons and/or that such purchases were attributable to Defendants' conduct.

(*Id*.)

Third, Keeney states that the hedging losses were not the fault of the defendants, but "the result of bad bets" by Northern in the derivatives markets. He founded this conclusion on (a) the fact that derivative markets were "purely speculative" and "costless collars that are not related to the purchases of natural gas" made by Northern, and (b) that the timing of the hedges appeared to be unrelated to the actual purchases of replacement gas. "Why were the hedges necessary?," he asked. "The disconnect between the periods and prices of hedging and the periods when gas was purchased are a clear indication that the hedges were purely speculative and unrelated." (*Id*. at 5-6).

Fourth, Keeney opines that the cost to improve the Cunningham storage facility overstates the cost of mitigating the nuisance, because it is simply a tally of capital expenditures at the field since 2004. According to Keeney, the work includes costs for containment and storage that Northern would have incurred anyway, or would have incurred as the result of FERC and KCC orders. (*Id*. at 6-7).

With respect to the expert costs for improving the storage field, Keeney again focuses on the lack of support: "the detail supporting the claim for Expert fees associated with the Cunningham projects is inadequate to allow determination of the activities performed and the nature of the respective engagements." (*Id*. at 7).

Northern's motion argues that Keeney's opinions are unreliable because they rest on the assumption that Northern lacked documentation for its damages claims, and that the assumption was false. The information supplied by Northern (Dkt. 728, at 3) indicates that it did, indeed, supply defendants with information which would support its damages claims, and that this information was simply ignored by the defendants and its expert.

The defendants in response stress the sheer size of the discovery presented in the case. (Dkt. 752, at 3) (given the "terabytes" of data, "Keeney [could] not possibly review all of the production in this case"). The defendants suggest that Northern bears the fault

for Keeney's failure to identify the relevant documents, because it "refused" to identify the specifically relevant documents.[1]

The court finds there are two problems with this argument. First, the issue of fault is secondary to the key issue of whether Keeney's opinions are reliable. For the reasons stated below, the court concludes that in important respects they are not, because their central premise is that Northern has no documentary evidence to support its claims. Shorn of this support, Keeney's opinions in many respects fall back on his own *ipse dixit*. Second, the record does not support the conclusion that Northern refused to identify the relevant documents. Northern communicated with defendants as to its claimed damages, but noting the volume of the underlying invoices and other materials, it proposed "retain[ing] the invoices and backup" absent a "request for production." In October, 2018, defendants requested help in locating certain documents – but not supposedly missing damages documents which later formed an essential part of Keeney's opinions.

A review of Keeney's March 1, 2019 deposition supports the conclusion that a lack of supporting evidence was an important factor in Keeney's opinions. Keeney testified that he relied on defendants' counsel to supply him relevant documentation. He would ask for information, and if none would be supplied, he assumed it did not exist:

---

[1] Defendants challenge Northern as "suggest[ing] that L.D.'s counsel might have intentionally withheld relevant documents from Keeney." (Dkt. 752, at 4). The court agrees that under the circumstances of the case there is no reason to believe the failure was intentional. But Northern's argument (Dkt. 728, at 35) was not restricted to a claim of an intentional failure to produce; it explicitly argued that the failure to provide the documents may have been inadvertent, and that exclusion remained appropriate in such case.

Q. Were there any documents that you asked for specifically?

A. Yes.

Q. Okay. And what documents would those be?

A. The -- the native format spreadsheets from virtually all of the experts and the employees that provided information on damages. I asked for copies of contracts with regard to the hedging. I asked for contracts, settlement documents, delivery tickets and so forth with regard to the gas purchases. Most of what I was asking for was backup for -- to substantiate the claim numbers that were being evaluated.

Q. Okay. And were those provided to you?

A. Some were; some weren't.

Q Okay. Do you know what [documents] weren't provided to you?

A. Any kind of supporting documentation.

Q. Can you elaborate on that?

A. Delivery tickets, invoices, payment stubs, gas analysis to purchase gas, the contracts associated with the hedging with the spreads that were done. Virtually all of that information was simply summarized. It was a spreadsheet and that's all the support that was provided.

Q. Okay. Do you know why the additional documentation wasn't provided to you?

A. No.

Q. Okay.

A. I presume it wasn't available.

Q. If it was available, is it something you would want to review?

A. Absolutely.


As Northern notes, Keeney's basic opinion that Northern was buying gas when it was expensive rather when it was cheap is strongly counterintuitive. Further, the opinion fails to take account of other evidence in the case, such as FERC constraints on when Northern could purchase gas, existing deposition testimony (by Dan Fancler) that the

additional gas was in fact purchased in order to meet operating commitments to customers, and that Keeney's opinion as to purchase timing failed to take into account defendants' increasing production after 2010.

Keeney had no opinion as to Northern's actual gas purchases, or as to the volumes of gas purchased by Northern. And, again in each instance, the supposed lack of supporting documents was important to him:

> Q. Can you agree reviewing – well, first of all, do you have any reason to dispute that Exhibit No. 10, which was Exhibit 2 to Mr. Fonda's deposition, do you have any reason to dispute that that accurately reflects the physical gas purchases that Northern made?
>
> A. I have no way to verify that. I've asked for the documentation that supports the purchases. I haven't been able to obtain it. But I don't know.
>
> ….
>
> A.  I have no explanation for the volumes. You'll have to ask Northern what the criteria was.
>
> Q. Okay. And you have no reason to dispute whatever information Northern puts out there for the volumes that it did choose to purchase?
>
> A. I'd love to see the backup.

And he agreed that the suggestion the purchases weren't necessary is linked to the lack of documentary evidence:

> Q. You're not [offering] an opinion that gas purchases were not operationally needed; correct?
>
> A. I am – I'm – I'm of the opinion that I didn't find any evidence from any internal documents, from any reservoir engineer, from any pressure maintenance group, from anybody inside NNG that said, "We better buy some gas."
>
> Q. Okay. So your opinion is simply that you didn't see anything that would support that conclusion?

A.   Correct.

With respect to tying the hedging transactions to the Cunningham gas purchases, a lack of documentation was also an important part of Keeney's opinions as related in his deposition.

Q.   And if, in fact, the 16 million in losses on the swap agreements are tied to direct purchases to offset storage ... gas taken out of the Cunningham field on a one-to-one basis by the defendants ..., would your opinion change?

[A.] I believe the hedging losses are unrelated because they're hedging losses.

….

I -- I haven't seen a document that would convince me of that.

Q.   …. Okay. But that doesn't answer the question that I just asked, does it? Because I asked if you were provided documents that satisfied you that that was, in fact, the case, what would your opinion be?

A   That's -- I mean, hypothetically, I – I can't answer the question until I see the documents. What I've seen does not support this claim and this claim.

….

Q.   Okay. So you reviewed the spreadsheets that were attached as PDFs as deposition exhibits?

A.   That's correct.

Q.   ….No other documents?

A   I was not able to find -- in fact, as part of the interrogatories, we asked for all the supporting documentation. I asked for the native spreadsheets. I asked for the contracts themselves. I asked for trade dates. I asked to see any memoranda that had anything to do with the thought process behind the hedging, and I got this.

…..

A.   Two pages.

Q.   Okay. And you weren't provided any of those things that you asked for?

A   No, none of those things could be located or were responded to in the interrogatories.

There is substantial documentary evidence directly linking the hedges to the Cunningham field purchases. Keeney was shown such documentation in his deposition and he agreed it was the type of important information that he would have liked to have had before issuing his report.

Q.   And without committing – I'm not asking you to commit to the specifics, but would this type of contract seem to be consistent with the memorandum that we looked at from Kent Miller to Mark Hewett indicating hedging .5 BCF of Northern's 1.8 BCF open position from 2008 and 2009?

A.   Well, without being able to reconcile it to the position, I can't really tell you. That's what these are, and, yes, I -- I suspect, if given the opportunity to go through all of them, I could at least correlate some -- some kind of strategy out of it.

Q.   And, sir, I just want to make sure that we have a clean record here because I can sense some of your frustration because you've expressed to us today that you would have liked to have reviewed all of these agreements, you would have liked to have gone through all the financial details of these transactions in order to form an opinion; correct?

A.   That is correct.

Q.   And I want to make clear to you that all of these agreements as indicated by the Bates numbers that are on the bottom of the page have been produced in this litigation and were, in fact, produced in this litigation in 2017 before the depositions of Mr. Waymire and Mr. Fonda. But you have not had the opportunity before today to see anything similar to this; correct?

A.   That is correct.


With respect to his opinion as to the capital expenditures being ordinary and necessary costs, Keeney again did not review the underlying information which had been

produced by Northern. Instead, Keeney had looked at the 2017 deposition of David Waymire and the exhibits that were attached in it. He did not review the invoices and other backup documentary information under the AFEs and summaries. He testified, "I was not aware that they were provided," although "I asked for them." He agreed that they were important to review. Further, although the underlying work order runs were not explicitly attached to the Waymire deposition as exhibits, Waymire explicitly spoke about them in the deposition. Those documents, he testified, were voluminous, but showed the actual costs incurred, and that having such information was important for any accountant to be able to "drill down and see the invoice and the details."

With respect to the claim for the expert costs associated with improving the Cunningham field, Keeney's report again relied on an alleged lack of evidence. However, in this respect it may be noted that in his deposition Waymire had explicitly testified that Exhibit 3 was simply a summary. He clearly indicated that there was specific documentation, and that it had been produced by Northern to the defendants.

Expert testimony is admissible if it is reliable. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589-93 (1993); *Dodge v. Cotter Corp.*, 38 F.3d 1212, 1222-23 (10th Cir. 2003). Reliability is absent where the putative expert fails to review the available evidence. *See Miller v. Pfizer, Inc.*, 19 F.Supp.2d 1062, 1085 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004).

In his affidavit presented after Northern's motion, Keeney concedes that, upon reviewing the documents specified by Northern, he longer opines that "Northern's

damages claim for replacement gas should be wholly disallowed for complete lack of support," and that its "damages claim for expert costs and containment [sic] O&M costs should be wholly disallowed for complete lack of support." (Dkt. 728-2, at ¶ 20-21). At the same time, but in purely conclusory fashion, Keeney also avers that none of the documents cited by Northern has caused him to change his opinions that Northern fails to account for lost gas due to other causes, that its losses were "driven by market concerns," that the derivative trades are "independent financial transactions, separate and apart from the physical purchase of natural gas," or that the capital costs "would have been incurred regardless of the conduct of the defendants." (*Id*. at ¶¶ 13-15, 19).

The court believes that Keeney's opinions as to market-driven motivation and capital expenses as ordinary and necessary costs should be excluded. A review of Keeney's original report, and his deposition, reveals that the supposed lack of underlying documentary support was an essential component of his opinions. When queried about these opinions in his deposition, the cornerstone of Keeney's position was always that Northern had failed to support its position with documentary evidence. This was true even though Northern had produced such evidence, and even where the limited sources reviewed by Keeney (such as the Waymire deposition) clearly indicated that there were additional invoices and backup documentation available. Once the pillar of a supposed lack of documentary support is removed, Keeney's remaining opinions provide little help to the jury.

As noted earlier, Keeney is unfamiliar with many of the circumstances which might affect the timing of Northern's gas purchases, rendering his testimony of limited utility at the outset. But the opinion was also integrally tied to the mistaken contention that there were "no [Northern] internal documents that support its claim that it was necessary to purchase the gas." (Dkt. 728-2, at 5). Keeney's opinion rested on a false premise. Similarly, the contention that Northern's gas purchases were somehow "market driven" is not a reliable expert opinion, once the false premise is removed. The remaining opinion of market motivation by Keeney rests on nothing more than his say so. Keeney was asked in his deposition about the counterintuitive nature of his claim that Northern was only buying gas at high prices.

Q. [I]t would seem to me that if somebody is simply trying to purchase gas when it is most beneficial in the market, you would want to purchase when the prices are low and not purchase when the prices are high.

. . .

Q. (By Mr. Olmstead) So explain to me why my understanding is wrong.

A. Because you're not in the financial markets.

Q. That's not an answer, sir.

A. Yes, it is.

An essential element of an expert witness is that they are able to *explain* the opinion, rather that simply invoke their own authority. When coupled with Keeney's lack of familiarity with other factors which might have influenced the timing of Northern's gas purchases, the court finds that the opinion that the purchases were market-related is unreliable.

The court will also exclude Keeney's opinion that the Northern's capital costs were ordinary and necessary expenses, rather than compensable responses to the defendants' alleged nuisance. Again, the supposed lack of documentation was an important pillar of Keeney's opinion, as reflected in his report and in the deposition. *See* Report (Dkt. 728-2) at ¶ 5.D.2 "there is insufficient information to allow any evaluation"). Without this support, Keeney's opinion appears to rest solely upon Doug Johnson's conclusions, that the capital expenditures were otherwise required by administrative agencies. *See id*. at ¶ 5.D.3. Keeney's opinion therefore adds no additional evidentiary support for the defendant's contentions.

The court reaches a different result conclusion on Keeney's opinion that Northern's derivative losses are unrelated and unrecoverable hedging transactions. Northern highlights the defendants' concession in their response that that the produced documents "would otherwise confirm that the transactions actually occurred and that there was nothing unusual about them." (Dkt. 752, at 9). But a review of Keeney's original opinion as expressed in his report indicates that the lack of documentation played an important but not (as with the claim of market driven gas purchases) an essential role in Keeney's opinion as to the hedging transaction. The Report (Dkt. 728-2, at ¶¶ 5.C.3-6) stresses the disconnect between the timing and nature of the actual gas purchases and the derivative transactions. The court finds that Keeney may provide testimony as to the opinions expressed in Section 5C of his Report. Although it is a close question, the court concludes that the questions by Northern as to the documentary support for the hedging

claims are an appropriate basis for the cross-examination of Keeney rather than a sufficient basis for exclusion of his opinion.

Northern's arguments as to the remaining portions of Keeney's opinions are relatively limited. The court will also deny Northern's motion as it relates to Kenney's opinions that Northern's damages claims fail to account for gas storage lost due to reasons other than any nuisance created by defendants (Report Section 5A). Northern's discussion of his opinion (Dkt. 728 at 6, Dkt. 766 at 5-6) is cursory. The original opinion expressed by Keeney in his report cited storage gas lost before 1984 due to production by Philips, or other production by Trisum or TransPac. Nothing in Northern's original motion addresses this aspect of Keeney's opinion. In its Reply, Northern cites a portion of John Fonda's deposition stating that it was "[m]y understanding" that Dan Dobbins had calculated what "would have been ... if a Bcf of gas was produced from these wells he made a deduction for native gas to determine the amount of gas that need to be purchased for replacement." (Dkt. 766-5, at 4).

But the narrow portion of the deposition cited does not establish what Fonda meant by "these wells." Since the ambiguous evidence is cited only in Northern's Reply, the court will provisionally deny the request to exclude Keeney's opinion that the replacement gas figure does not account for other storage gas lost due to other reasons.

The court grants the plaintiff's motion as to the contention (Report Section 5F) that Northern's claim for disgorgement of profits improperly duplicates its claim for the cost of purchasing replacement gas. The defendants note that they have independently moved

to determine that Northern cannot recover for both claims, and argue that Keeney should be allowed to testify as to the issue "in the event that motion is denied." (Dkt. 752, at 12). That motion is addressed elsewhere; the issue here is whether Kenney can address the issue as an expert. Defendants' argument assumes that Keeney as a forensic accountant has some expertise in the legal determination of what is duplicative recovery. Keeney's Report cites no relevant expertise, and instead simply references "my understanding" of court rulings. The court determines that such opinion would not be helpful to the finder of fact.

The court grants plaintiff's motion as to the opinions expressed by Keeney in Sections 5B ("Market Driven Actions"), 5D ('Ordinary and Necessary Costs'), 5E ("Expert Costs are Ordinary and Necessary"), and 5F ("Duplicative Claim") of his Report. A supposed lack of documentation was a vital and integral support for the first four of these opinions in Keeney's report, and the same plays a vital role in his defense of those opinions in his deposition. And without that support, the remaining opinion lacks sufficient reliability for submission to the jury. The final opinion, asserting the legal conclusion of that Northern's claims are duplicative, falls outside the scope of the witness's expertise.

## 2. Motion to Exclude Disgorgement Evidence

In the Pretrial Order (Dkt. 275, at 38), Northern explains its claim for Unjust Enrichment this way:

> UNJUST ENRICHMENT: Northern seeks disgorgement of profits realized by all defendants from the unjust production and sale of gas drawn to defendants' Extension Area wells (save and except Nash's Holland 1-26 and J.C. 1 wells) from the Cunningham Storage Field. Northern estimates Defendants' cumulative total profit from the sale of gas from the Extension Area wells to be in excess of $30 million. When Defendants' production of gas at their wells became unjust is a question of fact for the jury and is when Defendants knew or reasonably should have known their wells were producing storage gas drawn from the Cunningham Storage Field and/or interfering with or damaging the Cunningham Storage Field. Northern thus seeks disgorgement of all net profits realized from and after the date and/or dates on which the jury determines Defendants' production was wrongful and retention of profits was unjust.

The defendants seek exclusion of any evidence relating to disgorgement of profits, arguing that Northern violated its obligation to support that claim in its Rule 26 disclosures, in its answers to interrogatories, the Rule 30(b)(6) deposition of its corporate representative, or in his expert report.

In its disclosures of August 6, 2009 and July 21, 2016, Northern indicated that it sought the disgorgement of "more than $75,000" from sums gained by defendants through unjust enrichment. In 2016, defendants submitted Rule 33 interrogatories asking Northern for the amount of damages it sought under each Count in the Third Amended Complaint. Northern responded that "this discovery request will be the subject of expert testimony and will be supplemented with expert reports per the Court's rules and schedule."

On April 12, 2017, Defendants served a Rule 30(b)(6) deposition notice upon Northern requiring it to designate a corporate representative to address "the amounts Northern claims for disgorgement of profits realized by the defendants." Northern then designated geologist Thomas Cook to address the issue.

Cook testified on the issue on May 9, 2017 as the plaintiff's designated corporate representative.

> Q. What time span you -- does Northern include in its calculations for disgorgement of profits?
>
> A. It would be from when the wells initially started producing in roughly 2003 up through shut-in, which for Nash, I believe, was 2010, and February 2011 for L.D. Drilling.
>
> ….
>
> Q. [D]o you see the topic number 12…Looking at Exhibit 1 the topic asks for the amounts Northern claims for disgorgement of profits you're working on that, but you can't give us those numbers today, correct?
>
> A. That's right, yes, sir.
>
> ….
>
> Q. In terms of Topic 12 and the L.D. Drilling Group, tell me how much the amount Northern claims for disgorgement of profits realized by L.D. Drilling for their alleged wrongful production of storage gas?
>
> A. I don't have that number today.

Cook was asked about how he calculated the amount of net profits, and explained that he was "in the process of reviewing all of the income statements and expense statements or revenue statements and expense statements" provided in discovery by the defendants. He stated he was "still in the process of running the numbers essentially. There is quite a . . . bit of information on a monthly basis." Cook agreed that at that point

he "simply ha[d] reviewed revenue statements and expense statements for the individual producers."

> Q. What time span did you -- does Northern include in its calculation for disgorgement of profits?

> A. It would be from when the wells initially started producing in roughly 2003 up through shut-in, which for Nash, I believe, was 2010, and February 2011 for L.D. Drilling.

> Q. Okay. Now, the Nash Young well began producing in, I believe, December of '94, so why is it that you don't begin your calculation until 2003?

> A. Well, for the assessment that I've done so far I do not have had any of Nash Oil & Gas's records from 1994 to 2001, I believe. So, I guess, to back up from Nash's purpose -- Nash Oil & Gas I started in 2001 when I had records from them.

> ….

> Q. [W]hy is it that you include revenue and expenses prior to June 2010 in your calculations?

> A. I think that's a legal question as far as when – when the break is. . . . [A]ll I'm doing right now is running revenue from 2001 to when the wells were shut-in. And how that is divided up will be in my expert report and legal decision.

> …..

> Q. [D]o you think it's fair to seek disgorgement of profits from the producers for a time period prior to FERC finding enough evidence that the Extension Area wells were producing storage gas?

> A. Once it became – once it appears the operators knew that they were producing storage gas then I would say, yes, [from] that point on.

> Q. Okay. At what point in time does Northern believe the operators knew they were producing storage gas?

> A. I haven't pinpointed that[,] that's still in my expert report, I don't have an exact date at this point.

> Q. Do you believe it's as far back as 2001?

> A. No.

> Q. Okay. Do you believe it's as far back as 2005?

A.   Possibly.

….

Q.   And what is Northern's understanding as to what is the alleged wrongful production of storage gas by the defendant producers?

A.   That would be when they became aware they were producing storage gas and continued to produce it.

Q.   Okay. But you've told me that you can't tell us when the producers became aware they were producing storage gas, correct?

A.   Not today, no, sir.

Q.   [Y]ou would agree with me that the defendant producers did not know they were producing storage gas as far back as 2001, right?

A.    Well, I don't know if they knew back in 2001, but you know, whenever they started – their actions started acting like they were producing storage gas is what I am ultimately looking at.

….

Q.   I'm asking you right now because you're offered as a witness on behalf of Northern on a particular issue and I'm asking you what is the wrongful conduct or wrongful production that you're referring to?

A.   That would be when the actions of the operators indicated that they were reasonably sure they were producing storage gas.

The course of the May 2017 deposition established the parties were in conflict as to the need for the plaintiff to articulate at that time the extent of the amount of profits which should be disgorged. Defendants thought Northern was required to do so; Northern stated that the amount could not then be determined, that it had yet to receive its expert report, but that the defendants should be required to relinquish their profits once they manifested a knowledge they were producing storage gas. Counsel for one of the defendants responded that "whether that was inherent in and required to answer the question No. 12 we'll take up with the judge."

Northern represented that Cook would address the issue in his expert report, which was presented May 26, 2017. Northern subsequently produced reports by the geologist Cook, as well as by Randal Brush and geochemist Dr. Paul Boehm.

In his report, Cook writes that "the amount of net profit received from the LD and Nash operated wells in the 2010 Extension Area from pulling and producing storage gas from the Field is calculated at $32,217,938.23." Cook supplemented that report on June 27, 2017, presenting net profits attributable to each individual defendant.

Brush wrote that "[a] reasonable operator would have recognized its wells were producing storage gas at an early date (prior to January 2006) because of the anomalous well production behavior, among other indicators." He wrote:

> The Defendant wells' anomalous gas production rate trends clearly, and quickly, demonstrated their close connection to the Cunningham Storage Field. The trends were obviously abnormal. Every well's rates increased, rather than decreased, with time, and exhibited large cyclical changes in concert with the Cunningham Storage Field gas inventory, rather than uniform declining trend typical of native gas production wells.
> ….
> A reasonable operator would be aware of this abnormal behavior at an early date, prior to drilling a well in the case of LD [2003] and Val [2008]. One of the first actions of a reasonable operator before drilling a new well is to study the production from existing wells. A reasonable operator drilling wells in the 2010 Extension Area would have obtained the publicly-available production data [from existing Nash wells] to determine the potential recovery of the new wells, and would have noted these abnormal behaviors.

Brush states that "the Defendants should have known they were causing the migration of storage gas from the Cunningham Storage Field" by January of 2006.

Dr. Boehm opined that in his opinion, "[a]ny operator in the area to the north of

the Cunningham Field … would have known no later than 2006 that ... most wells [in the area] were producing storage gas or a mixture of storage and native gas."

Likewise, in his expert report, Mr. Cook, consistent with the testimony provided on Northern's behalf weeks earlier, provided several conclusions regarding when a reasonable operator would have known they were producing storage gas. Cook indicated that a reasonable operator would have known the Holland 1-26 and Young 1-26 wells were producing storage gas possibly as early as 1994, or in 2002-2003. He states his opinion that Nash should have known its extension area wells were producing gas from the Cunningham Storage Field by 1999, and that L.D. Drilling's actions indicated it was aware it was producing such gas by April, 2005.

On December 26, 2018, the defendants moved (Dkt. 702) for summary judgment on Northern's unjust enrichment claim, arguing that it was barred by the statute of limitations. In responding to the motion, Northern wrote:

> Defendants' interpretation of and reliance on the June 27, 2017 Supplement … is incorrect. Contrary to the opinion of Defendants' expert C.P.A., George N. Keeney, III, the "calculations contained in Mr. Cook's Supplement" *do not* represent "the Plaintiff's ("Northern") claims for unjust enrichment damages against the various non-operating owners/defendants described therein." Rather, the Cook Supplement calculations represent Northern's effort and its experts' opinion regarding *total* profits realized from production at all wells that are the subject of this lawsuit, from inception to plugging and/or abandonment, to be utilized as needed as evidence at trial. Northern does not seek disgorgement of all profits realized by Defendants. Rather, Northern seeks disgorgement of profits realized by Defendants relating to production at the Young #1-26 well from and after the date on which L.D. Drilling's production activities evidenced intentional, deliberate, and wrongful interference with the Cunningham Storage Field for the purpose of drawing storage gas from the field to L.D. Drilling's wells—January 2006.

(Dkt. 707 at 2-3) (emphasis in original, docket citations omitted)

Cook was deposed again on March 12, 2019. He testified he was never asked to calculate the amount that Northern claims for disgorgement of profits, that he never made any such calculation, and that the numbers set forth in his expert report focused on net profits numbers. He stated that he understood the earlier deposition was focused on describing the "net profits realized by each operator," and did not understand he was addressing the disgorgement claim. Cook testified that he could testify as to the "actual number of the net profits" of the defendants, but could not then "give … the amount that Northern is claiming for disgorgement of profits as against any particular defendant."

Defendant's expert Keeney testified that calculations as to the defendants' net profits should look to "[g]ross, taxes, royalty, override, operating expense, drilling costs, whatever components of expenditure occurred, basically a P&L by well by month," and that "Mr. Cook's calculations … did include those things."

As noted earlier, the defendants argue that Northern's failure to define the amount of their profits it seeks to disgorge violated its obligation to make appropriate disclosure under Rule 26(a). They also contend that Northern again violated its duties under Rule 30(b)(6) when Cook, its designated corporate representative, failed to address the issue of disgorgement in his deposition, or in his subsequent report. The defendants suggest that the testimony by Cook in his 2019 deposition reflects an attempt by Northern to evade the effect of their motion for summary judgment on the statute of limitations by to trying to create a factual issue on when the defendants allegedly knew they were capturing storage gas.

Northern argues that it violated none of the rules of discovery, contending that is not making a legal "claim" for disgorgement of profits which it was required to precisely define early in the litigation. Rather, according to Northern, it is asserting an equitable claim for unjust enrichment, and that the disgorgement of improper profits is simply one remedy for that claim. It was not required to produce detailed information on the defendants' profits under Rule 30(b) because the information was not then available. And, it argues, even if there was a violation of any discovery rule, the court should not employ the heavy sanction of excluding Northern's ability to recover.[2]

The court finds that the defendants' motion should be denied. The defendants correctly note that Kansas courts have frequently observed that "the proper measure of damages for unjust enrichment is restitution of the benefit conferred upon the defendant." *See, e.g., Estate of Hetrick v. Cessna Aircraft Co.*, No. 99,987, 2009 WL 1692025, *6 (Kan. App. 2009). But in all cases cited by defendants, the court is merely addressing the general measure of how damages are measured and proven; none involve how a claim for disgorgement must be presented and defined under Rules 26 and 30. Cases which have addressed the issue have concluded that Rule 26(a)(1)(A)(iii) does not require

---

[2] Northern argues that it is not claiming as a part of its case-in-chief that defendants must disgorge any certain amount. Rather, "[o]nce the jury has determined Defendants were unjustly enriched and identified the date on which such unjust enrichment began, Northern, by and through Mr. Cook, should be permitted to testify … regarding the amount of ill-gotten gains." (Dkt. 748 at 29 n. 11). But Northern also states that evidence of the scale and timing of defendants' net profits is independently admissible because it shows an intent to interfere (an element of its nuisance claim), and the unjustness of any retention of profits (an element of the equitable claim). ****

a party seeking disgorgement to detail its calculations in its initial disclosures. *See SEC v. Montano*, 2019 WL 2254946, at *3 (M.D. Fla. Mar. 5, 2019) ("Rule 26(a)(1)(A)(iii) does not apply to disgorgement or civil penalties, as neither are a damages remedy"); *United States v. Stinson*, 2016 WL 8488241, at *7 (M.D. Fla. Nov. 22, 2016) ("Disgorgement is not a damages remedy").[3] This conclusion is consistent with the practical nature of the federal rules of procedure — unlike a claim for legal damages, a equitable claim for disgorgement of profits will typically depend upon information not under the control of the plaintiff at the time of initial disclosures.

The court also finds Northern did not violate Rule 30(b)(6). Cook gave an estimate of the estimated net profits of the defendants in his Rule 30(b)(6) deposition, but had not made a separate calculation of the profits which Northern sought to be disgorged. The issue of net profits was addressed in his subsequent report, as well as the reports of two

---

[3] *See also United States v. RaPower-3*, 2018 WL 1581994, *1 n. 6 (D. Utah. March 14, 2018) (citing *Stinson*, and agreeing that Rule 26(a)(1)(iii) does not require disclosure of disgorgement calculations); *SEC v. Razmilovic*, 2010 WL 2540762, at *2 (E.D.N.Y. June 14, 2010) ("the disclosure requirement of Rule 26(a)(1)(A)(iii) [i]s inapplicable to the … claims seeking disgorgement … because such remedies were not 'damages' within the meaning of that statute"); *Consumer Fin. Prot. Bur. v. Borders & Borders*, 2017 WL 2989183, *8 n. 1 (W.D. Ky. July 13, 2017) (rejecting argument plaintiff was required to give "a computation of the disgorgement remedy," since "Federal Rule of Civil Procedure 26(a) provides only that a party must disclose damages at issue in the case"); *SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (equitable remedy of disgorgement "is a method of forcing a defendant to give up the amount by which he was unjustly enriched"); *Scott v. City of Phoenix*, No. CV-09-0875-PHX-JAT, 2011 WL 1085992, at *4 (D. Ariz. Mar. 24, 2011) ("equitable remedies … are not capable of the 'computation' required for the Rule 26(a)(1)(iii) initial disclosure").

other Northern experts. Under the circumstances of the case, the court concludes that no violation of Rule 30(b)(6) occurred.

> [D]isgorgement of profits … is not an issue of damages in the conventional sense. ([Defendant] has a far better grip on its actual profits than any information it could glean from [Plaintiff's] estimates [presented in the Rule 30(b)(6) deposition of its Chief Financial Officer]). Disgorgement is mostly an equitable remedy reserved for the court….
>
> The lesson is fairly simple. If after considering the relief due to Explorica under one or all of the three other proposed remedies, the court concludes that justice has not been done, it may order an accounting and award Explorica some or all of defendant's profits. This, however, is a consideration for the court, not for a Rule 30(b)(6) witness.

*Explorica, Inc. v. Elderhostel, Inc.*, at *1 (D. Mass. Apr. 13, 2010).

However, even if Northern had failed to comply with the requirements for earlier disclosure under Rule 30(b)(6), the court would in any event deny defendants' request to bar the plaintiff's claim for unjust enrichment. Whether to sanction a failure to comply with Rule 30(b)(6) is discretionary with the court. *See* Fed.R.Civ.P. 37(d)(1) ("The court where the action is pending *may*, on motion, order sanctions…") (emphasis added).[4] In determining whether to issue sanctions, the court will look to factors including:

> (1) the degree of actual prejudice to the [defending party]; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.

---

[4] Rule 37(c)(1) sanctions the failure to comply with Rule 26(a) by providing that the missing evidence will be excluded "unless the failure was substantially justified or is harmless," and the court may require payment of expenses, instruct the jury on the failure, or issue other relief "[i]n addition or instead of" the sanction of exclusion. Rule 37(c)(1) offers defendants no relief here because the strong weight of authority holding that Rule 26(a) does not require disgorgement calculations in initial disclosures.

*Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir.1992) (internal quotation marks, ellipsis, and citations omitted).

Here, multiple factors strongly support the denial of the sanction of exclusion. First, any hypothetical violation by Northern of Rule 30(b)(6) falls outside of the heartland of the evil the Rule is designed to combat.

> Foremost among the purposes of Rule 30(b)(6) is to curb the bandying by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it. A party does not fulfill its obligations at the Rule 30(b)(6) deposition by stating it has no knowledge or position with respect to a set of facts or area of inquiry within its knowledge or reasonably available.

*North Alabama Fabricating v. Bedeschi Mid-West Conveyor*, 2018 WL 276772, at *6 (D. Kan. Jan. 3, 2018) (citations and internal quotation omitted).

Here, Cook did not state he had no knowledge of the issue or refuse to address facts available to him. He provided testimony, later supplemented in his report, relating to the defendants' net profits. He also expressly testified that he believed the defendants would be responsible for the profits obtained from storage gas from "whenever [they] started acting like they were producing storage gas." This was again echoed in the reports of other Northern experts who indicated that the extent of profits to be disgorged would turn on factual issues of the defendants' knowledge. Viewed in terms of the entire circumstances of the case, the court finds that Northern bears little if any culpability for not defining the full extent of its disgorgement claims in Cook's 2017 deposition.

In contrast, the court finds that to the extent the judicial process has suffered interference, the defendants bear a relatively larger responsibility. It was clear at the time

of the 2017 deposition that Northern and the defendants were in sharp disagreement as to whether Cook was required to testify as to some bottom-line disgorgement calculation. So sharp was the disagreement that one attorney for defendant stated that whether Cook was required to address disgorgement was an issue "we'll take up with the judge." None of the defendants, however, raised the issue with the court. Indeed, defendants never raised the issue of an alleged failure to comply with Rule 30(b)(6) for the next two years, until the present motion. Given the explicit evidence offered by Cook, Brush, and Boehm that the defendants should be forced to disgorge profits earned from the point they were aware they were producing storage gas, the court finds no justification for the delay in raising the issue.

Finally, the court finds no substantial prejudice to the defendants. The substance of Cook's profits testimony is derived from the defendant's own financial information. And, as noted earlier, Cook's methodology of calculating defendants' profits is consistent with that of the defendant's own expert, Keeney.


## 3. Motion to Exclude FERC, Condemnation, and Injunction Rulings

Following Northern's response to one of their summary judgment motions, which incorporated or referenced decisions in the condemnation action, the preliminary injunction in this action, and the June 2, 2010 FERC order, defendants moved to exclude any reference to these decisions. The defendants argue such references are "unfair" and would "confuse and mislead the jury." (Dkt. 736, at 1). The defendants complain that any

reference to these decisions improperly prejudges the important issues relating to fault in the present action. Further, they complain that references by various experts in their rebuttal opinions, to the effect that the FERC or the Commission agreed with their conclusions, reflects improper attempts to bolster their own credibility. (*Id.* at 7). The relief sought by the defendants is sweeping: the band of "any evidence, directly or indirectly, of the findings and conclusions from the June 2, 2010 FERC Order, the Commissioners' Report in the condemnation proceeding (and any order adopting said report), and the preliminary injunction."

The court previously determined that the FERC Order should not have preclusive effect, and a central argument by the defendants is that the doctrine of collateral estoppel should also not apply to the findings in the Commissioners' Report in the condemnation action. Defendants also argue references to the FERC Order, Commissioners' Report, and preliminary injunction must be entirely excluded because no limiting instruction could effectively cure the prejudice to the defendants. (*Id.* at 23).

The elements for collateral estoppel are not in dispute: The doctrine prevents litigation of issues if the following conditions are met:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party, or in privity with a party, to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir.2000) (citation omitted). Defendants contend that the Commissioners' Report fails because three of these elements are not

present: (1) they contend that the "sole issue" in the condemnation action was the amount of just compensation owed, and thus fault was never an issue, as it is in the present action (Dkt. 736, at 12-13); (2) the condemnation action has not proceeded to final judgment (Id. at 14-15), and (3) they did not have a full and fair opportunity to address the issues. (Id. at 15-17).

With respect to the first objection, Northern in its response stresses that collateral estoppel is not limited to the ultimate issue in the case, but applies to any issue of fact "'essential to the judgment'" of the earlier action. *B&B Hardware v. Hargis Indus*., 135 S. Ct. 1293, 1303, 191 L. Ed. 2d 222 (2015) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27, p. 250 (1980)). Second, it argues that while courts may reference a "final judgment" element of claim preclusion as a form of shorthand, in reality all that is required is a decision which resolves an issue and closes the door to further argument or evidence. *See Bui v. IBP, Inc*., 205 F.Supp.2d 1181, 1189 (D. Kan. 2002) ("[t]he pendency of the appeal does not alter the finality of the case for purposes of res judicata"). Finally, it argues that the "full and fair opportunity" element is not defeated merely by the fact that defendants were precluded from advancing their counterclaims in the condemnation action, since this element requires the party opposing preclusion to demonstrate that the earlier proceeding lacked fundamental due process protections.

The court finds that the Commissioners' Report is entitled to some preclusive effect. While the ultimate issue in the condemnation case may have been the amount of just compensation, the Commission (and the District Court which adopted its findings)

29

in reaching that determination was forced to consider basic factual issues similar to those presented here. Thus, the court observed (Dkt. 790, at 7-8) as "patently obvious that the mechanism by which any storage gas occurred has a bearing on how much gas went into the Extension Area and when it did so."

In deciding whether a party as had a full and fair opportunity to litigate an issue, the court will "focus on whether there were significant procedural limitations in the prior proceeding, whether the party had the incentive to litigate fully the issue, or whether effective litigation was limited by the nature or relationship of the parties." *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 689 (10th Cir.1992) (internal citation omitted). A court may refuse to apply the doctrine of collateral estoppel "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Phelps v. Hamilton*, 122 F.3d 1309, 1322 (10th Cir. 1997) (quoting *Montana v. United States*, 440 U.S. 147, 164 n. 11 (1979).

The Tenth Circuit has stressed that, if the elements of collateral estoppel are otherwise present, the asserted lack of a full and fair opportunity to litigate an issue creates but a "narrow exception" to the rule, which

> applies only where the requirements of due process were not afforded, *see Crocog Co. v. Reeves*, 992 F.2d 267, 270 (10th Cir. 1993)—where a party shows "a deficiency that would undermine the fundamental fairness of the original proceedings," *Nwosun* [*v. General Mills Rests.*], 124 F.3d at 1257 [(10th Cir. 1997)] (citation omitted). *See also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 39 (1st Cir. 1998) ("[A]s long as a prior ... judgment is procured in a manner that satisfies due process concerns, the requisite 'full and fair opportunity' existed."); 18 Wright & Miller, [Fed. Prac. & Proc.], § 4415, at 366 [(2d ed. 2002)] (opining that full and fair opportunity exception "mean[s] no more than that claim preclusion cannot arise from proceedings that deny due process"). The fairness of the prior

> proceeding "is determined by examining any procedural limitations, the party's
> incentive to fully litigate the claim, and whether effective litigation was limited by
> the nature or relationship of the parties." *Nwosun*, 124 F.3d at 1257–58.

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1243 (10th Cir. 2017).

The condemnation proceeding presented significant procedural safeguards. All parties had the opportunity for full discovery under the Federal Rules of Civil Procedure. The defendants presented the testimony and opinions of their own expert witnesses, and they were able to cross-examine Northern's witnesses. The evidence was presented in a multi-week hearing before the Commission, which was conducted in accordance with the Federal Rules of Civil Procedure and of Evidence. The defendants had the opportunity to object to the Commissions' proposed findings, and have actively opposed the court's adoption of the Report. Other than again complaining of the inability to present counterclaims, the defendants' Reply (Dkt. 763, at 8-9) is silent as to any supposed flaw in the condemnation action. Critically, defendants point to no *procedural* effect in the condemnation proceeding which would have had the effect of depriving them of due process.

The absence of counterclaims does not bring the condemnation within the "narrow exception" of a lack of full and fair opportunity to be heard. The court excluded counterclaims from the condemnation action for pragmatic reasons, seeking to ensure early resolution of that action. *See* Case No. 10-1232-WEB, 2011 WL 2118642, *3 (D. Kan. May 27, 2011) (observing that condemnation is "a speedy and easy procedure [which] permits land owners to receive their compensation more promptly," and thus construing

Rule 71.1(e) "as purposely separating the condemnation issues from other matters, including counterclaims against the condemnor").

But an expeditious proceeding is not the same thing as a lack of due process. Defendants fail to identify any problems with the condemnation proceeding which would raise due process concerns. Of course, they do, again, argue (Dkt. 763 at 7) that preclusion would affect their ability to raise the "intent-based and fault-based" issues relevant to their counterclaims and by Northern's nuisance and unjust enrichment claims. But, as noted earlier, collateral estoppel is not limited to ultimate issues, such as fault or intent.[5] It also applies to any factual issue essential to the earlier court's judgment. Here, the facts identified by Northern were integral to the commission's determination of the mechanism of migration.

Decisions denying due process on the grounds that there was no full and fair opportunity to be heard are rare, and in each instance the earlier proceeding lacked

---

[5] On the first disputed element of preclusion, the defendants in their Reply (Dkt. 763 at 5-6) simply repeat the general authority (*City of Monterey v. Del Monte Dunes at Monterey*, 526 U.S. 687, 691 (1992)) to the effect that liability is not an issue in condemnation actions, ignoring Northern's observation that collateral estoppel bars any factual issue integral to the Commission's decision, with only two equivocations. First, out of some two dozen Commission factual findings cited by Northern, defendants complain that in one (Dkt. 742, at 8 ¶ (t)) Northern overstates that actual finding. Second, the defendants complain that a citation to the Order for the District Court adopting the Commissioners' Report (the court stated that defendants' actions destabilized the storage field) is unfair because it again would be relevant to the issue of fault. The court finds that the first objection (to Paragraph (t)) appears well-founded. The court rejects the second, for the reasons explained elsewhere in the opinion. Findings of the Commissioners and the District Court in the condemnation action are not inadmissible merely because they may be probative of an issue of fault.

essential due process protections. *See, e.g., Burrell v. Armijo*, 456 F.3d 1159, 1172-73 (10th Cir. 2006) (noting multiple due process issues in prior trial court decision); *Ryan v. City of Shawnee*, 13 F.3d 345, 348 (10th Cir. 1993) (no preclusive effect for a state court review of an arbitration decision, where the court could not "consider factual or legal findings or the merits of the arbitration award").

Northern expressly pointed out in its Response (Dkt. 747, at 29) that defendants have presented "no authority … presumably because no such authority exists" for their core argument:  that, by itself, an inability to bring a counterclaim in an action means the resolution of the action can have no preclusive effect. Presented with this direct challenge, the defendants in their Reply supply no such authority.

Finally, the court rejects the defendants' argument preclusion cannot apply because "the court has not yet entered a final judgment," and a motion for reconsideration is currently pending. (Dkt. 736, at 15; Dkt. 763, at 9). First as noted earlier, while courts often speak of final judgment as an ingredient of estoppel, the element may be satisfied by a decision short of a judgment which nonetheless establishes that further evidence or argument will not alter the result. Rather, finality "in the context here may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again." *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961).[6]

---

[6] The RESTATEMENT (SECOND) OF JUDGMENTS, § 13, Comment g observes that "[i]n particular circumstances the wisest course is to regard the prior decision of the issue as final for the purpose

Further, shortly after defendants' Reply, the court in the Condemnation Action overruled all pending motions for reconsideration. (No. 10-1232, Dkt. 1124). And in the earlier summary judgment Order (Dkt. 1100, at 14-15), the court had specifically directed that the parties (as they had before the intervening appeal) "work towards completion of an agreed Final Order." The Condemnation Action has been sufficiently resolved for preclusion to apply.[7]

The Condemnation Action, and the associated Commissioners' Report which addressed key factual issues in that case, involved enormous financial stakes for all parties. The action was vigorously contested and produced an extensive record. The record was then addressed by the Commissioners, who presented a thoughtful and measured resolution of important factual questions. At all stages in this enormous contest, the defendants were given full due process protections. The principle of

---

of issue preclusion without awaiting the end judgment," so long as the earlier decision was "adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered." Noting the "decisive resonance beetween the Restatement and the leading case of *Lummus*," which "has been consistently followed by every circuit which has had occasion to address the issue," the court in *United States v. McGann*, 951 F.Supp. 372, 381-2 (E.D.N.Y. 1997) determined that preclusion should apply to earlier award of partial summary judgment, where the earlier decision was "not tentative" in nature, and was rendered after "extensive briefs and comprehensive oral arguments." *See, generally,* Wright & Miller, 18A FED. PRAC. & PROC., Judgment § 4434 (3d ed.) ("[r]ecent decisions have relaxed traditional views of the finality requirement by applying issue preclusion to matters resolved by preliminary rulings or to determinations of liability that have not yet been completed by an award of damages or other relief").

[7] Indeed, the Condemnation Action Summary Judgment Order (Dkt. 1100) and the Order denying reconsideration (Dkt. 1124) together appeared to so conclusively resolve the matter that the defendants promptly (if mistakenly) filed Notices of Appeal. (Dkt. 1125, 1128).

conservation of resources which underlies the doctrine of claim preclusion remains vitally present here, and the court finds that the Commissioner's Report, and court findings drawn from that report, enjoy preclusive effect in this action.

By itself, this conclusion would justify denial of the defendants' motion, which requests a complete exclusion of all references to the Commissioners' Report. At the same time, it is apparent that not every single finding or conclusion in the lengthy Report is entitled to preclusive effect. As noted earlier, preclusion only applies to determinations "essential to the judgment."

To the extent that Northern would break down the Commissioners' Report into dozens of individual facts, including findings of credibility as to certain particular experts, and might seek preclusive effect as to each,[8] the court would deny the request. The Commission did reach ultimate conclusions as to the nature and cause of the migration, but particularized determinations at such a narrow level may be simply duplicative.

Northern does reference six more general areas of factual findings from the condemnation action which it intends to offer at trial:

(1) the mechanics, volume, and location of the gas migration during initial fill up;
(2) the complete absence of any commercial quantities of oil or gas in the 2010 Extension Area prior to commencement of storage operations; (3) that storage

---

[8] The court distinguishes such offensive trial use of the particularized findings in the Report from the defensive citation of such findings in response to defendants' requests for summary judgment. As explained elsewhere in this opinion, the court finds the Report relevant for determining whether material issues of fact exist which warrant trial.

operations were stable, for a ten year period, with no net migration; (4) that Northern began losing gas following ten years of stable operations commencing with Defendants' production from the 2010 Extension Area; (5) that Northern's losses increased exponentially as Defendants' production increased exponentially; and (6) that migration ceased after Defendants' wells were shut-in and the 2010 Extension Area reached pressure equilibrium with the Cunningham Storage Field.

(Dkt. 747, at 25-26).[9]

Defendants then simply assert that, without the relief sought by their motion— that is, completely banning any reference to the Commission's findings—the defendants would be denied "the opportunity to fully and fairly adjudicate the very issues and claims it [sic] was not allowed to raise via the counterclaims." The defendants then assert in an equally cursory fashion that any curative instruction would be "lengthy and complicated" and could not possibly cure the prejudice to the defendants, resulting in

---

[9] At the same time, Northern carefully notes that the six facts are not "intended to be comprehensive," because it believes preclusion exists for "EVERY factual finding made by the Commissioners and adopted by the Court that was not reversed on appeal." (Dkt. 747 at 26 n. 26) (emphasis in original). The court disagrees, for the reasons stated above. Facts from the condemnation action are preclusive only to the extent they were *essential* for the ultimate condemnation award. Just as not every strand of spaghetti is essential to the meal, not every finding in the Commissioners' Report rises to the required level.

As defendants correctly observe (Dkt. 763, at 5 n. 1) Northern has not "presented in its own motion" any request to actually "estop the Defendants from contradicting or challenge any of the factual findings or conclusions in the condemnation case." At least as to the six factual conclusions presented above, the court finds that the issue of preclusion has been adequately raised, and given the rapidly approaching trial, resolves the matter as provided herein.

Whether other factual conclusions from the condemnation action are entitled to preclusive effect may be addressed by motion in limine, bearing in mind the court's determination here that narrowly-focused factual findings from the Commissioner are likely to be excluded as not necessarily essential to the condemnation award.

36

"countless evidentiary objections," and thus fairness requires "complete exclusion." (Dkt. 736, at 24).

Northern argues that evidence relating to the FERC Order is admissible (1) because it is relevant to the defendant's claim that it fraudulently failed to disclose information to the FERC; (2) the submission of expert reports is relevant because the cost of those reports is an element of its damages; (3) the findings of the FERC may be used to impeach defendant's experts; (4) as a government report, the FERC Order may be properly relied on by Northern's experts, and (5) the report may be relevant to show the defendants' knowledge. (Dkt. 747, at 37-39). Similarly, with respect to the preliminary injunction, Northern states that it has "no intent to seek admission of the Court's findings and conclusions," but asserts that the court should admit "the *fact of the injunction itself* and the *reasons for the injunction*." (Dkt. 747 at 43 (emphasis in original)). Northern states that the evidence of the injunction is relevant to (1) explain the reason for the defendants' shutting in their 2010 Extension Area wells, the defendants having offered alternative rationales for doing so, as well as (2) to exclude any suggestion the shut-ins occurred out of civil-mindedness; (3) the defendants' counterclaims for wrongful injunction, and (4) Northern's damages for employing experts to support the award.

Some (if not all)[10] of these rationales may provide a limited basis for evidence relating to the FERC Order and the injunction. Resolution of the issue is not possible at

_____

[10] While denying defendant's motion without prejudice, the court doubts whether the echo chamber bolstering of experts is an appropriate basis for admissibility. Government reports are

37

this time, however, in light of the fact that the defendants' cursory Reply (Dkt. 763, at 10-11) addresses none of the specific issues raised by Northern. Instead, the defendants again merely state the conclusion that any reference to the Order or injunction is unfair and that the prejudice cannot be cured by appropriate instruction. The court believes the jury cannot understand the present action without a full understanding of how the dispute has evolved, which necessarily requires an understanding of the general nature of the decisions of FERC and the injunction—coupled with an appropriate cautionary instruction that only these jurors will be deciding the final outcome of the case, and only they will have all of the relevant evidence. Accordingly, the court denies without prejudice the defendants' motion to the extent that it seeks a blanket exclusion of references to the FERC Order and the preliminary injunction.

The precise contours of any reference to the FERC Order and the injunction may be revisited by appropriate motion in limine. Any such motion must address fully why

---

indeed frequently consulted by experts, but in this case the effect is an echo chamber where the sound is bouncing first off a FERC ruling which the court has expressly determined should have no preclusive effect, and second off an injunction ruling which occurred prior to full discovery. If not claim preclusion (which Northern disavows), this is "preclusion lite" which the court is inclined to deny.

Other than the factual issues established in the Commissioners' Report, as noted earlier, experts should testify with reference to the underlying data, not findings of the FERC or the injunction award.

specific references to the referenced orders, for the reasons identified by Northern, could not be cured by a limiting instruction.[11]

## 4. Expert Testimony on Knowledge

The defendants' motion (Dkt. 738) presents two issues. First, can the plaintiff's experts testify at all as to defendants' state of mind, specifically as to their knowledge that they were causing the storage gas to migrate? Second, can the experts give testimony as to what a reasonable operator should have known about the migration? The defendants argue that courts generally preclude experts from giving testimony as to a defendant's

---

[11] Consistent with its standard practice, the court will issue a full set of instructions to the jury prior to trial. In the present case, the court anticipates a limiting instruction along the following lines:

> You have heard references to the June 2, 2010 FERC Order and the preliminary injunction which was issued in this case. This evidence was introduced for you to understand the history and timing of the events between the parties, as well as for other limited and specific purposes as stated by the court.

> You should understand that the FERC Order and the injunction arose in different proceedings, with different evidence, and involved different issues. Only you will hear all the relevant evidence in the case, and only you can decide the claims and counterclaims in this action.

> You should not consider the contents of the FERC Order or the preliminary injunction as resolving any issue in the present action. You must decide this case on the basis of the evidence presented to you.

The scope of such "other limited and specific purposes," and the extent of any limiting instruction, may be addressed in—and will be resolved—by appropriate motions prior to trial. The "countless evidentiary objections" threatened by defendants (Dkt. 736, at 24) will not occur during the trial.

state of mind. In addition, they contend that statements by Northern's experts as to what the defendants "should have known" about the effects of their production impermissibly dilutes the legal standard for an intentional nuisance, transforming it into an action for negligence.

Northern argues that the various cases cited by defendants are not controlling, and cite a Tenth Circuit decision as suggesting that an expert may, in appropriate circumstances, testify as to a defendant's intent.[12] It also contends that expert testimony as to what defendants should have known, or what a reasonable operator should have known is probative evidence of its nuisance claim.

The elements of plaintiff's nuisance claim are not in dispute:

> (1) [T]he defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use; (2) there was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended; (3) the interference that resulted and the physical harm, if any, from that interference proved to be substantial; and (4) the interference was of such a nature, duration, or amount as to constitute unreasonable interference with the use and enjoyment of the land.

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 697 F.3d 1259, 1267 (10th Cir. 2012) (citations omitted).

Intent exists when the defendant caused the nuisance with active malice, or acts "with

---

[12] Northern has previously offered similar expert evidence. *See* Preliminary Injunction Order (Dkt. 420, at 14, 18) (citing opinions of Cook and Brush about what a reasonable operation "would have known" or "should expect"). Defendants opposed the conclusion, but did not object to the testimony as improper. This court and the Tenth Circuit have previously drawn from such evidence to render conclusions as to defendants' likely knowledge. *See* 697 F.3d 1259, 1267 ("Defendants knew that continued production from their expansion area wells was causing natural gas to migrate at a faster rate out of the Field and toward Defendants' wells"). Neither decision directly addressed the issue.

full knowledge that the harm to the plaintiff's interests are occurring or are substantially certain to follow." *Id.* (citations omitted). *See, e.g., Thorpe v. Ryan E. Kraft Tr.,* 2019 WL 2147874, *11 (Kan. Ct. App. 2019) (intentional nuisance requires proof that defendant "knew the ditch work would, *to a substantial certainty,* result in flooding") (emphasis in *Thorpe*).

In other contexts, "substantial certainty" has been defined as "more than merely a foreseeable risk and more than even a strong probability." *Kurisoo v. Providence & Worcester Railroad Co.,* 68 F.3d 591, 596 (2d Cir. 1995). "Substantial certainty requires more than a reasonable probability that an injury will occur; this term has been interpreted as being equivalent to inevitable, virtually sure and incapable of failing." *King v. Schuykill Metals Corp,* 581 So.2d at 303 (La.App. 1st Cir.1991).

The substantial certainty standard may require a stronger showing of intent where the alleged nuisance "only involves one incident rather than a continuous pattern" of injury. *See Lofland v. Sedgwick Cty.,* 26 Kan. App. 2d 697, 705, 996 P.2d 334, 339 (1999).

The court finds that the defendants' motion should be granted to the extent that the experts Cook, Brush, and Boehm would offer general conclusions about what defendants knew, or should have known, or should have done. As the defendants note, courts do generally exclude expert testimony that directly attempts to state a corporate defendant's state of mind. *See, e.g., Tyree v. Boston Scientific Corp.,* 54 F.Supp.3d 501, 564 (S.D. W. Va. 2014); *Johnson v. Wyeth, LLC,* 2012 WL 1204081, *3 (D. Ariz. April 11, 2012). Expert opinions "on the intent, motives, or states of mind of corporations … have no basis

in any relevant body of knowledge or expertise." *In re Rezulin Prods Liab. Litig.*, 309 F.Supp.2d 531, 547 (S.D.N.Y. 2004).

Northern argues a different rule has been recognized in the Tenth Circuit, citing *Okland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308 (10th Cir. 1998). In *Okland*, a gas producer sued Conoco for fraud. The defendant argued on appeal that the trial court had erred in allowing plaintiff's expert to testify about its intent.

Several factors limit *Okland* from becoming some sort of Tenth Circuit exception to the general caution against expert testimony on state of mind. First, the trial court in that case did *not* authorize generalized testimony about Conoco's intent, "sustaining several objections to Conoco's intent in the formation of the contract." 144 F.3d at 1327. Ultimately, after the court cautioned him to "stay away from any pejorative terms," the witness volunteered (without being directly asked about Conoco's intent) that "Conoco just maybe went a little bit overboard in figuring out a way to make their plant profitable, and they elected to do so out of the producer's pocket," and that "[w]e seem to have a situation here where the pipeline company had lost $4 million and they wanted to find out some way that they could get it back." *Id*. at n. 22. The district court overruled an objection and request to strike the testimony.

In reviewing Conoco's objection on appeal, the Tenth Circuit observed:

> The portions of Mr. Yoakam's testimony Conoco challenges concern Conoco's fraudulent actions in deciding to covertly keep a portion of the resale price from Okland. The testimony does not merely seek to explain Conoco's intent in forming the contract. Mr. Yoakam testified about what he thought Conoco was doing in light of his experience in the specialized field of oil and gas. He did not simply tell the jury that the conduct was fraudulent; he did not state any legal

> conclusions; and he did not testify as to the legal elements necessary to establish fraud.

*Id.* at 1328 (citations omitted). *Okland* supplies little support for the wholesale abandonment of the general rule discouraging expert testimony as to a party's intent or knowledge, with the court simply concluding that the trial court had not abused its discretion in refusing to strike the testimony.

Second, *Okland* should be read with other Tenth Circuit decisions or the decisions of this court which are consistent with the reluctance to allow such expert testimony. *See Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1553 n. 4 (10th Cir. 1992) (in securities fraud case, finding no abuse of discretion by district court in holding that expert "could not properly testify on [defendant's] state of mind*"); In re Motor Fuel Temperature Sales Practices Litig.*, No. 07-1840-KHV, 2012 WL 380159, at *7 (D. Kan. Feb. 6, 2012) (absent personal knowledge, "[a]n expert witness may not speculate as to the intent or motives of parties or others," since "[t]he question of intent is a classic jury question and not one for the experts").

Northern also relies on *FDIC v. Refco Group*, 184 F.R.D. 623 (D. Colo. 1993) as supporting a Tenth Circuit rule recognizing testimony as to the knowledge of a defendant. In that case, the FDIC, acting as a receiver for an allegedly defrauded bank, sought to introduce expert testimony about "whether employees, officers or directors of Refco knew about the fraudulent activities." *Id.* at 631. While overruling Refco's motion in limine seeking to exclude the experts, the court's actual holding is relatively narrow:

> Refco has indicated present and former employees will testify that they did not know of Wymer's fraud. FDIC asserts it will introduce expert testimony that particular individuals engaged in conduct inconsistent with industry practices or regulatory requirements from which the jury may infer or conclude that such individuals had the intent and knowledge required to establish FDIC's claims.

*Id.* That is, the court did not authorize direct testimony about what Refco knew, and simply held that the SEC's financial and regulatory experts could testify about unusual practice by Refco, from which the jury could infer knowledge.

That is an appropriate result here, and consistent with the general rule. The court finds that the plaintiff's experts may not testify about what defendants should have known, or render expert opinions about defendants' knowledge. None of the cited witnesses are forensic document examiners or have other training in assessing corporate knowledge. They have no experience, outside of this case, in assessing how knowledge might be imputed to a corporate entity. They are a geochemist, a petroleum engineer, and a geologist. The proposed testimony as to what the defendants "knew or should have known" or what a "reasonable operator" would know or do falls outside of their knowledge, skill, experience, training, or education, and thus is not properly placed before the jury. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013).

Of course, the plaintiff's experts[13] can testify as to the general practices in the gas production industry, and conduct by defendants which may be unusual, anomalous, or

---

[13] Here, Northern represents that Cook based his opinions on "the history and geology of the Viola Formation[,] extensive documentation that included, but was not limited to, KCC and KGS

contrary to standard industry practice, from which the jury could then infer knowledge. That is, while expert opinions as to the defendants' knowledge is inadmissible, many of the "bullet point" facts cited by Northern[14] in support those opinions may still be admitted. *See Goldberg v. 401 N. Wabash Venture LLC*, 755 F.3d 456, 461–62 (7th Cir. 2014) (without directly addressing real estate developer's "knowledge or state of mind, [a] business expert can however testify about the state of knowledge prevalent in a business that he has studied"); *Bouygues Telecom, S.A. v. Tekelec*, 472 F. Supp. 2d 722, 726 (E.D.N.C. 2007) (allowing expert opinion as to address general state of knowledge within the telecommunications industry, where "the facts surrounding the claims at issue are highly complex and technical," and "[t]he average layperson has no experience pertaining to what is or is not common knowledge within the telecommunications field").[15]

---

files and records, Defendants' well files, geological maps, production records, drilling and completion reports, as well as many, many other documents." (Dkt. 749, at 3-4). Brush has "evaluated the history of the Cunningham Field, both before and during storage operations[,] evaluated the production activities of [defendants, and] evaluated the impact of that production on the main Cunningham Field." *Id.* at 6. Dr. Boehm bases his opinions on the geochemistry of the gas produced by defendants. *Id.* at 9.

[14] (Dkt. 749, at 4-9). These include Cook's assessment (Section 7 of his Report) of abnormal production activity including anomalous production rates and cycling, abnormal water production, gas competition, drilling patterns, down-dip drilling, offset re-entering or re-drilling, and Dr. Boehm's assessment of gas chemistry. These are classic facts directly relevant to knowledge, outside the jury's common experience, which are admissible.

[15] To the extent that Northern relies (Dkt. 749, at 19, 27) on *Bouygues* to support a general right by experts to testify as to a defendant's knowledge, the court disagrees. First, such a generalized conclusion is contrary to the great weight of authority. Second, it does not appear that the experts in that case were utilizing the "reasonable operator" proxy for a defendant's actual knowledge, which all three of Northern's experts use. The focus of the testimony, as stressed by the court,

45

But the fact remains that many of these experts repeatedly offer opinions as to what a "reasonable operator would do," the information that "a reasonable operator would have reviewed," or what the defendants "should have known." Some of the opinions are even more removed from the "substantial certainty" standard, stating in general that a reasonable defendant "could have acquired" knowledge they were producing storage gas, or "could have determined" they were doing so.[16] The court finds these opinions should be excluded because (1) they address issues of corporate knowledge and thus fall outside of the witnesses' underlying geological and industrial expertise, and (2) such opinions inherently tend to diminish the level of intent required to establish intentional nuisance.

Further, the court notes that in some instances[17] these experts support their opinion that the defendants knew (or should have known) they were producing storage gas by simply referencing communications between the parties. Such evidence, of course, may be highly probative of the state of the defendants' knowledge. But it appears that in

was on industry knowledge — "interpretations of *what a person within the telecom field would know*." 472 F.Supp.2d at 726 (emphasis in original).

[16] *See* Cook Rep. Opinions Summary ¶¶ 5(A), 6(A)-(G); Findings and Opinions ¶¶ 7(A)(4), 7(C), 7(D); Brush Rep. ¶¶ 8, 10(i), (j), 11(g); Boehm Rep. Summary Opinion 4, at 11; Opinion ¶ 6.4, at 31).

[17] Brush Rep., ¶¶ 7(i)(xv) (referencing letter by Northern's attorney to Nash's attorney); Cook Rep. ¶¶ 7(B)(1), 7(B)(6), 7(C)(4), 7(C)(7), 7(E)(2) (referencing letters sent defendants); Boehm Rep. at 26 (referencing 1999 letter by Northern).

many instances[18] the underlying communication speaks for itself, and does not require reiteration by an expert. *See Clinton v. Mentor Worldwide LLC*, No. 4:16-CV-00319 (CEJ), 2016 WL 7491861, at *11 (E.D. Mo. Dec. 30, 2016) ("Recitation of … corporate documents does not fall within the purview of expert testimony under Federal Rule of Evidence 702").

## B. Summary Judgment Motions

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

---

[18] But not all. Dr. Boehm references (Rept. at 31) his 2006 affidavit presented to Nash as being "sufficient to show that the source of the produced gas was changing." Given the technical nature of the data referenced in the affidavit, Dr. Boehm could properly explain the meaning of the report.

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## 1. Plaintiff's Unjust Enrichment Claim

The defendant non-operating interest owners move for summary judgment on Northern's claim that they were unjustly enriched by the production of storage gas. (Dkt. 700). The defendants argue that pursuant to the rule of capture, Northern lost title to any gas produced before June 2, 2010, and thus an essential element of unjust enrichment is

missing. For gas produced after that date, they contend that another essential element — wrongful retention of a benefit — is missing because the buyers of that gas have held payment in suspense pending the outcome of the litigation.

The court, of course, has previously rejected defendants' argument that the rule of capture necessarily precludes any claim for unjust enrichment. (Dkt. 382, at 35). In their present motion, defendants suggest this conclusion is in error, partly by citing rule of capture cases from Colorado, Texas, and Utah, but also by suggesting two limitations in Judge Brown's prior ruling. First, they stress the decision was rendered prior to the Kansas Supreme Court's decision in *Northern Nat. Gas Co. v. Oneok Field Svcs.*, 296 Kan. 906, 926 P .3d 1106, 1121 (Kan. 2013) ("*Oneok I*"), which recognized the application of the rule of capture. At the time of the decision, this court only had the benefit of the trial court ruling addressing the issue by Judge Schmisseur. Second, they argue that Judge Brown actually analyzed the effect of the rule of capture only ast to plaintiff's nuisance claim, and did not directly address the issue ast to the claim for unjust enrichment.

The court denies the defendants' motion and will allow the unjust enrichment claim to proceed to trial. Contrary to the defendants' claims, the court did not discount the rule of capture holding in the parallel state litigation because of a lack of precedential value (as being simply a trial court ruling), but because the effect of rule of capture on title to the gas was not conclusive as to unjust enrichment, which was indeed specifically addressed in the court's opinion. Judge Brown explicitly ruled that the issue of title did not preclude Northern's claims for nuisance or unjust enrichment.

Moreover, the court concludes that the judgment does not preclude Northern's claims for nuisance, *unjust enrichment*, or civil conspiracy. The court notes that Northern's petition in the State action asserted only one claim—conversion. Northern did not assert—and the state district court did not adjudicate—any other tort claims. Nor does the judge's finding that Northern lost title to migrating gas (before June 2, 2010) necessarily preclude such claims. Northern claims the defendants have unreasonably interfered with Northern's use and enjoyment of its storage facility and have *unjustly obtained a benefit* by intentionally drawing storage gas out of Northern's field, in part by lowering pressures through the use of extraordinarily large pumping units. Although the question of who had legal title to migrating storage gas could be relevant to *such claims*, the claims do not contain an essential element that would require Northern to prove that it retained legal title to any storage gas that migrated to the defendants' property. The issue of whether Kansas would recognize a claim of nuisance, *unjust enrichment* or conspiracy in these circumstances was not presented in the state court pleadings and was not essential to the judgment entered.

*N. Nat. Gas Co. v. L.D. Drilling, Inc.*, No. 08-1405-WEB-DWB, 2010 WL 3892227, at *18 (D. Kan. Sept. 29, 2010) (citations omitted, emphasis added). This conclusion — that unjust enrichment does not depend upon title to the gas —remains equally true after *Oneok I.*

*Oneok I* merely confirmed that a title-dependent claim such as conversion is defeated by the rule of capture. The decision is entirely consistent with Judge Brown's decision, and the undersigned finds no reason to change the result. The defendants' present motion adds some additional authorities,[19] but their essential argument remains

---

[19] The rule of capture cases cited by defendants from outside Kansas, *INB Land & Cattle, LLC v. Kerr-McGee Rocky Mountain Corp.*,190 P.3d 806, 808 (Col. Ct. App. 2008); *Elliff v. Texon Drilling*, 146 Tex. 575, 210 S.W.2d 558, 562 (Tex. 1948) ("under the law of capture there is no liability for reasonable and legitimate drainage from the common pool"); *Cowling v. Utah Dep't of Nat. Resources*, 830 P.2d 220, 224 (Utah 1991) (under rule of capture, there is generally "no liability for causing oil or gas to migrate across property boundaries") do not support a different conclusion. All of the cases simply reflect the title-centered principle which may preclude title-centered legal claims like trespass or conversion, namely that "the owner of a tract of land acquires title to the oil or gas which he produces from wells on his land, though part of the oil or gas may have migrated from adjoining lands." *Elliff*, 210 S.W.2d 558, 561–62 (1948). All of the cases assume a pre-existing, naturally-occurring common pool of oil or gas. *See Elliff*, 210 S.W.2d at 581 (rules of

the same — that they were free to capture storage gas *even if under the circumstances of the case such capture was inequitable and contrary to good conscience*.

The rule of capture gives defendants protection from tort claims focused on title. But, as a general matter, equitable claims under Kansas law are not limited to infringements of title.

> The in personam nature of the [equitable] action is necessary because legal title may be properly vested in a defendant even though the plaintiff may have an equitable claim on the property. "*Equity's theory was that it did not decide title* but acted in personam. *It did not act on title or property* but upon the person of the defendant, *compelling him to follow good conscience rather than good title*." 1 Dobbs, Law of Remedies § 4.3(1), p. 587.

*Nelson v. Nelson*, 288 Kan. 570, 580, 205 P.3d 715, 724 (2009).

Specifically with respect to the present unjust enrichment claim, it is sufficient if defendants knowingly secured, or passively received, a benefit from Northern under the circumstances where the retention would be inequitable or unconscionable. *See J.W. Thompson Co. v. Welles Prod. Corp.*, 243 Kan. 503, 512, 758 P.2d 738, 745 (1988) (*citing* 66 Am.Jur.2d Restitution and Implied Contracts, § 4, p. 947).

The facts presented here present a colorable claim of unjust enrichment, and the defendants' motion for summary judgment is denied.

---

and gas capture reflect modern scientific understanding of minerals "commonly found in underground reservoirs … securely entrapped in a static condition in the original pool [unless] disturbed by penetrations from the surface"). None involve the injurious production of stored minerals *which would otherwise not available to the defendant*, and none involve any equitable claims seeking a remedy for such behavior.

## 2. Timeliness of Plaintiff's Unjust Enrichment Claims

The Nash Oil & Gas and non-operator defendants[20] have moved (Dkt. 702) for summary judgment on some of the unjust enrichment claims advanced by Northern, arguing that the plaintiff is seeking to recover for gas produced prior to the three-year limitations period for such claims under Kansas law. Citing the affidavit of expert George Keeney, the defendants contend that some of the wells referenced by Northern have been in production for years, with one well (Holland #1-26) having first produced gas in in 1995. The defendants also cite decisions in the action by earlier litigation[21] between Northern and Nash (involving wells Holland #1-26, Young #1-26, and JC-1), in which the court determined that Northern's 2004 claim for unjust enrichment was time-barred. Finally, the defendants cite a stack of documents (Dkt. 703, ¶7) which they contend shows Northern knew of its alleged injury more than three years before filing suit.[22]

_____

[20] The defendants are Larry Keenan, Timothy R. Keenan, Kim B. Shoemaker, Nancy H .Shoemaker, Vision Investments, HJB Inc., Steven Eugene Young, Whitetail Energy, Bill Milton, Tammy Milton, Ivan W. Milton, Lisa M. Milton, and the Estate of L.D. Davis.

[21] _Northern Natural Gas v. Nash Oil & Gas_, 506 F.Supp.2d 520 (D. Kan. 2007) (_"Nash I"_); _aff'd_, 526 F.3d 626, 630 (10th Cir. 2008).

[22] The litany of documents comprises largely communications by Northern, some as early as 1994, recognizing the issue of gas migration, but also includes a 2005 FERC Order, a 2003 letter by Nash, and a 2017 expert report. In its Response, Northern argues it is unclear in the context of the present motion what defendants mean by the "alleged injury" of which it was aware. Northern stresses that the present claim asserts the creation of a deliberate nuisance by the operator defendants, making unjust any retention of profits from gas production after January of 2006. As we find above, the discovery rule is inapplicable to claims of unjust enrichment. Accordingly, the evidence cited by Nash and the other defendants as to Northern's alleged knowledge is not relevant to the resolution of their motion.

The court held in *Nash* that Northern's failure to raise the claim within three years of when its injury was first ascertainable barred recovery of any lost gas, even gas lost less than three years before the lawsuit. Defendants also cite authorities holding that claims for unjust enrichment are not subject to any discovery rule in Kansas. *See Freebird, Inc. v. Merit Energy*, 883 F.Supp.2d 1026 (D. Kan. 2012) (given the absence of authority for applying the discovery rule in unjust enrichment claims, "the court declines to do so"); *Doll v. Chicago Title Ins*. Co., 517 F.Supp.2d 1273, 1281-82 (D. Kan. 2007) ("in the absence of any Kansas authority applying a discovery rule to a claim of unjust enrichment, the Court will not apply such a rule"). Alternatively, the defendants argue that even if the court were to apply the discovery rule, certain historical documents or pleadings presented by Northern (Dkt. 703, at 4-5) show that the plaintiff knew storage gas migration was occurring as early as 2003, or possibly even a decade earlier, or, alternatively, the limitation period would begin to run when any supposedly wrongfully-received money was paid. *See Hartman v. Stumbo*, 195 Kan. 634, 408 P.2d 693, 696 (1965).

In response, Northern contends that Keeney has misinterpreted the report of its expert Cook, who had calculated all of the defendants' profits from the subject wells and had not attempted to determine a discrete set of damages relevant to the unjust enrichment claim. (Dkt. 707, at 3). Northern affirmatively represents that in its unjust enrichment claim it is not seeking any recovery at all for production from the Holland #1-26 or JC-1 wells, and that it is only seeking recovery as to production from the Young 1-26 well for gas produced within the limitations period.

As to the limitations period, Northern agrees (*id*. at 13) that the discovery rule is inapplicable to its unjust enrichment claim. However, it argues that *Nash I* is not controlling as to the additional defendants because the case involved only Nash Oil, and accordingly the cases do not involve the same parties. *See Netwig v. Georgia-Pacific*, 266 F.Supp.2d 1279, 1284 (D. Kan. 2003) (citing elements of *res judicata*). More fundamentally, Northern argues that any application of the statute of limitations in *Nash I* is not entitled to *res judicata* with respect to its claim in the current action for wrongful production over a different time period. According to the plaintiff, the statute of limitations only precludes recovery of unjust enrichment which preceded March 14, 2005 (that is, three years before the filing of Case No. 08-1077, the predecessor of the present action). There is no bar in the present action, according to the plaintiff, because its unjust enrichment claim did not mature until approximately January, 2006, when the defendants' retention of profits from the gas production became inequitable, based upon evidence suggesting that at that time the defendants became aware they were knowingly producing storage gas.

The court finds that the motion for summary judgment should be denied in light of material issues of fact. "The statute of limitations for an unjust enrichment claim begins to run when all of the elements of unjust enrichment are present," which "generally means … the moment the retention of property becomes unjust." *Walsh v. Weber*, 2016 WL 4750102 (Kan.Ct.App. Sept. 9, 2016) (citing *Estate of Draper v. Bank of America*, 288 Kan. 510, 534, 205 P.3d 698 (2009). In *Draper*, the court observed that

> for unjust enrichment to occur:  (1) A benefit must have been conferred upon the defendant, (2) the defendant must have retained the benefit, and (3) under the

54

circumstances, the defendant's retention of the benefit must be unjust. The statute of limitations begins to run when all of these elements are present.

288 Kan. at 534 (citations omitted). Because one of the elements of the claim is the inequity of retention, a plaintiff cannot pursue the claim until the inequity of benefit retention arises. Or, as the *Draper* court observed, "'"such a cause of action accrues when the enrichment *becomes unjust.*"'" *Id.* (quoting *Vila v. Inter-American Investment*, 536 F.Supp.2d 41, 51 (D.D.C. 2008) (quoting *New World Comm'ns v. Thompsen*, 878 A.2d 1218, 1223 (D.C. Cir. 2005))) (emphasis added).[23] *See Bettis v. Hall*, 852 F.Supp. 1325, 1343 (D. Kan. 2012) (following *Draper* and finding fact question precluded summary judgment on equitable claim for recovery of money held by defendants, since the limitations period would run not from the time the profits were received, as "retention of the benefits did not become unjust until Plaintiffs requested the return of their profits."

The resulting focus is distinct from the traditional discovery rule, since the maturity of the action does not depend on the state of the *plaintiff's* knowledge. What is important is the *defendants'* knowledge. Northern's claim for unjust enrichment is mature

---

[23] The Kansas Supreme Court in *Draper* thus explicitly followed the approach followed by the United States Court of Appeals for the District of Columbia. There, "a claim for unjust enrichment accrues only when the enrichment actually becomes unlawful, *i.e.*, where there has been a wrongful act giving rise to a duty of restitution." *Bregman v. Perles*, 747 F.3d 873, 876 (D.C. Cir. 2014). This is a "fact-bound question," under which the plaintiff "is entitled to all favorable inferences in determining when the enrichment became unjust." *Vila*, 570 F.3d at 285.

Other jurisdictions take the opposite approach. *See In re Burton Wiand Receivership Cases Pending in the Tampa Div. of the Middle Dist. of Fla.*, No. 8:05-CV-1856T27MSS, 2008 WL 818504, at *8 (M.D. Fla. Mar. 26, 2008) (under Florida law "an unjust enrichment claim accrues when the benefit is conferred," rather than "when it becomes inequitable for a defendant to retain [the] benefit").

only when the retention of profits becomes inequitable, and this occurs when the evidence establishes that were aware their conduct was wrongful or refused legitimate demands by Northern for compensation. The defendants deny knowingly and wrongfully producing storage gas.

As noted elsewhere in the present order, there is substantial evidence, as established in the condemnation action, that the defendants caused or helped the migration of Northern's storage gas. But the court cannot determine beyond a reasonable doubt, on the basis of the present record, when the retention of profits by the defendants in general (or for any particular defendant or class of defendants) became inequitable.

For purposes of resolving the present motion, the court finds at least some evidence does support the claim of a January, 2006 date as the moment the unjust enrichment claim became actionable, as evidence exists which (read in the light most favorable to Northern) could indicate that defendants were then aware of the wrongfulness of production. It is possible that some storage gas produced of defendants may have been lawful or even innocent. Based on the evidence cited by the plaintiff, the present claim (brought in this December 3, 2008 action (and in the two preceding but incorporated actions, Case No. 08-1077 (filed March 14, 2008 and Case No. 08-1400 (filed December 22, 2008)) would be timely.

Northern expressly seeks the return of profits only "from and after … January, 2006," that being the date when defendants' actions showed intentional wrongdoing. (Dkt. 707, at 3). In each instance, the respective complaints identify well production from

a period more recent than the 2005 date corresponding to the date of the respective complaint. The plaintiff makes no unjust enrichment claim for profits from the Holland 1-26 or JC-1 wells involved in Nash. The plaintiff does make a claim for production the Young 1-2 well, but this well had become nonproductive and was sealed prior to the present action. The well was released (first to Jandie Oil, and later to L.D. Drilling) and reopened less than three years before the present action.

The court previously determined that whatever the result in *Nash I*, this did not preclude all future actions involving migrated gas, being in effect some kind of a declaration of open season on such gas. (Dkt. 152, at 17-18). There is evidence from which a rational factfinder could conclude that the plaintiff became aware that it had a renewed cause of action for a continuing trespass when defendants exhibited the substantial certainty that they were interfering with the Cunningham Field. Such evidence includes the extent of their knowledge of Northern's claims, their knowledge of the geology, and their actions in how they produced the gas (including allegations by Northern that the defendants employed unusual pressure cycles). Collectively, such evidence could reasonably establish that the unjust enrichment claim based on the alleged nuisance claim is timely.

### 3. Timeliness of Nuisance Claim

The operating defendants (L.D. Drilling, Val Energy, and Nash Oil & Gas) moved for partial summary judgment on Northern's nuisance claims, seeking a determination

that the plaintiff may not recover any damages which accrued more than two years before the present action, that is, March 14, 2006. It is uncontroverted that the plaintiff seeks to recover (a) $1,707,401 for observation wells which were in operation by July 26, 2005; (b) $125,628 for continuous pressure recording equipment which was in service by December 10, 2005), and (c) $4,664,264 for two withdrawal wells, which were in service by February 21, 2006. The defendants assert that Northern "was aware of its alleged injury" before March 14, 2006, citing the exact same stack of documents (Dkt. 746, ¶ 9) referenced by Nash in support of its motion attacking the timeliness of the unjust enrichment claims.

Northern controverts only one fact cited by defendants, the conclusion that it knew of its injury prior to 2006. As Northern points out, the twelve documents are all unauthenticated, without supporting affidavits (with the exception of a self-authenticating FERC order of September 15, 2005 authorizing the drilling of withdrawal wells).

More fundamentally, Northern argues that, whatever it may have suspected or alleged about gas migration at various points during the long history of the Cunningham Field, the extent of its knowledge of the alleged nuisance by these defendants as to these wells is a fact question. Towards this end, the plaintiff cites a February, 2009 FERC finding that Northern had not presented "convincing evidence gas [was] migrating" towards the wells of the defendants.

Under K.S.A. 60-513(b), an action for private nuisance must brought within two years of the time

the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action.

In the case of a continuing nuisance,[24] which is not permanent in nature and where the plaintiff suffers repeated injuries, the limitations period "begins with each new injury." *Eastman v. Coffeyville Resources Refining & Marketing*, 2010 WL 43810236, *7-89 (D. Kan. Nov. 19, 2010).

For purposes of the statute, "'substantial injury' … does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent.'" *Roe v. Diefendorf*, 236 Kan. 218, 222, 689 P.2d 855 (1984). *See also Johnson v. Board of Cty. Com'rs of Pratt Cty.*, 259 Kan. 305, 320, 913 P.2d 1190 (1996); *Williams v. Amoco Prod. Co.*, 241 Kan. 102. 108, 734 P.2d 1113, 1118 (1987).

Northern correctly notes that the injury in a nuisance case must be "of such a nature, duration or amount as to constitute an unreasonable interference with the use and enjoyment of land." *Northern Nat. Gas v. L.D. Drilling*, 697 F.3d 1259, 1267 (2012) (citing

---

[24] Northern here alleges a continuing private nuisance. In deciding whether a nuisance is continuing or permanent, the court looks to (1) the nature of the causative structure, (2) the nature of the damages, and (3) the ability to determine or estimate damages. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 473, 15 P.3d 338, 344 (2000). *See also Bowen v. City of Kansas City*, 231 Kan. 450, 646 P.2d 484, 488 (1982).

*Pagel v. Burlington N. Santa Fe Ry.*, 316 F.Supp.2d 984, 989 (D. Kan. 2004) (citing *Williams v. Amoco Prod. Co.*, 241 Kan. 102, 117, 734 P.2d 1113, 1124 (1987) (citing PROSSER AND KEETON ON TORTS § 87, pp. 622–23 (5th ed. 1984)))). Northern then takes from this that the limitations period is triggered only after the interference is readily ascertainable as both "substantial *and* unreasonable," (Dkt. 755, at 6) (emphasis added), but it is not clear that this is entirely correct. In the cited cases, the unreasonableness of the interference is presented as a element separate from whether substantial injury to the property occurred. Cases applying the statute of limitations to nuisance actions have focused on when it became apparent a substantial injury occurred, without any separate inquiring into the reasonableness of the defendant's conduct. *See, e.g., Burdette v. Virgindustries Inc.*, 2014 WL 1048003, *8 (D. Kan. March 18, 2014).

But the essential point remains—the defendants are entitled to summary judgment only if they demonstrate beyond a reasonable doubt that substantial injury to the storage field was reasonably ascertainable more than two years before the present action was filed. Such relief requires specific reference to specific evidence. Instead, the defendants simply gesture in the direction of a pile of various documents spanning nearly a quarter century.[25]

---

[25] None of the cited documents is anything like a smoking gun. In 2005, Northern sought permission to drill two withdrawal wells based on its "belie[f] that storage gas is migrating away from the storage field and collecting in a small anticlinal structure to the northwest." (Exh. 2, at 8). FERC granted the request for the wells in the expectation that this would "recapture gas that is presently migrating," and would "maintain the performance and reliability of Northern's storage field." (Exh. 3, at 4). Defendants cite January 19, 2005, Northern correspondence as

indicting that Northern was monitoring well activity. This is true — but other portions indicated that Northern believed agency staff felt a "lack of confidence in our plan for containment" and a desire for "specific and tangible evidence" about it, and stating the company was "continuing to monitor well development." (Exh. 6, at 1-2).

On February 14, 2005, Northern responded to an inquiry from the Kansas Corporation Commission as to "potential natural gas migration," and stating that it "continues to seek information in order to evaluate and determine the full limit of the gas migration." (Dkt. 764-4, at 2). Earlier communications are also equivocal, increasingly so as the documents grow older. In November, 2004, Northern wrote to landowners in the area that gas "has migrated outside the defined boundaries" of the Cunningham Field. (Dkt. 11). Northern asked for permission to inspect wells "where it is believed that gas has migrated." On October 31, 2004, Northern proposed obtaining priority contracts for certain specified properties "relative to gas migration." (Exh. 13). Neither communication indicates the extent or impact of the migration.

An April 28, 2003 letter by Nash's attorney acknowledged a communication from Northern "admoni[shing] against well drilling in the Viola formation, but stated that well had already been completed and that Northern had no "authority or jurisdiction to even suggest" drilling should stop, which could be taken as a denial of any migration due to nuisance. (Exh. 5). On June 3, 2003, counsel for Northern wrote to Nash stating that "we are investigating the potential that gas has migrated north," and asking for data and a sample from Nash's recent well to help in "Northern's evaluation of this issue." (Exh. 10). A 2003 report by one of Northern's experts provided technical data regarding "the *potential* storage gas migration from the Cunningham Field. (Exh. 7) (emphasis added).

Communications in 1994 state that storage gas "appears to have migrated … further north in the Viola Formation," while expressing uncertainty as to the extent of potential loss. "Since individual well volumes are not readily available and assuming both wells do produce gas, allowable status cannot be evaluated for either well to determine if overproduction is occurring." (Exh. 8). On December 16, 1994, one of Northern's experts reported that "[t]he latest Young 1-26 gas sample analysis … compares favorably to Cunningham storage gas." (Exh. 9). Leaving aside the necessarily speculative meaning of "favorably" in this context-free submission (is the Young 1-26 gas merely consistent with the presence of storage gas, or does it demonstrate that the Young 1-26 gas is necessarily the defendants' evidence?) there is again, nothing to directly indicate the extent of the storage gas lost.

Finally, defendants cite a portion of Cook's report for the impact of what Nash and LD Drilling "should have known" or "could have recognized" about gas migration based on the 2004 letter to landowners and the 2003 letter asking for gas samples. Leaving aside the defendants' insistence otherwise (Dkt. 738) that experts cannot properly testify as to corporate knowledge, the report again does nothing to expand on its underlying sources, which do not address how much gas has escaped, or whether the interference was substantial.

61

Those documents may be relevant to, but they are not conclusive of, what Northern knew and when it knew it. The documents indicate that Northern recognized a potential migration of gas outside the Cunningham storage field. But the story of the migration is simultaneously a complex technical matter, as Northern tried to document and support its suspicions, and a matter of historical evolution, as Northern attempted to mitigate the apparent loss by various means. Nothing in the submission by the defendants establishes when precisely it was "reasonably ascertainable" to Northern that there was "substantial" interference with the Cunningham field.[26]

Defendants cursorily suggest (Dkt. 476, at 4-5) that Northern's knowledge of any injury at all, regardless of the extent, would trigger the statute of limitations, citing decisions such as *P.W.P. v. L.S.*, 266 Kan. 417, 425, 969 P.2d 896, 902 (1998); *Friends Univ. v. W. R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980); and *Roe v. Diefendorf*, 236 Kan. 218, 222–23, 689 P.2d 855, 859 (1984). But none of the cited cases address an action for private nuisance; all were claims for negligence. In *P.W.R.*, the court expressly wrote that the "the objective knowledge of the injury, not the extent of the injury, triggers the statute both in medical and nonmedical malpractice cases." 266 Kan. at 425, 969 P.2d at 902. In *Friends University*, the court held that the statute of limitations on plaintiff's negligence action

---

[26] After presenting the standards for the timeliness of nuisance actions in Kansas, the defendants in one paragraph (Dkt. 746, at 4-5) simply assert without any explanation that Northern knew its right of action had commenced.

arose when the plaintiff was injured by leaking roof, not when it learned of the cause of the leak. And the court's discussion was specifically keyed to the tort of negligence:

> The statute of limitations starts to run in a tort action at the time a negligent act causes injury if both the act and the resulting injury are reasonably ascertainable by the injured person. [T]he use of the term "substantial injury" in [K.S.A. 60-513(b)] does not require an injured party to have knowledge of the full extent of the injury to trigger the statute of limitations. Rather, it means the victim must have sufficient ascertainable injury to justify an action for recovery of the damages, regardless of extent. An unsubstantial injury as contrasted to a substantial injury is only a difference in degree, *i.e.*, the amount of damages. That is not a legal distinction. Both are injuries from which the victim is entitled to recover damages if the injury is the fault of another.

236 Kan. at 222, 689 P.2d at 859.

But, as established earlier, an action for nuisance is different: interference which is not substantial in nature is not actionable at all. Put another way, the duration and extent of interference is an important element of any claim for nuisance. *See Hofstetter v. Myers, Inc.*, 170 Kan. 56, 228 P.2d 522 (1951) (whether a nuisance exists "depends upon many things, such as the type of neighborhood, the nature of the thing or wrong complained of, its proximity to those alleging injury or damage, its frequency or continuity, and the nature and extent of the injury, damage or annoyance resulting)."

Here, the evidence is not clearly beyond a reasonable doubt as to when the alleged private nuisance occurred, that action requiring both substantial interference and knowledge to a substantial certainty that such interference existed. Defendants' brief argument fails to address the issue of substantial interference, and the court denies the motion for summary judgment.

## 4. Equitable Remedy as Duplicative

The defendants argue that Northern's nuisance claim gives it an adequate legal remedy for any injury, and this renders any recovery for unjust enrichment duplicative. They stress that Northern's own statements indicate that the unjust enrichment claim is dependent on a determination that a nuisance existed.[27] (See Dkt. 706, at 10-11, 707 at 2). Specifically, defendants argue (Dkt. 744, at 3-5) that Northern that cannot recover on both claims because this "would result in two recoveries for the same alleged wrong," and the nuisance claim "provides an adequate remedy at law," (Dkt. 744, at 3-5).

In addition, the defendants in essence argue that an unjust enrichment action is premature, because the legal nuisance claim has not been established. The defendants cite *Nelson v. Nelson*, 288 Kan. 570, 597, 205 P.3d 715, 734 (2009), and argue that "Northern must pursue its [nuisance] claims against the Operator Defendants before seeking legal relief from the Non-Operator Defendants." (Dkt. 744, at 6).

The court rejects this last suggestion. In the estate contest at issue in *Nelson*, the court held that "a claim must first be made against the one who violated a duty or, when that person is deceased, that person's representative—*i.e.*, an estate administrator—and a remedy at law must be unavailable before equitable relief is allowed. *See* 288 Kan. at 597,

---

[27] Although presented as two separate arguments — that recovery on both claims "would result in two recoveries for the same alleged wrong," and that the nuisance claim "provides an adequate remedy at law," (Dkt. 744, at 3-5), the essence of defendants' argument is that the equitable remedy simply duplicates an already adequate remedy.

205 P.3d at 734 (citing *Wilkison v. Widerkehr*, 101 Cal.App.4th 822, 828–33, 124 Cal.Rptr.2d 631 (2002)).

The court in *Nelson* was not announcing some broadly applicable rule to all equity actions. Rather, the court (and the case it relied on) dealt only with the narrow issue of how claims to decedent estates must be presented under their respective state statutory schemes.[28] To the extent the defendants would suggest that an unjust enrichment claim must always await until a parallel legal claim has been resolved, this is inconsistent with the long-standing principle in Kansas law that a plaintiff "may join causes of action both legal and equitable in the same petition." *See Parrack v. Wittman*, 180 Kan. 193, 196, 302 P.2d 1005, 1008 (1956). The court rejects the suggest that concluding a separate legal action is a condition precedent to any action for unjust enrichment.

In response to defendants' larger argument, Northern contends that the unjust enrichment claim and nuisance action are not two remedies for the same action because it suffered two separate injuries: (a) "the immediate harm caused by the … production activity and the direct and actual cost of abating the nuisance," and (b) the equitable return of all "profits from all Defendants from their unjust production and sale of gas

---

[28] *See Nelson*, 288 Kan. at 598, 205 P.3d at 734 ("third-party beneficiaries assert[ing] a claim against the estate by alleging that [decedent]'s transfers of assets' were required "to open an estate and make a timely claim as required by K.S.A. 59-2239(1)"); *Wilkison*, 101 Cal.App.4th at 833-834 ("A party with a remedy at law against a decedent for breach of contract must proceed upon the theory that he or she is a creditor of the deceased, having a claim against the estate, and is subject to the provisions of the Probate Code requiring the presentation of claims to the executor or administrator.")

drawn from Northern's storage field." (Dkt. 756, at 4-5). According to Northern, the equitable claim looks to the value of gas taken, but the nuisance claim does not, looking to recoup the costs of gas purchased "to maintain the operational integrity of the Cunningham Storage Field." (*Id.* at 5). Finally, Northern argues, the claims are not duplicative because they apply to different defendants, with the unjust enrichment claim applying to non-operator defendants.

The court will deny the defendants' Motion (Dkt. 743) as currently framed. The defendants seek to completely dismiss the request for any equitable relief, as "Northern can never prevail on its unjust enrichment claim." (Dkt. 744, at 7). The facts presented by both the parties (approximately one page of facts for each side) on the issue are extremely cursory. As noted elsewhere, the defendants argue that Northern's gas purchases were inflated or driven by other, market-related considerations. If the jury is unpersuaded by Northern's evidence on the necessity and amount of replacement gas purchases, it could give the plaintiff little or nothing in the way of legal damages. At the same time, it might still rationally decide that a nuisance had occurred, and determine that the defendants' retention of profits for the migrated gas is unconscionable.

However, the court finds that defendants' general argument is well-founded: *full* recovery by Northern on *both* its nuisance and unjust enrichment claims would be inequitable. "[E]quity, we believe, abhors a windfall." *Prudential Ins. Co. of Am. v. S.S. Am. Lancer*, 870 F.2d 867, 871 (2d Cir. 1989) (dismissing disgorgement claim where legal remedy also existed).

66

This principle is well established in Kansas law. In *Beck v. N. Nat. Gas Co.*, 170 F.3d 1018, 1024 (10th Cir. 1999), the Tenth Circuit acknowledged that the single recovery rule precluded the recovery of both legal and equitable remedies for the same subsurface trespass:

> Not content with one recovery, in their cross-appeal the landowners first challenge the district court's ruling on summary judgment that the fair rental value of the Simpson formation was the proper measure of damages for both their trespass and their unjust enrichment claims. Instead, the landowners argue, they were entitled to a recovery on each claim….
>
> In Kansas, a plaintiff is limited to one recovery for a wrong. *See York v. InTrust Bank*, 265 Kan. 271, 962 P.2d 405, 432 (Kan. 1998). "The basic principle of damages is to make a party whole by putting him or her back in the same position as if the injury had not occurred, not to grant a windfall." *Short v. Wise*, 239 Kan. 171, 718 P.2d 604, 609 (Kan. 1986). To the extent that the landowners claim an entitlement to double the fair rental value, it is foreclosed by the above principle that a plaintiff is limited to one recovery for a wrong, which in this case was Northern's failure to pay a fair rental for the use of the Simpson formation.

*See also City of Neodesha v. BP Corp. N. Am.*, 50 Kan. App. 2d 731, 782, 334 P.3d 830, 863 (2014) (affirming dismissal of unjust enrichment claim that defendant was "'storing' contaminants under their property [because] the remedies of law for negligence, nuisance, and violations of K.S.A. 65–6203 were all available to the Plaintiffs").

Here, Northern would be placed in a better position. It would have the replacement gas, the costs of purchasing the replacement gas, and the profits of the defendants from the migrated gas. The plaintiff can't avoid this conclusion simply by labelling the cost of the replacement gas as an "abatement expense." The court will be in a better position to resolve the issue once the evidence is submitted at trial.

## 5. Counterclaims

### History of the Cunningham Storage Field

Northern owns the Cunningham Storage Field, a depleted natural gas reservoir converted for use as an underground natural gas storage field. By the end of 1978, FERC and KCC both approved construction and operation of the Cunningham Storage Field in the Viola formation in Pratt County and Kingman County, Kansas.

On October 30, 2008, FERC approved expanding the certificated boundaries of the Field by 1,760 acres. By February 2009, Northern had acquired gas storage rights within the Viola and Simpson formations underlying roughly 3,040 acres in the southern part of the 2010 Extension Area.

On September 14, 2009, Northern applied for a Certificate of Public Convenience and Necessity, seeking to further expand the Field. FERC granted the application on June 2, 2010. The 2010 Certificate authorized expanding the Field by 12,320 acres. FERC also directed Northern to design and implement a program to stop the migration of storage gas.

FERC denied Northern's request for expansion as to the "Section 28 Area" in Pratt County. This Area immediately adjoins the 2010 Extension Area, and includes Sections SE 1/4 S 20, S1/2 S21, E 1/2 S29, S28, NE1/4 S32, and N1/2 S 33 within T26S, R11W.

Defendant L.D. Drilling holds or has held oil and gas leases for fifteen wells within the Viola formation in the 2010 Extension Area. The Lease for each well provides:

Lessor … herby grants, leases and lets exclusively unto [LD Drilling] for the purpose of investigating, exploring by geophysical and other means, prospecting, drilling, mining and operating for and producing oil, liquid hydrocarbons, all gases, and their respective constituent products, injecting gas, water, other fluids and air into the subsurface strata, laying pipe lines, storing oil, building tanks, power stations, telephone lines, and other structures, and things thereon to produce, save, take care of treat, manufacture, process, store and transport said oil, liquid hydrocarbons, gases and their respective constituent produces and other products manufactured therefrom ….

On May 1, 2008, L.D. Drilling and Lumen Midstream Partnerships entered into a Pratt System Gas Purchase Contract for the sale of gas produced by the former's wells. To carry out this sale, Lumen had to build facilities so that it could receive gas at designated delivery points. This construction required Lumen to "spend a great deal of money to provide infrastructure out to the L.D. Drilling wells [to] obtain the L.D. Drilling gas."

The Contract did not require L.D. Drilling to supply any specified quantity of gas, but did require it to deliver "all gas produced from" its leases in the area.

On March 14, 2008, Northern filed suit against L.D. Drilling in which it asserted, among other claims, a claim of conversion alleging that gas produced from the L.D. Drilling Wells was storage gas from the Cunningham Storage Field to which Northern had title. Northern served the complaint on June 12, 2008, but voluntarily dismissed the action (Case No. 08-1077) on July 1, 2008, before the defendant answered.

On September 18, 2008, before or during Lumen's construction, and "as a result of [No. 08-1077 Case] and other actions of Northern involving lands south" of the L.D. Drilling leases, Lumen "requested, and [L.D. Drilling] agreed to make, certain payments

in the event of cessation of production and delivery of gas … arising out of or relating to the actions of Northern." The resulting Facilities Agreement provided:

> 3. For a period of five (5) years from when Buyer [Lumen]'s System is connected to the Delivery Point and capable of taking gas from said Delivery Point, Seller [L.D. Drilling] agrees that if Seller fails to commence deliveries of gas to Buyer ... or, once having commenced such deliveries, ceases producing and delivering gas …, in either case for any reason arising out of, resulting from, or relating to, either directly or indirectly, any Northern Action (as defined in paragraph 4. below), then Seller shall pay to Buyer the Facilities Amount (as defined in Paragraph 4. below) …
>
> 4. The following terms have the following meanings under this Agreement:
>
> a. "Northern Action" means (i) any claim, demand, lawsuit, regulatory proceeding (federal, state or otherwise) or other action of any kind involving, or taken by, Northern ... which affects all or any of the [L.D. Drilling Leases], the production of gas therefrom or the gas which may be produced therefrom ....
>
> b. "Facilities Amount" means an amount equal to One Million Eight Hundred Thousand ($1,800,000), subject to [reductions based on various production volumes].

Lumen's representative testified that it required the payment provision because it "was going to spend a great deal of money to provide infrastructure out to the L.D. Drilling wells." The Gas Purchase Contract became effective on September 23, 2008, the date on which the Agreement was signed by Lumen's President.

L.D. Drilling had previously sold gas from the 2010 Extension Area to ONEOK. Starting in January, 2009, L.D. Drilling sold its gas from that Area and the Section 28 area to Lumen.

The Lumen line was a "much lower pressure" line and when it switched from ONEOK, L.D. Drilling experienced a "substantial and immediate" but temporary

increase in production. L.D. Drilling switched from ONEOK to increase production from its 2010 Extension Area Wells; it did not switch because of any action by Northern.

Defendant Nash holds or has held oil and gas leases for nine gas wells within the Viola formation in the 2010 Extension Area. The Lease for each well gives provides:

> Lessor …. herby grants, leases and lets exclusively unto [Nash] for the purpose of investigating, exploring, prospecting, drilling, mining and operating for and producing oil, liquid hydrocarbons, all gases, and their respective constituent products, injecting gas, water, other fluids, and air into the subsurface strata, laying pipe line, storing oil, building tanks, power station, telephone lines, and other structures, and things thereon to produce, save, take care of, treat, manufacture, process, store and transport said oil, liquid hydrocarbons, gases and their respective constituent products and other products manufactured therefrom….

On or around June 1, 2009, ONEOK and Nash entered into a Gas Purchase Agreement under which Nash sold gas produced from these wells. Before the Gas Purchase Agreement, Nash sold gas from the wells to various predecessors to ONEOK, and possibly other entities. The Gas Purchase Agreement required ONEOK to pay Nash on a monthly basis..

On December 22, 2010, this Court entered a preliminary injunction requiring the Producer Defendants to cease producing gas from the Viola and Simpson formations from their 2010 Extension Area Wells. On March 13, 2012, Northern obtained a preliminary injunction in the Condemnation Case, giving it access to the 2008 and 2010 Extension Areas in order to begin implementing a FERC-approved containment plan.

L.D. Drilling shut in the L.D. Drilling Wells on or around February 25, 2011. It continued to produce gas from its Section 28 wells and sell gas produced from those wells

to Lumen. After L.D. Drilling failed to deliver the volume of gas promised in the Facilities Agreement, Lumen invoiced L.D. Drilling for "about half a million."

Neither the Nuisance Injunction nor the Condemnation Injunction directly affected Nash's existing contracts with ONEOK, which remained willing to buy oil or gas from Nash. ONEOK's corporate representative has testified that the "Northern Litigation" did not impact or affect: (a) ONEOK's willingness to enter into oil and gas purchase contracts with Nash; (b) ONEOK's willingness to purchase oil and gas from Nash; (c) ONEOK's willingness to comply with contractual obligations owed to Nash; (d) ONEOK's willingness to remain in, and not seek to terminate, contracts with any of the Producer Defendants; or (e) ONEOK's willingness to continue purchasing and paying for gas from the Producer Defendants. Similarly, the "Northern Regulatory Proceedings," did not (a) impact ONEOK's willingness to enter into new contracts with the Producer Defendants; (b) did not impact or affect ONEOK's infrastructure in south central Kansas; and (c) did not impact ONEOK's ability to comply with its gas purchase agreements with the Producer Defendants. Notwithstanding the Northern Regulatory Proceedings, ONEOK continued to buy oil and gas from the Producer Defendants.

Neither the Northern Litigation nor the Northern Regulatory Proceedings affected ONEOK's willingness to improve its pipelines around the Cunningham Storage Field. Similarly, Northern's prior suits against Nash and Trans Pacific did not, in any way, impact ONEOK's willingness to purchase oil and gas from Nash. ONEOK maintained a business relationship with Nash that continued at least until November 30, 2016, when

its corporate representative was deposed, and it remained willing to purchase oil and gas from Nash on standard contractual terms.

On October 2, 2009, Northern's counsel sent a letter to Mr. John Barker, former Senior Vice President, General Counsel and Assistant Secretary for ONEOK informing him of the claims asserted in this litigation against the Producer Defendants and Northern's position that Northern had an actionable claim against ONEOK for conversion of "Northern's storage gas produced and/or operated by Nash." Counsel attached a copy of the complaint in this action.

ONEOK responded on October 20, 2009, asking for legal authority and facts supporting its claims, including a request that Northern identify all of the Nash Wells allegedly producing storage gas.

Northern replied two days later, giving additional information supporting its contentions that "one or more affiliates of ONEOK have engaged in the unauthorized exercise of rights of ownership over Northern's storage gas…." Thus, by that date (October 22, 2009), ONEOK understood that Northern was threatening it with a lawsuit and claim for conversion for buying gas from Nash.

On October 23, 2009, ONEOK wrote Northern and Nash that it had "placed the proceeds due Nash Oil and Gas for production delivered to the central delivery point into suspense." ONEOK invited Nash to provide information it had to support its position with regard to Northern's claims, asking for specific information concerning "the

individual wells that deliver through" the central delivery point where ONEOK purchased gas from Nash.

At the same time, ONEOK wrote Nash:

Northern contends that ONEOK is converting Northern gas by virtue of its purchase contract with Nash… ONEOK requested that Northern provide it additional information concerning the claims they were making concerning title to the gas ONEOK is purchasing from Nash. In response to that request late on October 22, 2009, ONEOK received a significant amount of information that appears to have been generated by expert consultants retained by Northern in the lawsuit. That information and data was sent as additional support to the claims made in Northern's previous correspondence which I shared with you.

Based on the additional information received from Northern, ONEOK is advising Nash that it is placing all payments to Nash under its contract to purchase gas behind the Holland central delivery point in suspense until the title issue between Nash and Northern can be resolved. ONEOK is taking this action pursuant to Sections 9.4 and 10.1 of [the Gas Purchase Agreement].

After October 2009, ONEOK suspended payments for gas purchased from Nash pursuant to paragraphs 9.4 and 10.1 of the Gas Purchase Agreement.

On June 30, 2010, the District Court of Pratt County, Kansas entered judgment in the Pratt County Litigation in which it ordered "Defendants are ordered to hold all runs from Third-Party Defendants' wells in suspense pending further order of the Court." Since that date, ONEOK has complied with the order, and held all proceeds for Nash production in suspense and would not release those proceeds absent an additional order from the court.

On March 15, 2013, the Kansas Supreme Court issued an opinion in the Pratt County Litigation, in which it held Nash and L.D. Drilling held title to all storage gas produced from their 2010 Extension Area Wells prior to June 1, 2010. *Northern Natural*

74

*Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 911, 296 P.3d 1106 (2013). After the United States Supreme Court denied Northern's Petition for Certiorari, the Pratt County District Court entered a November 1, 2013 order directing ONEOK and Lumen to pay all proceeds (amounting to $3,358,374.59) held in suspense for the period of September 1, 2009 through June 1, 2010. ONEOK complied with the order and paid the proceeds.

ONEOK's representative has indicated that the 2009 Letters did not cause it to terminate any contracts with Nash, cease contract negotiations with Nash, or cease to comply with any contractual obligations owed to Nash. They did not inhibit ONEOK from complying with its obligations under the Gas Purchase Agreement, and the company remained willing to negotiate new contracts with Nash and enter into oil and gas purchase agreements with Nash. As to the validity of Northern's claims to title to the migrated gas, ONEOK believes that "when the Supreme Court said so then … *at that point* they [Nash} were right." (Emphasis added).

It is uncontroverted that notwithstanding the Kansas Supreme Court's 2013 opinion, ONEOK remained willing to purchase oil and gas from Nash. It has never refrained from purchasing and marketing gas produced by Nash nor has it refrained from purchasing and marketing gas within, at least, ten miles of the Field's boundaries. No actions taken by Northern have caused ONEOK to avoid the area of the Cunningham Storage Field. As of November 30, 2016, the Gas Purchase Agreement between ONEOK and Nash remained in effect.

**Condemnation Action Findings**

On July 16, 2010, Northern filed a condemnation action to acquire the rights and interests in the Extension Areas that it had been unable to acquire by agreement.

On March 13, 2012, by this court's order granting its preliminary injunction application, Northern acquired possession of certain interests and rights authorized by the 2010 Certificate.

Beginning in April 2014, Northern, defendants, and other interest owners within the 2010 Extension Area participated in a nineteen-day condemnation proceeding before a court-appointed panel of commissioners, including presentation of evidence and argument of counsel. The commission issued its Report on August 26, 2014.

The Report[29] found that from 1984 through 1994, injected volumes and withdrawal volumes in and from the Cunningham Storage Field matched. Between 2003 and 2009, some two dozen gas wells were completed in the upper portion of the Viola within the 2010 Extension Area. When production began in the 2010 Extension Area, injected storage

---

[29] Northern presents an extensive summary (Dkt. 730 ¶ 36(a)-(z); Dkt. 732 ¶ 46 (a)-(z)) of the findings from the Commission. Nash responds (Dkt. 750, at 3) only by arguing that the findings by commission should have no preclusive effect here, citing its arguments in support of its Motion to Exclude (Dkt. 736). L.D. Drilling makes the same argument (Dkt. 751, at 8-10), but challenges some particular facts as unfairly characterizing the conclusions of the Commissioners. As noted elsewhere in the present Order, the court finds that the essential conclusions of the Commission as to the nature and extent of the migration of the gas are entitled to preclusive effect, even if every detailed (A to Z) factual finding is not to be taken as *conclusively* established. Neither defendant here supplies any independent contrary evidence undermining the findings of the Commission.

gas volumes in the Cunningham Storage Field began to exceed withdrawal volumes, indicating migration out of the field.

The Report found that the deviation in inventory that began in 1995 roughly corresponded with the beginning of production from the Holland 1-26 and Young 1-26 wells, operated by Nash Oil & Gas, Inc., in the 2010 Extension Area. As more wells were drilled and produced in the Area, the rate loss increased. Production rates at the Defendants' wells climbed exponentially, and migration increased exponentially.[30]

Looking at both geology and historical evidence, the Report determined that the Viola formation in the 2010 Extension Area did not contain appreciable amounts of native gas. The Report determined that prior to storage operations in the Cunningham Storage Field in 1978, the Viola formation in the 2010 Extension Area was completely saturated with water, precluding any accumulation of native gas of any consequence. And there is no structural feature, such as a dome or anticline, which would allow gas to accumulate in the 2010 Extension Area. As revealed in a core sample from the Guthrie 1-31 well, the very top few feet of the Viola was highly fractured. This fractured layer extends across a substantial part of the middle of the 2010 Extension Area. Virtually all of the wells drilled in the 2010 Extension Area after 2002 were completed only in the top few feet of the Viola,

--------------------------------

[30] L.D. Drilling challenges (Dkt. 751, at 9) as misleading some of the Commission findings cited by Northern on the grounds that these are taken from the Commission's summary of Northern's position. The court finds that the summary set forth above fairly characterizes the conclusions of the Commission, which explicitly found as "reasonable and supported by the evidence" expert Brush's assessment of the migration. (Report, at 17).

which had a ferocious water drive that would cause greatly increased water production if the wells were allowed to penetrate beyond the top seven feet. Based on the history of the 2010 Extension Area, the Report found it likely that it held no appreciable volume of gas before storage began at the Cunningham Field. When the Young 1-26 well was drilled in 1985, the gas sample taken from the drill stem test was almost entirely storage gas.

The 2010 Extension Area is in pressure communication with the Cunningham Storage Field and once the Field was developed gas was, in fact, migrating from the Cunningham Storage Field to the 2010 Extension Area on a more or less continuous basis.

During the initial fill-up of the Cunningham Field, Northern lost approximately 1.4 Bcf of a mixture of storage gas and native gas to migration, and from 1978 to 1984 Northern found that it lost approximately 17 to 18 Bcf from the Viola formation. The Field was then stable, and there was no further material migration of gas to the 2010 Extension Area until production in the Extension Area began in 1995. An additional 3.15 Bcf of gas accumulated in the 2010 Extension Area to replace water produced from the Viola by operators in the 2010 Extension Area.

The 1.4 Bcf of gas which migrated during fill-up ended up in the vicinity of Nash's Young and Holland wells in the central part of the 2010 Extension Area. However, the rest of the Viola remained saturated with water. Gamma ray-neutron logs from the 2010 Extension Area showed that only the upper portion of the Viola contained gas.

The Report noted that drill stem tests from wells drilled in the Area before 1994 showed gas in only economically insignificant amounts. Several wells were drilled in the

Extension Areas prior to 1994; the Viola portions of all but two tests were considered non-economic, resulting in dry holes. The two tests showing recoverable gas were from Nash's Holland 1-26 and Young 1-26 wells, which were most likely fed by gas that migrated from the Cunningham Field during initial fill-up. There is no evidence of a substantial accumulation of gas in the 2010 Extension Area prior to commencement of production therefrom in 1994. Pressure and production data clearly show that there simply could not be a large volume of gas in the 2010 Extension Area supporting production from the defendants' wells therein.

Historical data reveals an "uncanny relationship" between production rates for the Extension Area wells and the pressure in the Cunningham Field, with the overall rate of production from the Extension Area Wells rising and falling in virtual lock-step with pressure in the Field. When pressure in the Cunningham Storage Field declined, production rates out of the 2010 Extension Area declined precipitously, even to the point that some of those wells essentially ceased production altogether.

The court adopted the Commissioners' Report in its entirety. All parties appealed various aspects of the resulting condemnation award, but no party appealed or challenged any of the Commission's factual findings which have been noted here.

**Nash's claims**

Beyond the established fact that Northern's gas has migrated, Nash is unaware of any ultrahazardous activity in which Northern has engaged. Asked about his company's

claim, Jerry Nash testified that he "wouldn't say that [migrated gas] is harmful to us. Certainly not in a hazardous way."

Before the shut-in, Nash was earning an average of $500,000 per month from its Extension Area Wells. While Nash complains that the wells had to be shut in as a consequence of the dispute between the parties, Nash agrees that it benefitted from the presence of storage gas under its wells.

Nash stopped producing gas from the wells in August 2010, and states that it shut-in the wells because its source of income was taken away.

Nash states that from 1994 to 2010, the wells produced $19 million in gross income. ONEOK's records show that for the three-year period of November 2006 to October 2009 it paid Nash a net amount, after taxes and fees, of $20,523,206.72. The gross value of Nash's production during that time period was $24,011,292.71. In addition, for production from November 2009 through June 1, 2010, Nash was paid $3,038,876.33.

ONEOK suspended payments to Nash in October of 2009. Nash shut in its wells in the Extension Area in August, 2010. ONEOK continues to hold a "small amount" of proceeds in suspense for Nash's production from June 1, 2010 through August 2010.

Asked to describe how it was damaged by Northern's alleged negligence or the presence of storage gas under the Nash Well, Nash testified "because my whole field ... was condemned because of storage gas being in the Extension Area."

Q. And, it's Nash's position that it was damaged by the presence of storage gas in the Extension Area?

A. Yes.

Q. And, is that because of the ability to produce more gas beyond the $19 million worth of gas that was produced was taken from you?

A. Yes. The fact that I was no longer able to produce, [Northern] condemned the whole acreage.

In addition, Nash describes its alleged damages as follows:

> Northern sent a letter stating that ONEOK was purchasing stolen gas from Nash Oil & Gas, therefore ONEOK suspended an average of a half million dollars a month income which in turn caused Nash Oil & Gas to have to shut the wells down because we couldn't operate without some source of income.

Nash concedes there are no false statements in the letters sent by Northern to ONEOK in October of 2009. Jerry Nash testified that in October 2009 "[i]t was true" that Northern had, in fact, asserted claims in federal court against Nash for conversion because Northern believed that Nash was producing storage gas that Northern owned.

However, Nash contends that Northern's 2009 representations to ONEOK became false when the Kansas Supreme Court ruled, in 2013, against Northern's conversion claim as to gas produced before June 1, 2010.

Nash concedes that Northern had, as represented in the 2009 Letters, sued Nash for conversion. Other than the 2009 Letters, Nash is not aware of any other communications between Northern and ONEOK that led ONEOK to suspend payments to Nash. ONEOK had the contractual right to suspend payments to Nash.

Asked to identify any knowing and reckless falsehoods Northern has allegedly made, which serve as a basis for its Defamation and Slander of Title counterclaim, Nash identified: asserting the conversion claim in this action, a statement allegedly made by Tom Mertz to members of the media that Nash was siphoning gas from the Cunningham

Storage Field, and other statements made by Northern published in various media accounts.

Nash claims Northern's representatives have made false and defamatory statements that Nash was siphoning or stealing gas from the Cunningham Storage Field that were published in the Hutchinson, Kansas newspaper. Nash contends Northern's alleged false and defamatory statements are contained within a collection of news articles that were identified as Exhibit 5 to Nash's May 22, 2017 30(b)(6) deposition. Outside of the alleged false and defamatory statements contained within those news articles and the 2009 Letters, Nash is not aware of any other allegedly false and defamatory statements made by Northern about Nash.

The effects of the media articles are unclear. Nash contends that the articles damaged its reputation, "causing Nash's lender to restrict Nash from drawing on its line of credit other than for litigation costs." (Dkt. 750, at 6). The cited portions of the Jerry Nash deposition are equivocal as far as causation, indicating that at some point after ONEOK began holding funds it suspense, Nash's bank refused drawing on the line of credit.

Nash generally indicates a lack of familiarity with the actual content of the media articles. Thus, he emphasizes (Dep. at 128) "the way I perceived" the articles as "saying we're a thief and stealing gas and whatever, cutting the fence and herding your cattle out, or whatever was said." The July 20, 2010 Associated Press article published in the *Pratt Tribune* does not make reference to any blatantly illegal activities such as fence cutting or

82

cattle rustling. It does reference Northern's move to condemn properties in the Extension

Area, and states:

> Northern Natural Gas spokesman Mike Loeffler said the goal is to stop drilling by third-party natural gas producers, who the company contends have been essentially siphoning off their stored gas supplies by changing the geological pressure. The company believes that the drilling has sucked gas away from what had been a stabilized field.

A March 27, 2010 *Hutchison News* article reported on the "ongoing, complex

quarrel" involving the Cunningham Storage Field. After noting Northern's 2009 FERC

application, the articles states that "a large group of mineral owners and the Haynesville

Township sought a change in state laws … to repeal a 1993 prohibition against third

parties collecting migrating gas." The article included a statement by an attorney for the

landowners that existing law "creates real difficulties for landowners," including "the

potential to lose significant revenues." The requested legislation would "level the playing

field between us and a utility like Northern Natural."

The article then includes a response from Northern:

> Reinstating the pre-1993 "rule of capture," said Northern spokesman Mike Loeffler, "would legalize theft."

> "We think it's bad policy," Loeffler said. Not just for Northern, but for other operators in the state. It sends a chilling message regarding property rights. What's being done is for the unjust enrichment of a few."

> …

> According to Northern, there are several factors that support its allegations that its gas has migrated more than 5 miles north and that other companies are knowingly taking it, to the tune of $1 million to $1.2million a month in lost gas.

> "It's important to note that from 1947 to 1977 there were no producing gas wells drilling the proposed extension area," Loeffler said. "People trying to produce in

the area found no natural or native gas. There were 12 dry holes. Now 33 of the most prolific natural gas wells have been drilled and are drilling in that area. We know you cannot go from dry holes to prolific gas."

Production records for some of these recent wells also show, he said, that gas flows increase when Northern injects new gas into storage.

Native gas from the region is historically high in helium content, Loeffler said. Gas drawn from at least two of the wells on the northern edges of the new boundary Northern is seeking, however, have low levels of helium, closely matching the makeup of gas in Northern's storage.

"You can tell from the gas composition they are producing our storage gas," he said. "We know wells between 4 and 5 miles north of our facility are producing our gas. That gas belongs to our customers. Storage services are very important to them because it's the way to manage gas price volatility."

No one has ever told Jerry Nash that they would refuse to do business with Nash because of any statements made about Nash by Northern that were published in the news, and Nash has no evidence that "anybody has chosen not to do business with Nash Oil & Gas because of something they read in the newspaper."

With regard to damages claimed by Nash in this litigation, Nash intends to rely solely on expert testimony. Nash's expert petroleum engineer, John Paul Dick, agrees the Producer Defendants benefited from the presence of storage gas in the 2010 Extension Area.

Before the 2013 Kansas Supreme Court decision, Nash was concerned that the Court might rule in Northern's favor. In fact, it engaged in efforts in 2010 with the Kansas Legislature to change K.S.A. § 55-1210 to ensure that producers like Nash would be immune from claims that they were producing storage gas.

84

Nash would have continued to produce gas from the Nash Wells even if they had not been condemned.

From December 1994 through February 2011, the Operator Defendants produced in excess of 12.7 BCF of gas from the 2010 Extension Area.

In 2013, the Kansas Supreme Court rejected Northern's conversion claim as to gas produced from Extension Area wells prior to June 2, 2010. The court held that pursuant to Kansas law, title to such gas passed to the producer defendants.

In 2014, the Pratt County, Kansas District Court held that the producer defendants had title to produce gas in the Extension Area after June 2, 2010, and the producer defendants in the present action accordingly claim damages for the amounts of gas they could have produced from date of shut in after June 2, 2010 and the Date of Taking in the Condemnation Action (March 30, 2012).

**L.D. Drilling's Actions**

The primary focus of L.D. Drilling's business is the production of oil. Geologist Kim Shoemaker testified in May 2017 that in the preceding five years he had worked with the defendant to drill approximately 100 wells in Kansas. During that time, L.D. Drilling did not have trouble finding buyers for oil or gas produced from its wells in Kansas, including wells in Pratt, Reno and Kingman counties, Kansas. Excluding wells inside the 2010 Extension Area, Northern's actions, litigation and regulatory actions did not impact, in any way, L.D. Drilling's ability to drill, complete, or sell gas from wells in Kansas.

85

Despite Northern's actions, litigation, and regulatory actions, L.D. Drilling continued to produce and market gas from the Section 28 Area and sell that gas to Lumen. Shoemaker testified in 2017 that L.D. Davis's reputation was and had been excellent. He could not identify anyone who would have refused to do business with him or his company.

Northern's actions did nothing to interfere with L.D. Drilling's ability to conduct business in Kansas.

The presence of storage gas in the 2010 Extension Area did not harm L.D. Drilling in any way. Shoemaker testified that "other than being somewhere where it maybe shouldn't be," the storage gas was not harmful or hazardous. Indeed, J.P. Dick testified that the presence of the gas was beneficial to L.D. Drilling, and members of the L.D. Drilling Group.

Gas production from the L.D. Drilling Wells in the 2010 Extension Area resulted in an estimated $17,216,062.64 in net revenue from the date of initial production of each well until the date on which each well was shut-in on or around February 2011. Total third-party production from the Viola formation in the 2008 and 2010 Extension Areas up to the Date of Taking in the Condemnation Case was approximately 15.2 Bcf. From 1994 through February 2011, the Operator Defendants produced in excess of 12.7 BCF of gas from the 2010 Extension Area.

Outside of the 2010 Extension Area, Northern did nothing to force L.D. Drilling to abandon production.

Northern's original motion was premised in part on a May 24, 2017 stipulation in which L.D. Drilling agreed that its damages would be presented by an expert available for deposition, that its attorney fees claim was a component of its intentional tort claims; that it might seek statutory attorney fees; and that "the amount or measure" of its damages "is the lost production from the date ... the 2010 Extension Area wells were shut-in to the Date of Taking set forth in the condemnation action." Northern contended that the stipulation is in conflict with the additional claim that L.D. Drilling should also be able to recover a $578,877 penalty it paid to Lumen under the Facilities Agreement because "L.D. Drilling could not meet minimum delivery obligations." The defendant has produced evidence that compensation for the Lumen penalty was not part of the stipulation, and Northern agrees now (Dkt. 760, at 8) that it is not entitled to partial summary judgment on the effect of the stipulation as to the defendants' counterclaims for waiver and estoppel.[31]

---

[31] This factual narrative incorporates the Producers' additional statements of fact, to the extent these are supported by admissible evidence, are not merely duplicative of Northern's facts, and do not attempt to dispute essential factual findings from the Condemnation Action. Many of the additional facts by the defendants (Dkt. 750, ¶¶ 11-12, Dkt. 751 ¶¶ 3-8, 27, 28) are simply repetitive of the above facts, establishing that the Cunningham Storage Field is not sealed, that a significant breach exists, and that migration occurred quickly. Some of L.D. Drilling's additional facts—such as the contention that there was a substantial amount of native gas recently displaced by storage gas (Dkt. 751, ¶¶ 31-32) appears to be contrary to the Commissioners' findings that the Field, after an initial fluctuation, had achieved significant stability without migration after the mid-1990s.

Otherwise, the facts presented by L.D. Drilling (*id*. ¶¶ 9-26) as suggestive of negligence by Northern may well be relevant to the intent and knowledge of the parties, and whether the relative use of the land was reasonable. But those facts are not controlling or material to the issue not before the court—whether the defendants were injured in a way which would support the counterclaims presented by them.

## Conclusions of Law

Producer defendants Nash and L.D. Drilling have both counterclaimed against Northern for nuisance, negligence, ultra-hazardous activity, and lost production due to wrongful injunction. In addition, defendant Nash advances counterclaims for defamation, slander of title, and tortious interference with contract. The court finds that summary judgment should be granted as to the counterclaims advanced by the producer defendants.

Northern argues in support of its motion that the common counterclaims fail because the defendants were not damaged by the migration of storage gas, their interests in land were not unreasonably interfered with, and the migration of natural gas did not pose any hazard justifying a tort claim under Kansas law. It also argues that the defendant's claims of damages for production after 2010 FERC certification are barred by law. Finally, with respect to Nash's additional counterclaims, it argues that it made no false and defamatory statement of fact which would justify relief, and that Nash has failed to show any tortious interference. The court concurs.

This court has explicitly determined it was "clear that the [FERC] certificate means Northern retains title at least to any storage gas that has migrated or will migrate to the Expansion Area from June 2, 2010 and thereafter." (Dkt. 420, at 31). The Tenth Circuit reached the same conclusion: "Kansas law merely prohibits the Landowners and Producers from recovering the value of storage gas that Northern both (1) originally owned and injected, and (2) acquired certificate authority over." 862 F.3d at 1232. Thus,

"certification extinguished any property interests the . . . Producers may have held in the gas before that date." *Id*. at 1225. And again: "Producers had no right to produce such gas after the date of certification." *Id*. at 1227-28.

Of course, the defendants argue that Kansas law compels a different result, citing the 2014 Pratt County decision indicating that the Producers could acquire title up to the actual Date of Taking in the action. This court, of course, is obliged to follow Kansas law as articulated by the Kansas Supreme Court. But the Pratt County decision carries no precedential authority, and nothing in that decision provides any reason for this court to depart from its earlier ruling. More importantly, the clear and explicit ruling by the Tenth Circuit is binding precedential authority. The defendants cannot recover for damages due to lost production after FERC certification. Since all the claims for lost profits (or for a contractual penalty based on nonproduction) are keyed to continued production after that date, defendants suffered no compensable damages and their claims are subject to summary judgment.

The claims of nuisance, negligence and ultra-hazardous activity are subject to summary judgment because the subsurface migration of the Cunningham storage gas cannot be reasonably viewed as damage or unreasonable interference with the Extension Area. Such migration occurred deep within the surface of the earth, and defendants have presented no evidence at all that the migration created any hazard to anyone. To the contrary, the migration was a bonanza for the defendants, who eagerly and energetically capitalized on the lucrative opportunity.

The court will independently grant summary judgment on the defendants' claims of injury due to ultrahazardous activity, as the plaintiff's right to dismissal of the claim is clear.[32] Kansas has adopted the Restatement (Second) of Torts §§ 519 and 520 to analyze claims involving strict liability for abnormally dangerous activities. *See Burdette v. Virgindustries*, 2010 WL 11440784, *2-3 (D. Kan. Aug. 4, 2010). Under the general rule of Section 519, a person engaged in "an abnormally dangerous activity" is liable for any resulting harm to person or property. In deciding whether an activity is "abnormally dangerous," the court consults the factors set forth in Section 520:

    (a)  existence of a high degree of risk of some harm to the person, land or chattels of others;

    (b)  likelihood that the harm that results from it will be great;

    (c)  inability to eliminate the risk by the exercise of reasonable care;

    (d)  extent to which the activity is not a matter of common usage;

    (e)  inappropriateness of the activity to the place where it is carried on; and

    (f)  extent to which its value to the community is outweighed by its dangerous attributes.

---

[32] The court need not, and does not, address Northern's additional argument that the Producer defendants lack standing to raise any nuisance claims, since they possess only a personal property interest under Kansas law, rather than an interest in land required to bring an action for nuisance. *See Riverview State Bank v. Earnest*, 198 F.2d 876, 879 (10th Cir. 1952). The defendants counter that a production lease is a hybrid interest under Kansas law, justifying an action for nuisance. *See Ingram v. Ingram*, 214 Kan. 415, 420, 521 P.2d 254 (1974) (an oil and gas lease is a hybrid property interest which, depending on the context, may be treated as personal or as real property). "To be certain," Northern acknowledges, "a review of the leases itself is required." (Dkt. 732, at 35). But since the court otherwise determines that the nuisance claims should be dismissed because the gas migration benefitted rather than interfered with land in the Extension Area, it is unnecessary to address the issue.

Comment f to his section provides that all or several of the factors must be present. "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm that results from it, even though it is carried on with all reasonable care." *Id.* Comment l provides that "[w]hether the activity is an abnormally dangerous one is to be determined by the court."

Under Kansas law, "[the] drilling and operation of natural gas wells is not an abnormally dangerous activity." *Williams v. Amoco Prod. Co.*, 241 Kan. 102, 734 P.2d 1113, 1123 (1987). This is generally consistent with the conclusions of other courts. *See Indiana Harbor Belt R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir.1990); *Ely v. Cabot Oil & Gas*, 38 F.Supp.3d 518, 529-520 (M.D. Pa. 2014) (in the absence of other evidence, subsurface natural gas drilling is not considered an ultra-hazardous activity).[33]

Moreover, recovery under strict liability for ultrahazardous activity requires that the resulting harm be "the type of harm that would be anticipated as a result of the risk created by the ultrahazardous activity." *Andrews v. Plains All Amn. Pipeline*, 2017 WL 10543401, *5 (C.D. Cal. Aug. 25, 2017) (citing *Venoco, LLC v. Plains Pipeline*, 2016 WL 10646303, 11 (C.D. Cal. Sept. 26, 2016)). As a result, even in jurisdictions where oil-related activities are considered ultra-hazardous, a party claiming purely economic damages

---

[33] The result may be different if additional facts demonstrate a heightened danger of a threat to human safety. *See McLane v. Northwest Natural Gas*, 255 Or. 324, 467 P.2d 635, 637-38 (1970) ("storage of large amounts of natural gas in a populated area to be such an activity").

caused by a shutdown of operations cannot recover under this doctrine since, these are not damages "in the same category as the sorts of harms that would be expected from abnormally dangerous activities involving oil." *Id*.

Here, Nash presents no justification for treating the subsurface storage of natural gas in a rural area as an ultrahazardous activity. There is no evidence of any actual risk of physical injury to any human, no evidence of any damage to chattel, and the only effect on the real estate in the Extension Area was to increase its value. Further, even if the migration somehow negatively affected the value of the land in the Extension Area, or caused any economic injury to Nash (which it did not), it still may not recover because such economic injury is entirely unrelated to the type of threat to human safety which the ultrahazardous activity doctrine is designed to redress.

The court also grants summary judgment as to the additional tort claims filed by Nash, which has presented no evidence of any false and defamatory assertion of fact which has injured its reputation. The 2009 ONEOK letters merely establish that Northern was contending (as it contends now) that Nash was wrongfully producing storage gas and it was attempting to legally protect its rights. In 2009, the actual lawful status of the migrated gas that had migrated prior to the time of the 2010 Certification was unclear. The Kansas Supreme Court did not rule that title had passed to the defendants until 2013. At the time of the ONEOK letters, recent precedent supported Northern's legal claim.[34]

_____

[34] *See N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 632 (10th Cir. 2008) (while K.S.A. 55-1210(c) did not create a separate right of action, it did "abolish[] the rule of capture with respect

The media reports cited by Nash do not demonstrate that Northern made any false representation of fact. The *Pratt News* article quotes a Northern representative statement that the producers were "essentially siphoning off their stored gas supplies." But, as set forth elsewhere in the opinion and as related in detail in the Condemnation Action Commissioners' Report, this was factually correct. In the *Hutchinson News* article, Northern representative Mike Loeffler is quoted as saying that modifying K.S.A. 55-1210(c) "would legalize theft." But this was manifestly an *opinion* as to the hypothetical effect of proposed legislation, presented separate and apart from Loeffler's detailed *factual* explanation, citing historical and geological evidence, for why Northern believed the producers were capturing Cunningham storage gas.[35] As a statement of opinion, it is not actionable. *See Robinson v. Wichita State Univ.*, 2018 WL 836294, *16 (D. Kan. Feb. 13, 2018).

Further, as set forth above, Nash has failed to demonstrate any actual injury to its reputation. The cited deposition testimony from Jerry Nash establishes the lack of such

---

to migrated gas without limit to where the gas migrates." Several months before the letters to ONEOK, Judge Brown in this action had reached the same conclusion — the statute ended the rule of capture "to protect an injector's title" placed in storage, and "[n]othing in this subsection expressly limits its application only to areas that are approved or certified as storage fields." *N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 618 F. Supp. 2d 1280, 1290 (D. Kan. 2009). And, indeed, the cited news reports indicated that Northern's opponents felt the same way, seeking a "a change in state laws [K.S.A. 55-1210(c)]" so as to "level the playing field."

[35] A similar expression of opinion in the same article is expressed by the attorney for the landowners: "There may be some thieves involved here, but no one has determined yet who it is." That is, Northern was the thief.

evidence, and Nash has failed to identify any expert testimony which would document such an injury. There is simply no evidence that the defendant has been injured in any quantifiable way by the ONEOK letters or the news articles. To the contrary, as established elsewhere, Nash's only claimed damages are the inability to produce gas from Extension Area wells after they were shut in. These claims are precluded by law, and summary judgment is appropriate as to the additional claim of defamation.

The same result is true for Nash's slander of title claim. Slander of title is a "false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury." *Safety Fed. Sav. & Loan Ass'n v. Thurston*, 8 Kan.App.2d 10, 648 P.2d 267, 270 (Kan.Ct.App.1982) (citing 50 Am.Jur.2d, Libel & Slander § 539). A slander of title claim requires that a plaintiff suffer special damages. *Saddlewood Downs v. Holland Corp.*, 33 Kan.App.2d 185, 99 P.3d 640, 649 (2004). For purposes of this claim, a "statement is malicious when the harmful act is committed without a reasonable justification." *Southern Star Cent. Gas Pipeline v. Cline*, 754 F. Supp. 2d 1257, 1265 (D. Kan. 2010) (citing *Saddlewood Downs*, 99 P.3d at 649).

In *Saddlewood*, the court upheld the determination that the plaintiff had failed to support its slander of title claim by demonstrating either actual damages arising from a mechanic's lien, or malice in obtaining a mechanic's lien:

> The parties each raise legitimate arguments supporting a determination in their favor. Saddlewood might have a good argument that it was an invalid lien. But we find, as the district court did, that Holland's actions in filing the lien were not malicious as intending harm without reasonable justification. They were permissible for attempting collection of money Holland felt was due and owning.

> There were also substantial facts and arguments tending to support the lien's validity.

33 Kan.App.2d at 198, 99 P.3d at 649.

Summary judgment is appropriate here, as Nash has failed to present any evidence of malice by Northern. The plaintiff acted to protect its interests based on an apparently good faith assessment of the substantial evidence, coupled with favorable contemporaneous interpretations of Kansas law.

IT IS ACCORDINGLY ORDERED, the court grants Northern's Motions for Summary Judgment as to the Producer Defendants' Counterclaims (Dkt. 729, 731), denies defendant's various Motions for Summary Judgment on Northern's nuisance and unjust enrichment claims (Dkt. 700, 702 743, 745); and, with respect to the evidentiary motions, the court grants defendant's Motion to Exclude Expert Testimony on Knowledge (Dkt. 737), denies defendants' Motion to Exclude Disgorgement Evidence (Dkt. 733) and their Motion to Exclude all Reference to Prior Decisions (Dkt. 735); and the court grants in part and denies in part Northern's Motion to Exclude Testimony by Expert Keeney (Dkt. 727).

s/ J. Thomas Marten
J. Thomas Marten, Judge