IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


NORTHERN NATURAL GAS CO.,
      Plaintiff,

    vs.                                    No. 08-1405-JTM

L.D. DRILLING, INC.,
      *et al.*,
          Defendants.


MEMORANDUM AND ORDER

Several motions in limine presently before the court were addressed in a hearing conducted October 15, 2019. Consistent with the rulings at that hearing, and for the reasons provided herein, the court issues the following orders for the fair and efficient trial of the present matter.

## Northern

## 1. Evidence in contradiction of Condemnation Action Findings

By prior Order, the court found that factual findings in the Condemnation Action were entitled to preclusive effect here to the extent those findings were essential to the condemnation judgment. At the time, Northern had identified some six facts which it argued were essential in the Commission Report's assessment of the gas migration, as adopted by the district court in the condemnation action. In its present motion in limine

(and in its contemporaneous requested jury instructions), Northern has now identified 19 facts it alleges should be deemed to have preclusive effect under this standard.

These requested factual findings are set forth in the Appendix to the present Order. Northern asks not only for the court to find that these facts are established as a matter of law, it requests an order in limine precluding the defendants from offering evidence to the contrary. In particular, it singles out the proposed testimony of defense expert Fred Baldassare, who would testify as to the nature of native gas as distinguished from storage gas, and expert Cary McGregor, who would testify that the Field was in fact not stable during what has been called the interim period.

L.D. Drilling presents three arguments in opposition to the accepting the nineteen facts as having been preclusively established: (1) the cited findings were not essential to the judgment, as the only issue in the condemnation action was the appropriate value of the gas (native or storage) in the Extension Area on the date of taking, (2) the cited findings were not actual findings by the Commissioner, but were plucked by the plaintiff from the Commission's summary of Northern's position, and (3) precluding the defendants from challenging some of the findings would prevent them from challenging causation.[1]

_____

[1] In addition to these three legal arguments, L.D. Drilling also presents two complaints that do not rise to the level of a legal objection. First, it complains that Northern's approach of unilaterally presenting its list of facts entitled to preclusive effect is "draconian" and frustrates its preferred solution of presenting "an agreed statement or stipulation by the parties." (Dkt. 807, at 5). While this would certainly be the preferred result, it is insufficient grounds to deny collateral estoppel where it might otherwise be applicable. Further, the complaint carries less weight when defendant fails to identify any of the 19 facts to which it would concede. Rather, it simply states that "there are aspects of Northern's proposed preclusive facts that are not

The first argument has already been resolved against the defendants. The valuation of the gas in place was the ultimate issue in the condemnation action, but to decide that, the court (and the Commission) had to address how the gas migrated. Thus, the condemnation court previously recognized as "patently obvious that the mechanism by which any storage gas occurred has a bearing on how much gas went into the Extension Area and when it did so." (Dkt. 790, at 7-8). And this court recently determined that the Commissioners had reached "ultimate conclusions as to the nature and cause of the migration." (Dkt. 711, at 35). While the amount and nature of native gas in the Extension area was not an ultimate issue, resolving the question was again an integral part of how the condemnation court reached its bottom line.

The court agrees that general conclusions as to the size and nature of the migration were essential parts of the condemnation decision. And the calculation of native gas, if not an independent and explicit goal of the Commission, nevertheless was an essential part of the math. As the court in the condemnation action observed, evidence about "native gas in the Extension area remained essential to the Commission's methodology and calculations." (Dkt. 1100, at 6).

It is true that some of the 19 proposed findings appear within the section of the

---

controverted," without specifying what those are. (Dkt. 807, at 4).

Second, it complains that it, and Northern, expended substantial resources in discovery on the issue of causation, and that this effort would be "an expensive exercise in futility" if preclusion exists. Again, this may be true, but it is not a reason to deny preclusion if it is otherwise appropriate. It simply means that defendants developed their causation evidence on the gamble that preclusion would not apply, and Northern was forced to respond in kind on that chance they gambled right.

Commission Report which summarizes Northern's arguments, particularly with respect to Randal Bush's inventory analysis approach. But it is misleading to suggest that, because of this, they were only *arguments*. To the contrary, after summarizing the approaches of both parties, the Commission decisively rejected defendant's theories, and agreed that the inventory analysis was a "sound and reasonable approach." (Report, at 28). The Commission specifically agreed with Brush's methodology, as did the district court when it adopted the Report and denied the defendant's various objections, including those specifically targeting Brush's assessments. The court concluded:

> The commission's report is fundamentally sound and supported by the record. The commission thoroughly considered the evidence, the instructions, and the parties' arguments. Its resulting determination represents a fair resolution that is both supported by the evidence and consistent with the constitutional requirements of just compensation. The court hereby denies the parties' objections to the report and adopts the report of the commission in its entirety.

(Order of February 5, 2015, Dkt. 941, at 52-53). The court recognized that "the commission proceeded to conduct extensive hearings in an expeditious and fair manner. It then produced a comprehensive and clear report that addressed a welter of arguments and issues arising from a complex set of facts." Order of February 5, 2015 (Dkt. 941 at 52). The court accepted the Brush-derived conclusions that "'[t]he evidence showed there was about 4.55 BCF of gas within the Extension Area on the date of taking. The property taken by Northern should be valued based on that total." (*Id*. at 4). The court specifically rejected the objection that the Commission had erred in this calculation, agreeing with Brush's assessment as the most reasonable assessment, finding that only 1.4 BCF

migrated during the initial fill-up of the Field, and that the Expansion Area was "saturated with water prior to 1978." (*Id.* at 24, 28. *See also id.* at 26 ("had it not been for defendants' production of water and gas, the Cunningham Storage Field inventory would have remained stable at about 44 BCF")).

The court previously emphasized the high standard required for preclusion. "Facts from the condemnation action are preclusive only to the extent they were *essential* for the ultimate condemnation award." (Dkt. 771, at 36 n. 9) (emphasis in original). In resolving the issue, "narrowly-focused factual findings from the Commissioner are likely to be excluded as not necessarily essential to the condemnation award." *Id.* The court finds that, of the 19 facts originally cited by Northern, preclusive effect should exist for 1-13, 16, and 19. These establish the mechanism and scale of the gas migration, the stability of the field at various times, and the absence of native gas; all were essential to the court's ultimate conclusions. Defendants are precluded from offering evidence in contradiction to these facts.

On the other hand, the court finds that the remaining fact conclusions of the Commission, however persuasive in their reasoning and however strongly corroborated and supported by the facts in that case, were not *essential* to the judgment. Such findings provide additional support for the Commission's conclusion, but it is possible that the Commission might have reached a similar conclusion (reflecting the scale of migration and the absence of native gas) without deciding (for example) that the gas moved "along a highly-fractured zone," that native gas is distinguishable by the presence of helium, or

production in the Extension Area was closely correlated with Field pressure.

The Commission was not charged with deciding if any actions of Northern contributed to the migration, was not required to separately and directly address causation, and its conclusions do not necessarily or completely preclude Producer's pushing theory of migration.. Accordingly, the court believes some cited factual conclusions require modification. Thus references to the stated amount of gas being "*drawn* out of the Cunningham Storage Field," (Report at 13-14) (emphasis added) will be modified.[2]

The court grants Northern's motion to clarify that there shall be no testimony tending conflict with the findings identified here as essential.

## 2. Trans Pac Litigation

Northern notes that defendants' witness and exhibit lists contained proposed testimony by expert and fact witnesses as well as nearly 100 exhibits from the *Trans Pac* litigation. Northern acknowledges that it did not succeed in that action, and that "limited testimony is appropriate" in order to explain "the history and development" of the Field. (Dkt. 787, at 14). However, "any detailed … testimony or exhibits" would be irrelevant and wasteful. (*Id.*).

---

[2] The court will further modify the requested facts to the extent that they target "Defendants" as a single group, agreeing with Val Energy that the Commission in the cited sections was not focused on allocating responsibility for any group of producers.

In its response, L.D. Drilling complains that Northern's motion fails to specifically identify which evidence it seeks to exclude, and that as the gas migrated "during some of the same time period involved in this case, many exhibits will be relevant, even if the theories of recovery and defenses may differ." (Dkt. 807, at 10-11). It also argues that evidence of title and the rule of capture remain relevant to the balance of equities, that the factual rulings about migration control here, that Northern raised the issue itself, that the matter was mentioned in Northern's 2005 letter to the KCC, and that the matter is relevant to Northern's knowledge and to the defendants' knowledge. (*Id*. at 12-13).

None of the defendant's proffered rationales warrant wholesale reference to evidence of findings from the *Trans Pac* case. And notably, while castigating Northern for failing to specifically identify evidence from *Trans Pac* that it seeks to exclude, L.D. Drilling does not in its response suggest that it will only offer limited reference to *Trans Pac* – that it does not intend to use those 100 exhibits, or otherwise essentially try *Trans Pac II*. Further, the court notes that the defendants themselves have expressed strong concern with the dangers of importing findings from other actions — vigorously opposing any use of findings by the Commission in the condemnation case, and arguing that references to the preliminary injunction and the FERC certification should be for historical purposes only.

The court will deny Northern's motion. The court has previously determined that the findings in *Trans Pac* do not have preclusive effect here. The case asserted trespass and conversion claims relating to one specific well which has long been out of service.

Still, evidence as to the result of the *Trans Pac* litigation is admissible to show the parties' knowledge of the potential migration. The motion in limine is accordingly denied, but the defendants are cautioned to limit the amount of time they spend on the issue, and the court will issue a cautionary instruction, similar to what is in the proposed instructions, as to the preliminary injunction and the FERC order, that this action is controlled by the evidence actually presented here.

### 3. Northern as Reasonable and Prudent Operator

In its previous Order, the court granted the defendants' motion seeking to prevent Northern's experts from offering the opinion that in various respects the Producer Defendants did not act as a reasonable operator. (Dkt. 771 at 41-44). Defendants argued, and the court accepted, that the repeated contention might confuse the jury by suggesting a negligence standard. *See id.*, at 46 ("such opinions inherently tend to diminish the level of intent required to establish intentional nuisance"). That is, the evidence could lead the jury to infer that the Producers could be liable if they departed from a standard of reasonable care; whereas intentional nuisance requires either an intent to cause a substantial and unreasonable interference, or a substantial certainty of such interference.

Northern's motion argues that same should be true of defendant's evidence. The plaintiff cites the proffered testimony of defendant expert Doug Johnson to the effect that Northern did not act as a reasonably prudent operator, or that it should have acted in a certain way. Conversely, Northern points out that that defense experts John Paul Dick

and Lanny Butner propose to testify that L.D. Drilling and VAL Energy *did* act as reasonably prudent operators.

L.D. Drilling argues in response that the rationale for exclusion (potentially confusing the jury about intentional nuisance) doesn't apply here – there is no nuisance if they were merely negligent. Second and further, "regardless of whether Northern acted prudently," defendant argues that Northern's conduct remains relevant to show both causation and mitigation, particularly with reference to whether there is unreasonable interference." (Dkt. 807, at 15) (citing *N. Nat. Gas Co. v. L. D. Drilling*, 697 F.3d 1259, 1270 (10th Cir. 2012) (quoting *St. David's Episcopal Church v. Westboro Baptist Church*, 22 Kan.App.2d 537, 921 P.2d 821, 828 (1996)).

This is not persuasive. L.D. Drilling is arguing for a trial where its experts can testify that it was a reasonably prudent operator, but Northern's experts cannot disagree. This would generate as much confusion for the jury as the problem the court was originally trying to address. Further, to the extent that the defendants are pointing to the totality of the circumstances "balance of utility" standard for determining an unreasonable interference, that is a two-edged sword – it is a *balance* of utilities, including *that of the defendants*.[3] If balancing utilities weighing requires judging whether Northern

---

[3] Proposed Instruction 18 provides in part:

> Determination of the utility of the conduct of the defendant involves consideration of the purposes of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.

acted as a reasonable gas storage operator, the same test supports judging whether the Producer Defendants acted a reasonable gas producers.

The court concludes that the best approach is to deny the motion in limine while also modifying the prior order barring Northern (and only Northern) from referencing the "reasonably prudent" standard. As a result, both sides may use the term if the evidence otherwise supports it, and the court will address any potential jury confusion by cautionary instruction.[4]

## 4. Expert testimony of corporate knowledge

This is similar to the preceding argument. The court previously granted defendants' motion to bar Northern's experts from testifying about the state of any corporate defendant's knowledge. The court acknowledged the general rule disfavoring expert testimony as to a company's knowledge, and held that the issue should be addressed by documentary evidence or fact witnesses. Northern's motion seeks to apply the same ruling to defendants' experts.

L.D. Drilling's response states that they "agree that expert testimony regarding a corporation's knowledge or state of mind is not helpful or appropriate and do not intend to offer such expert testimony." (Dkt. 807, at 16). However, it then proceeds to state it will

---

[4] See Proposed Instruction 20.

show Northern knew of the gas migration by "fact witness testimony and primary exhibits" and that their "experts may rely on such facts in formulating the opinions to which they testify, and the court will be in a much better position to rule as to the propriety of any opinion testimony thereon in the context of trial." *Id.*

Of course, a court will always be in better position to judge context during trial, but the whole point of a motion in limine is that by the time you have that context, irrelevant or prejudicial evidence will already have been presented. Notably, L.D. Drilling does not now say how such evidence could then be used by its experts. Northern's motion is otherwise valid and the court will not withhold a ruling on the possibility that L.D. Drilling may come up with a rational basis for having expert testimony on corporate knowledge. The court grants the motion, providing that if defendant subsequently wishes to present expert testimony, it may argue for such a result outside the presence of the jury.

## 5. Malpractice Lawsuit

Northern sued its original attorneys in the *Trans Pac* litigation for malpractice. It argues that that action is irrelevant to the present nuisance claim and should be excluded. Northern contends that *Martin Pringle* might be used to suggest that it was overly litigious.

L.D. Drilling's response here is similar to what it said in response to the previous issue, and similarly ambiguous. It says defendants "have no plans" to use *Martin Pringle*

in the manner described," (Dkt. 807, at 16), but still argues the court should deny the motion – both because the case "is part of the history and background of the case," and because it might become relevant depending "upon what facts are developed at trial." *Id*.

As indicated in the previous section, the court will not deny plaintiff's motion which appears otherwise valid simply because L.D. Drilling somehow hopes to find some basis to talk about the case. More importantly, *Martin Pringle* is quite unlike the *Trans Pac* case itself, which did present claims for gas migration at trial and which all parties agree should be addressed (although they differ to what extent). As discussed earlier, any references to *Trans Pac* should be limited — to the extent that the defendants need to address the underlying facts, they should do so directly without attempting to retry the *Trans Pac* case.

*Martin Pringle*, on the other hand, was a legal malpractice action, in which the Tenth Circuit ultimately concluded (in response to a certified question) the relatively narrow question of whether the abolition or the rule of capture by K.S.A. 55-1210 should be interpreted prospectively (as Martin Pringle argued) or retroactively (as Northern essentially if unsuccessfully argued). That case was resolved on narrow legal question (the applicability of a statute) without any trial, the court holding that an injector "loses title to or possession of the migrated gas when the gas migrated before July 1, 1993, the effective date of the controlling statute." *N. Nat. Gas Co. v. Martin, Pringle, Oliver, Wallace & Bauer*, 289 Kan. 777, 791–92, 217 P.3d 966, 976 (2009). Since defendants do not suggest any nonprejudicial reason to discuss *Martin Pringle*, the court grants the motion.

### 6. Northern's Communications with ONEOK and Lumen

Northern seeks to exclude evidence of its communications with ONEOK and Lumen, the Producer Defendants' customers, arguing that the communications (in which it claimed the gas had migrated and stated it was commencing litigation) are no longer relevant after the court dismissed the defendants' counterclaims. L.D. Drilling argues that that "depending on what evidence is presented at trial," the evidence "may be necessary to explain that they [ONEOK and Lumen] suspended revenues due to Northern's claims of ownership made long before June 2, 2010." (Dkt. 807, at 17).

Wait-and-see is an insufficient basis for denial of plaintiff's motion. The court hereby grants the motion. The defendant may come forward and seek leave to raise the issue if it does somehow later become relevant.

### 7. Northern's Affiliation with Enron, Berkshire-Hathaway, and Warren Buffet

Northern moves to exclude references to Enron (a former affiliate), Berkshire-Hathaway (a present affiliate), or Warren Buffet (an investor in Berkshire-Hathaway). L.D. Drilling opposes the motion, noting that some of the early documents mention Enron, and jurors will need to be whether if they have investments in Berkshire-Hathaway.

The court finds that this is an insufficient basis for failing to exclude potentially prejudicial evidence. The defendants have not shown that references to Enron are so numerous or essential that they cannot be addressed by redaction, or simply allowed to stand. In the event that the Enron affiliation is independently raised by any witness or noted by any juror, the court will address they issue by separate instruction. Similarly, the court can inquire about jurors having an interest in Berkshire-Hathaway, without going into the detail of who owns whom.

## 8. Testimony about the law

Finally, Northern seeks to exclude lay or expert "testimony about the meaning or interpretation of various statutes and legal decisions." (Dkt. 787, at 24). It cites the proposed testimony of Butner, who would testify that Val's actions did not constitute a nuisance in light of the rule of capture, and Dick, who would testify in part about the results of the *Trans Pac* case.

L.D. Drilling argues that evidence of the rule of capture remains relevant, citing the prior orders of the court. The effect of these is inconclusive and limited, however. In its Order of September 29, 2010, for example, the court merely observed that the issue of title "could be relevant" to Northern's nuisances and unjust enrichment claims. 2010 WL 2892227, at *17. The court did not directly address the issue. Similarly, in the preliminary injunction order, the court observed (759 F.Supp.2d 1282, 198-1300 (D. Kan. 2010)):

The utility of the defendants' conduct is relevant to the nuisance claim. *See*

Restatement (Second) of Torts, § 826 ("An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if ... the gravity of harm outweighs the utility of the actor's conduct...."). The defendants have a right to produce natural gas to which they or their lessors hold title in the expansion area. Moreover, Northern's erroneous assessment of the underground fault appears to have contributed at least in part to the situation it now claims to be a nuisance, and Northern could also bear potential liability for what amounts to an unauthorized use of the Viola formation in the expansion area.

Northern's motion accordingly is directly linked to the issues surrounding the instructions, here specifically how to define an unreasonable use of the land.

The court first notes that in the injunction, while the court does indicate that the legality of title was weighed in determining if the interference was unreasonable, the court still concluded that "several factors unique to this case nevertheless support Northern's claim that the defendants' production currently constitutes an unreasonable interference." *Id*. Indeed, the court wrote that the legality of production would not trump the otherwise-established nuisance:

The court recognizes that Northern has not yet paid for any such rights, and the defendants thus retain the right to produce native gas unless and until Northern pays compensation pursuant to a lawful condemnation. But at the same time, the defendants do not possess a right to produce storage gas to which Northern retains title, nor do they have a right to unreasonably interfere with a certified storage field.

*Id*. at 1300.

L.D. Drilling in its brief argues that there are "numerous cases in Kansas and elsewhere" holding the lawfulness of a defendant's conduct is a relevant consideration (Dkt. 807 at 20), but it cites only two – one unpublished Kansas Court of Appeals decision,

and one case from Ohio.

In *Brougham Estates Ltd. P'ship II v. Bd. of Trustees of Kansas City Kansas Cmty. Coll.*, 141 P.3d 1199 (Kan. Ct. App. 2006), the Court of Appeals did not hold that legality was a relevant factor for denying a finding of nuisance. Rather, the trial court there had held that a nuisance existed, in part because the defendant's motorcycle school violated local noise ordinances, and the Court of Appeals was tasked with determining whether substantial evidence supported the finding. In the relevant passage of the opinion, the court held that the ordinance was not in fact violated. The case thus simply stands for the proposition that illegality[5] cannot be deemed to support a finding of nuisance where the conduct was not in fact unlawful.

*City of Cleveland v. Ameriquest Mortg. Sec.*, 621 F. Supp. 2d 513, 527 (N.D. Ohio 2009), *aff'd sub nom. City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496 (6th Cir. 2010) addressed a claim of public, not private nuisance, with the attendant unique rules

---

[5] That illegality may be probative of a nuisance is a separate question of whether legality is appropriately considered as separate factor against a finding of unreasonable infringement.

> We do not suggest that the unlawfulness of a defendant's conduct or property use cannot be relevant in some cases to the question of whether the defendant intentionally or negligently caused the nuisance, or even to whether the effects of the interference were sufficiently unreasonable to constitute a nuisance, but it is beyond well-established in Texas that the plaintiff need not prove that the defendant's conduct was illegal or unlawful, and the fact that the conduct was lawful provides no defense to the claim.

*Crosstex North Texas Pipeline v. Gardiner*, 505 S.W.3d 580, 603 n. 12 (Tex. 2016).

adopted in Ohio to police such frequently "[n]otorious vague and ill-defined" claims. *Id.* at 526. And indeed, the court does hold that compliance with regulations "insulates such conduct from suit as a public nuisance," but defendant should have noted the explicit caveat attached to the ruling, the court stressing that "[o]bviously, this conclusion *is strictly limited to qualified public nuisance actions under Ohio common law.*" *Id.* at 523 n. 13 (emphasis added). The court literally emphasized the point: "[A]s noted in *Crawford v. Nat'l Lead Co.*, 784 F.Supp. 439, 445 (S.D.Ohio 1989), "[a]lthough what is authorized by law cannot be a *public* nuisance, it may nevertheless be a *private* nuisance." *Id.*

The issues relating to unreasonable interference and legality are set out in Instruction No. 17 and 18.[6] Notably, none of the underlying authorities recommend any

---

[6] Instruction 18 addresses unreasonable interference. The court notes Northern's objection to the second paragraph in defendants' requested instructions (which is taken from the 2012 appeal), arguing that the balancing of the utility of interests "is not a proper consideration for the jury" because at that point the court was only "determining whether to issue an injunction." (Dkt. 805, at 15).

The court overrules the objection. The language found in the 2012 Tenth Circuit decision is taken from *St. David's Episcopal Church v. Westboro Baptist Church, Inc.*, 921 P.2d 821, 828 (Kan. Ct. App. 1996), which in turn was quoting *Kaplan v. Prolife Action League of Greensboro*, 111 N.C.App. 1, 22, 431 S.E.2d 828, *rev. denied* 335 N.C. 175, 436 S.E.2d 379 (1993), *cert. denied* 512 U.S. 1253, 114 S.Ct. 2783, 129 L.Ed.2d 894 (1994), *overruled on other gds., Sharpe v. Worland*, 251 N.C. 159, 522 S.E.2d 577 (1999), and *Kaplan* was quoting *Pendergrast v. Aiken*, 293 N.C. 201, 217, 236 S.E.2d 787, 792 (1977). It's true that all the most recent cases in this chain (*Northern, St. David's*, and *Kaplan*) were proceedings to enjoin nuisances. But once you reach *Pendergrast*, 293 N.C. at 217, and the authorities cited therein, it's clear that the doctrine is not limited to injunctions but to general nuisance law, including what is now Sections 826 to 828 of the RESTATEMENT (SECOND) OF TORTS.

Kansas courts have repeatedly cited with approval provisions from this Chapter of the RESTATEMENT as to the nature of a private nuisance. *See United Proteins, Inc. v. Farmland Indus.*, 259 Kan. 725, 732, 915 P.2d 80, 85 (1996) (citing § 825); *Sandifer Motors v. City of Roeland Park*, 6 Kan.App.2d 308, 628 P.2d 239 (1981) (same); *Thorpe v. Ryan E. Kraft Trust*, 2019 WL 2147874, *8-9

17

explicit instruction that legality is a defense or a relevant consideration in deciding whether a nuisance exists. And this is consistent with essence of nuisance, which is designed to address infringements of possession by conduct which is otherwise lawful: "at the heart of nuisance is the notion that *the lawful use* has the effect of 'ousting' an adjacent landowner from his estate." *Hendricks v. Stalnaker*, 18 W.VA. 31, 34 n. 4, 38 S.E. 2d 198 (1989) (emphasis added). *See also Northern Nat. Gas*, 697 F.3d at 1271 ("the fact that a business is carried on lawfully and in accordance with ordinary methods does not relieve one from liability if the use is unreasonable and as such constitutes a nuisance"); *Rosedale Drive-In Theater v. Burlington Northern R. Co.*, 1992 WL 135020, *4 (D. Kan. May 29, 1992) ("Contrary to defendant's assertion, even though it may have been lawful for defendant to build the abutment, the abutment may still be the subject of an actionable nuisance"); *Sandifer Motors, Inc. v. Roeland Park*, 6 Kan.App.2d 308, 628 P.2d 239, 245 (1981) ("[a] lawful action may become a nuisance by reason of its negligent performance"); *Helms v. Oil Co.*, 102 Kan. 164, 168, 169 P. 208 (1917) ("[w]hether or not a use which in itself is lawful is a nuisance depends upon a number of circumstances").

Nonetheless, while the court has not found any case which supports expressly instructing the jury that the legality of the annoying conduct may be considered a relevant

_____

(Kan.Ct.App. May 17, 2019) (same); *Ostrowski v. Kathleen S. Lynn Revocable Trust*, 2014 WL 2747571, *13 (June 13, 2014) (citing § 821D); *Culwell v. Abbott Constr.*, 211 Kan. 359, 506 P.2d 1191, 1195 (1973) (citing Chapter 40 generally). There is no reason to think Kansas courts would disavow the Restatement's approach when it comes to the balancing of utilities approach recognized in §§ 826-28 during a trial on the merits.

18

factor in determining unreasonable interference, it also remains true that the authorities cited by Northern simply establish that legality, by itself, is not an automatic defense to a claim of nuisance. Further, the test for unreasonable interference is itself inherently and explicitly a "consider all the facts" approach, which directs the finder of fact to weigh a wide variety of considerations.

Accordingly, the instructions set forth the broad approach recommended by the Restatement for determining whether an interference with land is unreasonable. The court instructs the jury that it can consider a wide variety of factors with respect to the utility of the use of the land.

The court finds that expert testimony on what the law was or meant is inappropriate, and the court grants plaintiff's motion to that extent. However, the court will give a short summary of the history of relevant Kansas law, an explanation that it is provided for the jury to understand all the history and circumstances of the case, coupled with the statement that legality alone is not a defense if the juror otherwise decides that a nuisance would exist.[7]

## Val Energy

Val seeks to exclude any reference to its net revenues, number of employees or finances. In addition, it seeks to exclude evidence about what it "knew, or should have

---

[7] Proposed Instruction No. 19.

known, or should have done, regarding [its] intent or motive in producing gas from wells within the 2010 extension area." Val argues that, as the court has excluded testimony about the knowledge of the defendants, it should also preclude any witness from testifying as to intent. Third, Val seeks exclusion of any references to gas migrating more than a mile from the certified Field "as Northern's gas, our gas, or any other possessive term, claiming ownership of that gas." (Dkt. 789, at 3).

None of the other defendants have opposed Val's Motion, and Northern has agreed in substance with Val's three requests. It agrees that testimony about the size of a corporation is generally irrelevant, but with the reservation or concern that defendants may open the door on the issue if they portray themselves as "they are small, 'mom and pop' companies with few employees or that suggest a lack of financial resources or stability (particularly by way of comparison to Northern)." (Dkt. 798, at 2). Northern agrees that all parties should stay away from offering opinion testimony about the state of mind of a corporate entity, noting that it seeks the equal application of this rule as to defendants' witnesses in its own motion in limine. Finally, Northern

> will agree to instruct its witnesses to make their best efforts to avoid referring to storage gas within the 2010 Extension Area and more than one mile from the certificated boundary of the field as "Northern's" or using possessive terms such as "our" gas—assuming Defendants agree to similarly instruct their witnesses to make their best efforts not to refer to produced gas using possessive terms suggesting it is their gas.

(Dkt. 798, at 4). In the event that any witness erroneously uses such terminology, Northern states that it would not object to an instruction to the jury that title to the gas is

irrelevant to its nuisance claim. The court grants Val's motion.

## L.D. Drilling

L.D. Drilling[8] seeks to exclude evidence relating to (1) its net profits after June 2, 2010 (Dkt. 793), and (2) the findings and fact and conclusions of law in the preliminary injunction order (Dkt. 420) issued December 22, 2010. (Dkt. 794). Both motions are related to the recent decision of the Kansas Supreme Court holding in *N. Natural Gas v. ONEOK Field Servs*, No. 118,239, 2019 WL 4230519 (Kan. Sept. 6, 2019), effectively resolving in Northern's favor the issue of title to the gas after the date of the FERC certification. The first request is premised on the argument that money generated by production after June 2, 2010 was held in suspense, and with the recent Kansas Supreme Court decision those funds are now available for recovery in the state action. Accordingly, the Non-Operating Defendants will not have received any benefit from the production. (Dkt. 793, at 4). In the second motion, L.D. Drilling (and the Estate of L.D. Davis) argues that in the wake of that decision the injunction itself (which the court previously stated could be referenced for historical purposes) is now irrelevant, but that if the court believes such references are allowed they should be strictly limited to:

> the fact of the preliminary injunction itself and when the preliminary injunction became final and effective, or which parties were covered by the preliminary injunction, subject to an appropriate cautionary instruction. However, arguments and evidence concerning the reasons for the

---

[8] The Non-Operating Defendants join in the motions. (Dkt. 802).

> injunction or the Court's findings of fact and conclusions of law are
> irrelevant, highly prejudicial, and run the substantial risk of misleading and
> confusing the issues before the jury.

(Dkt. 794, at 2). In particular, the defendant is concerned with Northern's reference in a

prior pleading (Dkt. 747, at 43) to the necessity for hearing evidence as to "the reason for

the injunction."

With respect to the first motion, Northern agrees that the revenues from the

production after June 2, 2010 are not recoverable as a part of its unjust enrichment claim

in this action. However, it opposes the motion because production after the certification

is relevant to essential elements of it nuisance case against the producers, including intent

(Northern must show the producers knew they were interfering with Northern's

property interest, or were substantially certain this would occur), and that the

interference was unreasonable (which requires evaluation, as noted elsewhere, of a broad

range of factors, including the size and length of the interference). As to the first, the

plaintiff notes that the preliminary injunction order was premised in part on the notice

effect of the FERC certification as evidencing intentional interference. (Dkt. 420, at 30).

Northern also states that it does not oppose the second motion "to the extent

Defendants seek to exclude the Court's legal reasoning." but it also argues that evidence

is admissible as to "the injunction itself, its scope and effect, and the factual (as opposed

to legal) reasons Northern sought and obtained the injunction. (Dkt. 800, at 1-2).

There is some merit to both of Northern's arguments. Intent is an essential element

of its case, and (as the court found during the course of the injunction hearing) continued

22

production after FERC certification is probative of intent. However, plaintiff goes too far with respect to the second argument in trying to draw out from the injunction language it wants to use. Northern states that it "does not intend to offer the Preliminary Injunction itself into evidence or to offer testimony describing the *legal* reasons [for it] or the Court's legal analysis (e.g., that the Court found that Northern was likely to prevail on the merits of the its nuisance claim)." *Id*. at 3-4 (emphasis in original), and also states that "[t]he language of the Preliminary Injunction itself illustrates why it is relevant," proceeding to recite various conclusions of the court. *Id*. at 3 (citing Dkt. 771, at 2, 28, 30, 38).

But these were all factual conclusions by the court at the time of the injunction, and this court has already determined that the injunction ruling is not entitled to preclusive effect. Northern is free to explain why it asked for an injunction, but it may not cite language from the Order as independent evidence in favor of its claims here.

IT IS ACCORDINGLY ORDERED this day of October, 2019, that the Motions in Limine of Northern (Dkt. 786), Val Energy (Dkt. 789), the Non-Operating Defendants (Dkt. 792), and L.D. Drilling ((Dkt. 793, 794) are granted in part and denied in part, as provided herein.


s/ J. Thomas Marten
J. Thomas Marten, Judge

APPENDIX

NORTHERN'S REQUESTED FACT FINDINGS

1. Following the 1978 certifications by the KCC and FERC, Northern placed the Cunningham Storage Field in service as an underground natural gas storage field and began to inject natural gas into the Viola formation.

2. The Viola formation underlying the 2010 Extension Area was completely saturated with water prior to Northern's commencement of storage operations in 1978, which means there was no appreciable accumulation of native gas in that area prior to 1978.

3. Approximately 17 to 18 BCF of storage gas was lost from the Viola during the first seven years of Northern's operations.

4. By the early 1990s, Northern determined that some of the 17-18 BCF of storage gas had migrated to the Simpson formation, a sandstone layer lying directly beneath the Viola.

5. Of the remaining 17 to 18 BCF storage gas that migrated during initial fill-up, at most, only 1.4 BCF migrated to the 2010 Extension Area and accumulated in the area of the Young 1-26 and Holland 1-26 wells.

6. During the period from 1984 to 1994, the Cunningham Storage Field experienced stable operations during which there was no further material migration of storage gas to the 2010 Extension Area.

7. Northern again began losing storage gas following the ten years of stable operations as Defendants began to produce natural gas in the 2010 Extension Area in 1995.

8. The deviation in inventory that began in 1995 roughly corresponded with the beginning of production from the Holland 1-26 and Young 1-26 wells operated by Nash.

9. In 2005, Northern obtained FERC approval to drill recycling wells north of the Cunningham Storage Field in an attempt to intercept migrating storage gas, but these wells were ineffective for that purpose.

10. Drilling in the 2010 Extension Area began to increase rapidly, and Defendants drilled some two dozen gas wells in that area between 2003 and 2009.

11. As more wells were drilled in the 2010 Extension Area by Defendants, particularly at and after 2003, the rate of storage gas loss from the

Cunningham Storage Field increased.

12. When water was removed from the Viola by Defendants' wells drilled in the 2010 Extension Area, that water was replaced by storage gas drawn from the Cunningham Storage Field.

13. The "inescapable conclusion" from the evidence is that, once the gas and water production from the Viola wells in the 2008 and 2010 Extension Areas are accounted for, the inventory analysis of the Cunningham Storage Field would yield a fairly stable inventory of roughly 44.6 BCF.

14. Movement of storage gas occurred along a highly-fractured zone in the upper few feet of the Viola.

15. Northern's storage gas losses increased exponentially as Defendants' production in the 2010 Extension Area increased, and there was an extraordinary correlation between field pressure and production rate from the 2010 Extension Area wells, with the overall rate of Viola production from Defendants' wells rising and falling in virtual lock-step with pressure in the storage field.

16. By 2012, an additional 20 BCF of storage gas was drawn out of the Cunningham Storage Field, approximately 15 BCF of which was produced by third-party producers in the 2010 Extension Area, including Defendants.

17. Native Viola gas is distinguished analytically from storage gas by the presence of helium.

18. Had it not been for Defendants' production of water and gas in the 2010 Extension Area, the Cunningham Storage Field inventory would have remained stable after 1995.

19. Migration of storage gas ceased after Defendants' wells were shut-in and the 2010 Extension Area reached pressure equilibrium with the Cunningham Storage Field.